# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### LYNCHBURG DIVISION

ROBERT LEARN,
     Plaintiff,

v.

GROUP LIFE, DEPENDENT LIFE,
ACCIDENTAL DEATH AND
DISMEMBERMENT INSURANCE FOR
EMPLOYEES OF CENTRA HEALTH,
INC.,
     Defendant.

CIVIL ACTION NO. 6:20-cv-0060 NKM

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

Tevis Marshall (VSB No. 68401)
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
Riverfront Plaza - West Tower
901 East Byrd Street, Suite 1300
Richmond, VA 23219
Tel: (804) 663-2333
Fax: (804) 225-8641
tevis.marshall@ogletree.com

-and-

Kyle N. Kirby (admitted *Pro Hac Vice*)
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
Two Monument Square, Ste. 703
Portland, Maine 04101
Tel: (207) 387-2984
Fax: (207) 387-2986
kyle.kirby@ogletreedeakins.com

**Table of Contents**

Table of Authorities  ................................................................................................ ii

Introduction  ........................................................................................................... 1

Undisputed Material Facts  ..................................................................................... 2

   I.  Relevant Provisions of the Group Policy.  .................................................... 2

  II.  Summary of the Plaintiff's Claim and Lincoln's Administrative Review.  ................. 4

       A.  Plaintiff stopped work after receiving an unfavorable performance
           review.  He blamed his poor work performance on his thyroid condition
           and applied for disability benefits.  ........................................................ 4

       B.  Over the course of 2018, as predicted by Plaintiff's endocrinologist,
           Plaintiff's thyroid condition responded to treatment and stabilized.
           Meanwhile, progress notes from Plaintiff's other physicians showed
           no other occupationally limiting conditions.  ......................................... 6

       C.  After collecting updated medical evidence and consulting with an
           independent board-certified psychiatrist, Lincoln determined that
           Plaintiff no longer met his burden to prove entitlement to disability
           benefits.  .................................................................................................. 8

       D.  Following Lincoln's determination, Plaintiff changed physicians and
           appealed.  After a full and fair review, including consultation with
           another independent board-certified physician, Lincoln upheld its
           determination.  ......................................................................................... 10

       E.  Plaintiff changed physicians again, obtained legal counsel, and filed
           a second-level administrative appeal.  .................................................... 14

       F.  Lincoln undertook a full and fair review of the medical evidence—
           including consultation with two additional independent board-certified
           physicians—and again determined that Plaintiff failed to meet
           his burden.  .............................................................................................. 17

Standard of Review  ................................................................................................ 20

Argument  ............................................................................................................... 22

Conclusion  ............................................................................................................. 30

**Table of Authorities**

**Cases:**

Aetna Health Inc. v. Davila, 542 U.S. 200 (2004). .................................................................. 20

Band v. Paul Revere Life Ins. Co., 14 Fed. App'x 210 (4th Cir. 2001). ............................... 21

Bess v. Mutual of Omaha Ins. Co., 2011 WL 5858815 (S.D. W.Va. Nov. 22,
2011). ...................................................................................................................................... 29

Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003). ................................. 20, 25, 28

Booth v. Wal-Mart Stores, Inc., 201 F.3d 335 (4th Cir. 2000). ............................................. 22

Boyd v. Metropolitan Life Ins. Co., 636 F.3d 138 (4th Cir. 2011). ...................................... 20

Brogan v. Holland, 105 F.3d 158 (4th Cir. 1997). ................................................................. 26

Champion v. Black & Decker (U.S.) Inc., 550 F.3d 353 (4th Cir. 2008). ........................ 22, 29

Childers v. United of Omaha Life Ins. Co., 2013 WL 683498 (S.D. W.Va.
Feb. 22, 2013). ........................................................................................................................ 27

Coffman v. Metropolitan Life Ins. Co., 217 F. Supp. 2d 715 (S.D. W.Va. 2002),
aff'd, 77 Fed. App'x 174 (4th Cir. 2003). ......................................................................... 26, 27

Conkright v. Frommert, 559 U.S. 506 (2010). ....................................................................... 21

Davis v. Unum Life Ins. Co., 444 F.3d 569 (7th Cir. 2006). ................................................. 29

Denmark v Liberty Life Assurance Co., 566 F.3d 1 (1st Cir. 2009). .................................... 29

Donnell v. Metro. Life Ins. Co., 165 Fed. App'x 288 (4th Cir. 2006). .................................. 21

Elliott v. Sara Lee Corp., 190 F.3d 601 (4th Cir. 1999). ................................................. 21, 28

Ellis v. Metro Life Ins. Co., 126 F.3d 228 (4th Cir. 1997). ................................................... 22

Evans v. Eaton Corp. LTD Plan, 514 F.3d 315 (4th Cir. 2008). ....................................... 3, 22

Feder v. Paul Revere Life Ins. Co., 228 F.3d 518 (4th Cir. 2000). ....................................... 21

Fine v. Sun Life Assurance Co., 97 F. Supp. 3d 799 (E.D. Va. 2015). ................................. 29

Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989). ............................................... 21

Gorbacheva v. Abbott Labs. Ext. Disability Plan, 309 F. Supp. 3d 756 (N.D. Cal.
2018), aff'd, 794 Fed. App'x 590 (9th Cir. 2019). ................................................................ 24

Harrison v. Wells Fargo Bank, N.A., 773 F.3d 15 (4th Cir. 2014). ....................................... 21

Heimeshoff v. Hartford Life & Accident Ins. Co., 571 U.S. 99 (2013). ............................... 20

Hobson v. Metropolitan Life Ins. Co., 574 F.3d 75 (2d Cir. 2009). ....................................... 29

Johnston v. Prudential Ins. Co., 916 F.3d 712 (8th Cir. 2019). ............................................. 23

Joyner v. Continental Casualty Co., 2013 WL 865846 (W.D. Va. March 7, 2013). .............. 27

Kennedy v. Plan Administrator for DuPont Savings & Inv. Plan, 555 U.S. 285 (2009). ....... 20

Killen v. Reliance Standard Life Ins. Co., 776 F.3d 303 (5th Cir. 2015). .............................. 29

Maniatty v. Unum Provident Corp., 218 F. Supp. 2d 500 (S.D.N.Y. 2002), *aff'd*,
62 Fed. App'x 413 (2d Cir. 2003), *cert. denied*, 540 U.S. 966 (2003). ................................ 26

Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105 (2008). ................................. 21, 22, 29, 30

Patel v. United Omaha Life Ins. Co., 2012 WL 2370129 (D. Md. June 21, 2012). .............. 29

Pettaway v. Teachers Ins. & Annuity Ass'n, 699 F. Supp. 2d 185 (D.D.C. 2010). .............. 27

Piepenhagan v. Old Dominion Freight Line, Inc., 395 Fed. App'x 950 (4th Cir. 2010). ....... 28

Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41 (1987). ............................................................... 20

Rutledge v. Liberty Life Assurance Co., 481 F.3d 655 (8th Cir. 2007). ................................ 29

Scott v. Eaton Corp. LTD Plan, 454 Fed. App'x 154 (4th Cir. 2011). ................................... 25

Silva v. Voya Servs. Co. Employee Welfare Benefit Plan, 2020 WL 2537454
(D.S.C. May 19, 2020). ........................................................................................................... 26

Smith v. Continental Casualty Co., 369 F.3d 412 (4th Cir. 2004). ....................................... 22

Teague v. Hartford Life & Accident Ins. Co., 2006 WL 8455977 (W.D.N.C.
March 17, 2006). ..................................................................................................................... 26

Varity Corp. v. Howe, 516 U.S. 489 (1996). .......................................................................... 21

Whitten v. Hartford Life Group, 2006 WL 1214060 (E.D. Va. April 28, 2006). ................... 27

Williams v. UNUM Life Ins. Co., 250 F. Supp. 2d 641 (E.D. Va. 2003). .................. 25, 26, 27

Wilson v. Reliance Standard Life Ins. Co., 2018 WL 994327 (E.D. Mich.
Feb. 21, 2018). ........................................................................................................................ 26

Withey v. Metropolitan Life Ins. Co., 1994 WL 731584 (D. Colo. Mar. 7, 1994). .............. 27

**Other Authorities:**

Employee Retirement Income Security Act of 1974 ("ERISA"),
29 U.S.C. § 1001, *et seq.* ................................................................................................ *passim*

29 U.S.C. § 1102(a)(1). ................................................................................................ 20

29 C.F.R. §§ 2560.503-1(h). ................................................................................................ 21

Defendant The Lincoln National Life Insurance Company ("Lincoln")[1] moves for Judgment on the Administrative Record.

## Introduction

This case is a dispute over allegedly-due long-term disability ("LTD") benefits governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq*.

Plaintiff Robert Learn was employed as a regional director of rehabilitation services at Centra Health, Inc., a non-profit healthcare system based in central Virginia. On February 10, 2017, he received a negative job performance review, and two weeks later he stopped work claiming that a recent diagnosis of Graves disease, an immune system disorder which results in overproduction of certain thyroid hormones, explained his performance shortcomings. Plaintiff applied for long-term disability ("LTD") benefits based on his thyroid condition, ongoing Iodine-131 treatments for that condition, and underlying complaints of anxiety and depression.

Lincoln initially approved Plaintiff's claim and paid LTD benefits for some twenty-one months, until March 5, 2019. By the time Lincoln stopped paying, Plaintiff's lab tests showed consistently normal thyroid hormone levels for more than six months. In September 2018, Plaintiff's treating endocrinologist opined that Plaintiff had responded to treatment, his hormone levels had become "biochemically euthyroid," meaning normal, and he was no longer medically disabled from his own occupation. LIN2667–68[2]. Plaintiff's treating psychiatrist likewise

---

[1] Lincoln was substituted as the Defendant in this case by this Court's order of January 20, 2021. *See* ECF Doc. #12.

[2] In this memorandum, Lincoln has cited directly to the pages of the Administrative Record (LIN0001 through LIN3215), a true and correct copy of which was filed with the Court on March 12, 2021. *See* ECF Doc. #20.

1

concluded that by the end of 2018, Plaintiff's depression and anxiety symptoms were not occupationally limiting.  *See* LIN2331.

In response, Plaintiff changed doctors and appealed Lincoln's determination.  Plaintiff submitted neurocognitive test results which allegedly showed a cognitive decline, but the testing lacked any validity measures to confirm Plaintiff's best efforts or rule out symptom exaggeration.  According to progress notes, Plaintiff's new psychiatrist subsequently found Plaintiff to be "cognitively intact," LIN0397, and ultimately refused to offer any opinion of continued disability.  *See* LIN0248.  Plaintiff then engaged a new endocrinologist who offered only a conclusory opinion that Plaintiff could not work, but her analysis focused on Plaintiff's so-called "thyroid storm" in 2016 and 2017, and overlooked consistent test and examination results since that time that overwhelmingly showed that Plaintiff was no longer disabled.

Despite Plaintiff's failure to meet his burden to prove his claim, Lincoln afforded him two full levels of administrative appeal, each conducted by claims professionals who were not previously involved in Lincoln's determination.  In all, Lincoln consulted no less than seven medical professionals, including four independent and board-certified physicians, to evaluate the medical evidence in the case.  They came to the unanimous conclusion—agreeing with Plaintiff's original treating physicians—that Plaintiff failed to prove that any medical condition precluded his ability to work on March 5, 2019, and beyond.

Lincoln's final determination was correct, let alone reasonable, and this Court must uphold that determination under ERISA's highly deferential arbitrary-and-capricious standard of review, which is applicable here.

## Undisputed Material Facts[3]

### I.    Relevant Provisions of the Group Policy.

Under the terms of the Group Policy, Plaintiff at all times bore the burden of proving a continuous disability in order to maintain benefits.  The Group Policy provides that claimants must promptly provide "written proof" of any claim.  LIN0142.  It states:

> PROOF OF CLAIM.  The Company must be given written proof of claim within 90 days after the end of the Elimination Period.  When it is not reasonably possible to give written proof in the time requested, the claim will not be reduced or denied solely for this reason, if the proof is filed:
>
> 1.  as soon as reasonably possible; and
>
> 2.  in no event later than one year after it was required.

LIN0142.  Moreover, "Proof of claim must be provided at the [claimant's] own expense." LIN0142.  Such proof "must show the date the Disability began, its cause and degree" and must include, *inter alia*, "a completed statement by the attending Physician, which must describe any restrictions on the [claimant's] performance of the duties of his or her Regular Occupation." LIN0142.

To prove a "Total Disability" during the 90-day Elimination Period and beyond, a claimant must show that "due to an Injury or Sickness [he or she] is unable to perform each of the Main Duties of his or her Own Occupation."  LIN0139.  For purposes of the Group Policy, a claimant's "Own Occupation" refers to "a collective description of related jobs, as defined by the

---

[3] This section is separately captioned "Undisputed Material Facts" solely for purposes of complying with Local Rule 56(b).  However, this title is a misnomer in ERISA benefits cases, such as this, where all facts (disputed and undisputed alike) have been taken from the Administrative Record, and the Court's role is limited to reviewing the reasonableness of Lincoln's determination on the basis of the evidence in that record.  *See*, *e.g*., Evans v. Eaton Corp. LTD Plan, 514 F.3d 315, 321 (4th Cir. 2008) ("[T]he district court functions in this context as a deferential reviewing court with respect to the ERISA fiduciary's decision.").

3

U.S. Department of Labor Dictionary of Occupational Titles," and thus is not limited to the specific job requirements of a claimant's particular employer.  LIN0137.

Absent proof of continuous disability, a claimant's coverage simply comes to an end once he or she is no longer actively working a regular schedule of at least 32 hours a week.  *See* LIN0120 (eligibility requirements for Class 1 employees); LIN0134 (defining "Active Employment").

**II.     Summary of the Plaintiff's Claim and Lincoln's Administrative Review.**

> **A.     Plaintiff stopped work after receiving an unfavorable performance review. He blamed his poor work performance on his thyroid condition and applied for disability benefits.**

Plaintiff stopped work on February 27, 2017, following an unfavorable performance review two weeks earlier.  On February 10, 2017, Plaintiff's supervisor met with him to discuss a variety of job performance concerns.  *See* LIN2197.  These included Plaintiff's "lack of business acumen," his "[i]nability to form a cohesive unit with [his] managers," his team's lack of confidence in his leadership, and his "[i]mpulsivity with tasks and objective," among other items. LIN2197.  Plaintiff's supervisor concluded that he "[l]acks composure at times, [is] easily rattled, and doesn't handle stress well."  LIN2198.

Following this meeting, but prior to stopping work, Plaintiff's treating endocrinologist, Dr. Lester Reed, wrote a letter in which he attributed Plaintiff's job performance shortcomings to a new diagnosis of Graves disease and Plaintiff's inability to normalize thyroid function despite ongoing treatment with Iodine-131.  *See* LIN2072–73.  Dr. Reed said that the effects of Plaintiff's current treatment would produce a "changing thyroid state for another 16 weeks at minimum," and suggested that Plaintiff's job performance should not be assessed "until he has been rendered biochemically euthyroid for a period of 8 weeks or more."  LIN2073.  "Many if not all of his described behaviors," suggested Dr. Reed, "could well have been either directly or

4

indirectly accounted for by the coexistent thyrotoxicosis and subclinical hyperthyroidism."
LIN2073.

Plaintiff applied for LTD benefits on May 1, 2017.  In his application form, Plaintiff said
he was unable to work due to "severe exhaustion, anxiety, depression [and a] significant decline
in cognition."  LIN3044.  But Plaintiff also said that he expected to return to work by September
2017.  LIN3044.

In connection with his application, Plaintiff submitted an Attending Physician Statement
("APS") by Dr. Reed, dated May 7, 2017.  On that form, Dr. Reed said that Graves disease and
depression limited Plaintiff's ability "to focus and attend to details during hormone flux."
LIN2970–72.  Nevertheless, Dr. Reed said Plaintiff's prognosis was "very good" as "the thyroid
condition will eventually [be] completely resolved."  LIN2972.  In three to four months, Dr.
Reed estimated, Plaintiff "should be metabolically euthyroid and mentally stable."  LIN2972.  In
"120 days," Dr. Reed continued, "[Plaintiff] should resolve all of the above limitations and be
fully functional."  LIN2972.

On May 9, 2017, Plaintiff underwent another Iodine-131 treatment for his thyroid
condition.  *See*, *e.g*., LIN1997.  The same day, Lincoln's Vocational Consultant Triska Henry-
Boyd reviewed information from Plaintiff's employer, prepared a vocational analysis, and
determined that Plaintiff's occupation corresponds to the Directory of Occupational Titles
classification of "Director of Rehabilitation Services," an occupation that exists in the national
economy at the "light" physical demand level.  LIN0007.

On May 30, 2017, Plaintiff visited his psychiatrist, Dr. Michael Emerson Judd, for a
follow-up to manage his medications for anxiety and depression.  LIN2941.  At that visit,
Plaintiff denied difficulty concentrating and reported "good tolerance" of his medications and

5

"fair symptom control." LIN2941. However, Plaintiff also said that his fatigue had worsened because "he had another radioactive iodine treatment." LIN2941.

Based on Plaintiff's symptoms being attributed to his thyroid condition and ongoing Iodine-131 treatment, Lincoln Claim Examiner Charles Zimmer approved LTD benefits and wrote to notify Plaintiff of that decision on July 21, 2017. LIN2923. As Mr. Zimmer explained, "Your policy provides benefits as long as you are unable to perform the main duties of your Own Occupation, as defined in your policy." LIN2923. "Occasionally," Mr. Zimmer advised, "we will send you supplementary claim forms to provide us with continuing proof of disability, which will include requesting current medical records." LIN2924.

**B.      Over the course of 2018, as predicted by Plaintiff's endocrinologist, Plaintiff's thyroid condition responded to treatment and stabilized. Meanwhile, progress notes from Plaintiff's other physicians showed no other occupationally limiting conditions.**

Upon approval, Lincoln began paying LTD benefits, and in accordance with Mr. Zimmer's approval letter, Lincoln thereafter periodically requested updated medical information from Plaintiff and his physicians.

On February 12, 2018, Dr. Reed provided an updated APS. LIN2861. Asked to opine on Plaintiff's physical limitations, Dr. Reed ranked them as "Level 3," meaning "[m]oderate limitation on functional capacity; capable of clerical/administrative (sedentary) activity." LIN2861. But he also noted that Plaintiff was "now improving to Level 2," which indicated the capacity to perform up to medium-level physical activities. LIN2861. With respect to psychological limitations, Dr. Reed said Plaintiff was "able to function in most stress situations and engage in most interpersonal relationships (slight limitation)." LIN2861. Asked if Plaintiff currently remained disabled from his own job, Dr. Reed answered "No." LIN2862. Dr. Reed also wrote on the form, "Patient has improved over the last 12 weeks." LIN2861. "In the past

his cognitive function was impaired by high thyroid fluctuation.  He is now improving and expected to fully recover by 3/8/18."  LIN2862.

Laboratory results dated March 8, 2018, showed that Plaintiff's thyroid stimulating hormone ("TSH") and Free T4 levels were both within normal ranges.  LIN2750.  Tested again on April 20, 2018, Plaintiff's TSH level was low, but his Free T4 level remained normal.  LIN2725–26.  The following day, Dr. Reed adjusted Plaintiff's medications.  LIN2716.

Plaintiff visited his primary-care physician, Dr. Peter Gibbs, for an annual exam on April 25, 2018.  LIN2711.  Plaintiff reported that he "feels well with minor complaints, has decreased energy [but] is sleeping well."  LIN2711.  As part of the visit, Dr. Gibbs recorded a mental status exam, which showed Plaintiff to be "Oriented x3 with appropriate mood and affect, able to articulate well with normal speech/language, rate, volume and coherence, demonstrates appropriate judgment and insight[,] and attention span and ability to concentrate are normal."  LIN2713.

On May 29, 2018, Plaintiff visited Dr. Judd, who recorded that Plaintiff's mood was "fair" and that he was without suicidal ideation, hallucinations, or feelings of hopelessness.  LIN1984.  Dr. Judd's mental status exam also showed Plaintiff's insight and judgment to be "good," his thinking to be "logical," and his impulse control to be "within normal limits."  LIN1984.

Laboratory testing on June 7, 2018, and again on September 11, 2018, showed consistently normal TSH and Free T4 levels.  *See* LIN2702; LIN2680.  Following receipt of the September test results, Dr. Reed wrote to Drs. Judd and Gibbs on September 12, 2018, to confirm that Plaintiff has now been "biochemically euthyroid" for approximately six months.  LIN2667–68.  Dr. Reed continued, "Disability insurer Lincoln . . . will be calling [Plaintiff] in

about a week to review the results of these laboratory data and our recommendations."

LIN2667.  "I relayed to him that he is now biochemically euthyroid and that I can no longer

recommend a biochemical basis [for] any disability."  LIN2667.

Thereafter, Plaintiff made regular visits to Dr. Judd on September 12, November 8, and

December 12, 2018.  *See* LIN2797; LIN2789; LIN1945.  Dr. Judd's progress notes from those

visits consistently show that Plaintiff appeared appropriately dressed and groomed, that he spoke

with "normal rate and tone," that his memory and concentration were "[i]ntact," and that his

thought processes were "[l]ogical and goal directed."  LIN2797; LIN2789; LIN1945.  At all

three visits, Plaintiff reported no suicidal thoughts or hallucinations, and Dr. Judd deemed his

judgment to be "[i]ntact."  LIN2797; LIN2789; LIN1945.  In November, Plaintiff self-reported

his mood as "fair," LIN2789, and by the December visit, he reported that his mood was "a little

better."  LIN1945.  Nothing in any of these progress notes indicates that Plaintiff was currently

suffering from anxiety or depression symptoms of such severity that he might be unable to work.

**C.      After collecting updated medical evidence and consulting with an
         independent board-certified psychiatrist, Lincoln determined that Plaintiff
         no longer met his burden to prove entitlement to disability benefits.**

Lincoln ultimately paid LTD benefits for some twenty-one months, until March 5, 2019.

*See* LIN2404.  As part of its ongoing review of Plaintiff's claim, Lincoln obtained copies of the

medical records described above and solicited additional information from the Plaintiff.  *See*,

*e.g.*, LIN2838.

On February 5, 2019, Mr. Zimmer asked Sheila Cordero, a Behavioral Health Clinical

Consultant, to review the current medical evidence and assess what psychological impairments,

if any, continued to limit Plaintiff's ability to work.  As part of her assessment, Ms. Cordero

telephoned Dr. Judd to better understand Plaintiff's functional ability.  LIN0044–45.  Dr. Judd's

8

office told Ms. Cordero to send her questions in writing, which she did, *see* LIN2564–67, but Dr. Judd did not respond.  LIN0045.  Lacking Dr. Judd's input, Ms. Cordero recommended that Lincoln obtain a peer review of the medical evidence by an independent psychiatrist.  LIN0043.

Following that recommendation, Mr. Zimmer asked a third-party vendor to select a qualified independent physician to review the file, and the vendor selected Dr. Phillip Helding, who is board-certified in psychiatry.  As recounted in Dr. Helding's report, which is dated February 22, 2019, he also attempted to speak with Dr. Judd, but Dr. Judd did not respond. LIN2411.  Dr. Helding summarized the medical evidence, including the various mental status examinations in the record.  LIN2412–14.  After determining that from a psychiatric perspective Plaintiff's primary diagnoses are depression and anxiety, Dr. Helding went on to explain,

> The psychiatric information offered and available is actually fairly consistent. It does not describe symptoms of the severity that would typically be expected to cause any functional impairment to the point of not being able to perform work related tasks.

LIN2414.

On March 4, 2019, Mr. Zimmer determined that Plaintiff no longer met his burden to prove entitlement to LTD benefits under the Group Policy and wrote to Plaintiff to notify him of that determination.  [2404–08]  In his letter, Mr. Zimmer quoted applicable policy language, identified and summarized the materials considered, and explained the basis of his determination:

> Dr. Reed indicated on 09/12/2018 that you were no longer considered disabled due to Graves Disease.  As you also had a comorbid condition of depression and anxiety, we evaluated the medical records to assess any potential work restrictions and limitations due to these diagnoses.  A peer review completed on 02/22/2019 noted that there was no medical evidence to support any impairments related to your behavioral health conditions that would result in functional limitations preventing the performance of the essential duties of your own occupation.  Therefore, you no longer meet the definition of Total Disability as indicated in your policy and your claim file has been closed.

9

LIN2407.  Mr. Zimmer also advised Plaintiff of his appeal rights and said that any appeal ought

to include "any additional documentation . . . such as medical treatment records, laboratory

results, x-rays or other testing results" that might support Plaintiff's claim.  LIN2408.

> **D.**      **Following Lincoln's determination, Plaintiff changed physicians and appealed.  After a full and fair review, including consultation with another independent board-certified physician, Lincoln upheld its determination.**

Following Lincoln's determination, Plaintiff visited Dr. Judd for two more regular

appointments, before discontinuing treatment with him.  *See* LIN1935; LIN1955.  Then, on April

29, 2019, Plaintiff visited psychiatrist Dr. Kenneth Fore for an initial evaluation.  LIN2331.

According to the progress note from that visit, Plaintiff reported that he was "not pleased with

Dr. Judd" because "Dr. Judd did not feel he was still disabled."  LIN2331.  Plaintiff told Dr. Fore

that his goal was to "wean off all medications" and that he currently had a "happy mood overall

but [was] still dealing with some lingering cognitive issues."  LIN2331.  According to Dr. Fore's

mental status exam, Plaintiff's judgment and insight were both "fair to good," LIN2332, but in

light of Plaintiff's self-report of cognitive concerns, Dr. Fore referred him to Dr. Joseph Conley

for neuropsychological testing.  *See*, *e.g*., LIN2328.

On May 24, 2019, Dr. Conley examined Plaintiff and administered a battery of

psychological and cognitive tests.  *See* LIN2394–96.  Plaintiff told Dr. Conley that cognitive

symptoms "caused his loss of employment," and that Dr. Judd's "failure . . . to complete required

paperwork" caused a loss of disability benefits.  LIN2394.  Tests for intelligence, auditory and

visual attention, mental tracking, long-term verbal memory, word-fluency, abstract concept

formation ability, mental flexibility, and executive planning ability, all yielded either "average"

and "unremarkable" results or results "contraindicating" any cognitive dysfunction.  LIN2395.

However, one of the tests administered returned a below-average result that, according to Dr.

Conley, "indicat[ed] impaired mnestic function, specifically rapid decay of recently encoded verbal memory traces." [2395] Based on that result, Dr. Conley diagnosed Plaintiff with a "Mild Neurocognitive Disorder," in addition to "Major Depressive Disorder." LIN2396.

On May 27, 2019, Plaintiff appealed Lincoln's determination. LIN2381. In his appeal letter, Plaintiff argued that "the road to euthyroid was both lengthy and arduous" and that while some symptoms, including irritability and anxiety, had improved, his cognitive function had not. LIN2381. Plaintiff especially took issue with the observations of his own physician, Dr. Judd, who said that Plaintiff's cognition, thought processes, and judgment were "intact." LIN2381–82. Plaintiff argued that Lincoln should consider instead the records provided by his new mental health professionals, Drs. Fore and Conley, discussed above, which Plaintiff believed to be more supportive of his claim. LIN2381–82.

Lincoln assigned the appeal to Appeal Claims Specialist Keri Younker, who wrote on June 10, 2019, to acknowledge the appeal. In her letter, Ms. Younker explained that "[i]t is important that we have all available medical records so that we have a clear picture of your current condition." LIN2359. She encouraged him to submit any additional materials bearing on his claimed disability.

Before commencing her review, Ms. Younker also asked Dr. Fore to complete a supplemental information form, which he returned on June 12, 2019, but apparently did not sign. LIN2354–58. Dr. Fore reported that he diagnosed Plaintiff with a "mood disorder (depression + anxiety)" and this condition is "managed well" through various medications and monthly 30-minute sessions. LIN2354–55. Dr. Fore indicated that Plaintiff was currently performing regular "household chores + responsibilities," including routine shopping and bill paying. LIN2358. Notably, Dr. Fore indicated that "increased work demands" were a factor in Plaintiff's

11

decision to leave work but he did not list or describe any medical restrictions or limitations preventing Plaintiff's return to work.  LIN2358.

As to Plaintiff's alleged physical impairments, Ms. Younker asked Registered Nurse Lynn Sucha, a clinical consultant, to review the medical evidence.  After reviewing Plaintiff's medical history, in a report dated June 25, 2019, Nurse Sucha concluded,

> The medical records document the claimant is euthyroid (normal) and stable in September 2018.  The [Plaintiff] has been released to return to work from a medical perspective as of 3/8/18, then again in an e-mail in September 2018. There are no additional medical records beyond 9/11/18, and therefore, the medical records are insufficient in volume and content to support any physical restrictions or limitations from 3/5/19 forward.  Also, there are no providers certifying physical disability for the time period of 3/5/19 and forward.

LIN2346.

As to Plaintiff's alleged neurocognitive limitations, Ms. Younker asked a third-party vendor to recommend an independent physician with an appropriate specialty to also review the medical evidence in the file.  The vendor selected Dr. Edan Critchfield, who is board-certified in clinical neuropsychology.  *See* LIN2347–52.

In his report, dated June 27, 2019, Dr. Critchfield summarized the medical evidence, noting in particular Dr. Judd's mental status exams in late 2018 showing Plaintiff's attention and memory to be "intact" and Dr. Conley's subsequent neurocognitive examination.  LIN2348–49. Dr. Critchfield specifically explained that Dr. Conley's examination "did not include any standalone measures of performance validity," which are typically necessary to show that a patient exerted his or her best efforts on such cognitive testing.  LIN2348–49.  Based on the entirety of the record, Dr. Critchfield concluded,

> Overall, it is this reviewer's opinion that the available medical records do not provide adequate evidence of cognitive or psychiatric symptoms to result in functional impairment.  Neuropsychological evaluation completed 5/24/2019 did not reflect memory or attention deficits of a nature or severity that would

12

be expected to result in functional impairment.  Furthermore, multiple mental status exams have reflected intact memory and attention.  Anxiety and depression have been longstanding, and present during time periods when the claimant had demonstrated the capacity to work.  There is no record that psychological symptoms ever reached a severity necessitating a higher level of treatment, such as intensive outpatient or inpatient psychiatric admission.

LIN2351.

Upon receiving Nurse Sucha's and Dr. Critchfield's reports, Ms. Younker sent copies of both to Plaintiff to provide him with an opportunity to comment and provide any additional information.  LIN2338.  As she wrote, "We are not making a final determination on your disability claim at this time as we want to provide you every opportunity to review our assessment and provide a response."  LIN2338.

On July 30, 2019, Plaintiff submitted additional progress notes from Dr. Fore, including those from his most recent appointments with the psychiatrist on June 25, and July 23, 2019.  According to the June 25, 2019 progress note, Plaintiff told Dr. Fore that he was "miserable" and the two discussed Plaintiff's interest in using CBD oil and Dr. Fore's recommendation that Plaintiff take up exercise.  LIN2325.  At that visit, Plaintiff presented with "[g]ood eye contact," was "well groomed [with] good hygiene," and was "cooperative and friendly."  LIN2326.  Plaintiff denied suicidal ideation, and Dr. Fore rated Plaintiff's judgement and insight as "fair."  LIN2325.  On July 23, 2019, Dr. Fore again noted Plaintiff's "[g]ood eye contact," good grooming and hygiene, and "cooperative and friendly" disposition.  LIN2336.  Dr. Fore also noted that Plaintiff's medications have "no side effects at this time."  LIN2335.  Plaintiff again denied any suicidal ideation or destructive behaviors.  LIN2335.  And Dr. Fore again rated Plaintiff's judgment and insight as "fair."  LIN2335.  In none of these contemporaneous examination records did Dr. Fore express any opinion that Plaintiff was unable to work.

13

Upon review of these additional records, Dr. Critchfield prepared an addendum report

dated August 20, 2019.  LIN2318–22.  He concluded,

> From a neuropsychological perspective, the additional medical records do not
> provide support for cognitive or psychological symptoms of a nature or
> severity to result in functional impairment.  Records indicate the claimant has
> had fluctuating report of depression, which have been treated with outpatient
> psychiatry appointments for medication management.  There was no evidence
> his depressive symptoms were of a severity that he required elevation to a
> higher level of care such as intensive outpatient or inpatient psychiatric
> treatment.  There was no evidence of suicidal ideation, psychotic symptoms,
> or gross neglect.

LIN2321.

On August 30, 2019, Ms. Younker upheld Lincoln's prior determination, and wrote to

notify Plaintiff of her decision.  LIN2311.  In her uphold letter, Ms. Younker quoted the

applicable Group Policy language, reviewed the occupational requirements of Plaintiff's former

occupation as it exists in the national economy, and summarized the procedural history of

Plaintiff's claim.  *See* LIN2311–13.  In explaining the rationale for her decision, Ms. Younker

discussed the medical evidence in the file and the consultation reports prepared by Nurse Sucha

and Dr. Critchfield.  *See* LIN2313–14.  Ms. Younker acknowledged that Plaintiff had been

diagnosed with a thyroid condition as well as depression and anxiety, but she nevertheless

concluded that the totality of the medical evidence did not support Plaintiff's claim that he was

unable to perform the main duties of his own occupation beyond March 5, 2019, the date LTD

benefits were last paid.  LIN2315.

### E.    Plaintiff changed physicians again, obtained legal counsel, and filed a second-level administrative appeal.

A week after Lincoln's first level uphold, Plaintiff visited Dr. Reed for a follow-up

appointment on September 5, 2019, *see* LIN1883–85, after additional lab tests in July 2019

showed that Plaintiff's TSH, Free T4, and Free T3 levels all remained within normal ranges.

14

LIN1509.  On physical examination, Dr. Reed found that Plaintiff's "[t]hyroid [was] not enlarged and not palpable now and the thyroid region [was] without tenderness, or nodules." LIN1885.  Based on such test and examination results, Dr. Reed reduced the dosage of Plaintiff's thyroid medication.  LIN1883.

Thereafter, Plaintiff visited a new endocrinologist, Dr. Meredith Berger, on November 27, 2019, complaining about sleep problems, fatigue, and cognitive decline.  LIN2078.  Dr. Berger administered a depression screening test and interpreted the results to indicate "Minimal Depression."  LIN2078.  Lab tests on that day showed normal TSH, Free T4, and Free T3 levels. LIN2085–86.  Dr. Berger ordered a follow-up round of laboratory tests, completed in December 2019, which again showed normal results.  LIN2056.  When Plaintiff next visited Dr. Berger on February 4, 2020, Plaintiff reported "[f]eeling better than he was" and that he "[c]an now remember multiple step processes where he could not before."  LIN2042.

With the assistance of Attorney Brandon Osterbind, Plaintiff filed a second-level administrative appeal on February 25, 2020.  LIN2242.  Attorney Osterbind's 35-page appeal letter contained a lengthy narrative of Plaintiff's medical history and, focusing on the 2016–2018 timeframe, argued that Plaintiff "was truly on a roller coaster of symptoms with periods of highs and periods of lows."  LIN2267.  In connection with the appeal, Attorney Osterbind submitted new advocacy letters by Drs. Reed and Berger; lay affidavits by Plaintiff and his friends and family members; as well as a voluminous collection of medical articles concerning the effects of Graves disease.

Dr. Reed's letter provided a summary of Plaintiff's course of treatment and attributed Plaintiff's 2016 work performance issues to his thyroid condition.  *See* LIN2069–71. Specifically, Dr. Reed said, "Many if not all of [Plaintiff's] described behaviors between 2016

15

and 2018 could well have been either directly or indirectly accounted for by the coexistent

thyrotoxicosis and subclinical hyperthyroidism and hypothyroidism." LIN2070. "With regard to

this condition affecting his job while at Centre," Dr. Reed continued, "I wrote at the time that I

believed his thyroid function requiring two doses of I-131 and multiple serum measures of TSH

that indicated he was not in an ideal euthyroid stage could have affected his job and especially

given his underlying behavioral health disorder."

While Dr. Berger's advocacy letter also focused on Plaintiff's symptoms between 2016

and 2018, *see* LIN2107–09, she attacked Dr. Reed's prior assessments (and ignored some two-

years of consistently normal test results) when she wrote, "It is unclear how [Plaintiff's]

physicians deemed him clinically euthyroid when his thyroid levels were obviously not

controlled and not stable at any point." LIN2107.[4] Dr. Berger acknowledged Plaintiff's reported

improvement when he visited her in February 2020, but she nevertheless suggested that Plaintiff

was still unable to work and said that it would be "difficult to pinpoint the exact date when he

can." LIN2109.

In an 82-paragraph affidavit, Plaintiff recounted his work history, described the onset of

his disability in 2016, and asserted that memory problems and fatigue continue to prevent him

from being able to work. *See* LIN1349–60. The other affidavits submitted with the appeal

contain general statements and anecdotes from other people concerning Plaintiff's apparent loss

of enjoyment and alleged inability to work. For example, Jason Thompson, a former co-worker,

said, "[Plaintiff] told me that he is no longer able to work because of his medical condition."

LIN1347. Brian Heffernan, a childhood friend, said, "I have spoken to [Plaintiff] about his

---

[4] For the convenience of the Court, Lincoln has prepared a table summarizing Plaintiff's lab
results during the relevant periods before and after Lincoln determined that LTD benefits were
no longer supported. That table is filed herewith as Exhibit A.

declining health and encouraged him to seek medical treatment." LIN1361. Virginia Penn, Plaintiff's mother-in-law, said, he "has lost interests in things he used to be interested in and has lost motivation to do things." LIN1365.

**F.      Lincoln undertook a full and fair review of the medical evidence—including consultation with two additional independent board-certified physicians— and again determined that Plaintiff failed to meet his burden.**

Lincoln assigned the second-level appeal to Appeal Claims Specialist Joseph Jackson. He first sought the opinion of a nurse consultant, who after noting the volume of medical journal articles received with the appeal, recommended a panel review by a board-certified endocrinologist "to assist in assessing the severity of [Plaintiff's] thyroid condition" and a board-certified neuropsychologist to evaluate whether the evidence supports the Plaintiff's alleged cognitive and psychiatric limitations. LIN0415.

Following that recommendation, Mr. Jackson asked a third-party vendor to select a panel of independent physicians for such a review. The vendor selected Dr. Jeremy Hertza, who is board-certified in neuropsychology, and Dr. Poonam Sood, who is board-certified in endocrinology. Together, Drs. Hertza and Sood prepared a panel report on March 27, 2020.

In his section of the report, Dr. Hertza summarized Plaintiff's clinical history and documented his two attempts to confer with Dr. Conley. LIN0416–419. Dr. Conley did not return his calls. LIN0419. Dr. Hertza observed that Plaintiff's reported diagnoses "include major depressive disorder, generalized anxiety disorder, and mild neurocognitive disorder due to thyroid disease." LIN0419. He also noted that while there were many mental status exams contained in the record, none reported functional impairment. LIN0419. As to Dr. Conley's neuropsych exam, Dr. Hertza explained that the exam included "no effort tests with regards to cognition," and "as a result, this test is not interpretable for forensic reasons." LIN0419. After

17

reviewing all of the medical evidence, Dr. Hertza concluded that the record did not support

functional impairment during the time period in question:

> Given mental status exams that do not describe functional impairment, formal assessment with no validity measures, and no indication of high level care, the available medical record is found to not support functional impairment, from 03/05/2019 to present.

LIN0420.  Dr. Hertza also considered the possible side-effects of Plaintiff's medications, and

concluded that the record contained no report of functional impairment due to such effects.

LIN0420.

Dr. Sood, writing a separate section of the panel report, summarized the medical evidence

from an endocrinology perspective.  *See* LIN0422–23.  Dr. Sood made three attempts to confer

with Dr. Berger, but she did not return his calls.  LIN0423.  Focusing on Plaintiff's treatment

from March 5, 2019, and forward, Dr. Sood noted the medication adjustments in the record, but

explained that Plaintiff's lab results during the period were consistently normal.  LIN0423; *see*

*also*, *e.g*., Exhibit A (summarizing lab results).  Accordingly, Dr. Sood concluded,

> There is no functional impairment resulting in restrictions and limitations supported. . . .  While it is possible that thyroid patients don't feel as well on certain formulations of thyroid medication, this does not impact functionality or result in restrictions or limitations.

LIN425.

In a final section of the panel report, Drs. Hertza and Sood, documented their consensus

view, after discussing with each other the potential interaction of the Plaintiff's various

conditions and medications, that the medical evidence did not support functional impairment

beyond the date Lincoln terminated benefits.  LIN0426.

Mr. Jackson shared a copy of the panel report with Attorney Osterbind on April 1, 2020,

to provide an opportunity to respond.  LIN0411.

18

Attorney Osterbind responded on April 22, 2020, by sending two additional advocacy letters—one from Dr. Fore and another from Dr. Berger.  LIN376.  In his letter, Dr. Fore did not express any opinion that Plaintiff remained unable to work.  Rather he said, "I have informed [Plaintiff] that my role is limited in disability determinations to the point of sending medical records.  I feel that anything above and beyond this will start to cause stress in the patient-doctor relationship as some see me 'siding with one party or another.'"  LIN0248.  With this letter, Dr. Fore submitted progress notes from Plaintiff's April 15, 2020, appointment, at which time, Dr. Fore's mental status exam again showed that Plaintiff was "cognitively intact and not in acute distress."  LIN0397.

In her letter, Dr. Berger, again emphasized the events of 2016 through 2018—*i.e.*, events that began before Plaintiff stopped work and ended before Lincoln terminated benefits—and characterized Plaintiff's condition at that time as a "thyroid storm."  LIN0401.  She attributed Plaintiff's report of cognitive decline to his thyroid condition and, without citing any cognitive testing, asserted that Plaintiff "is not capable of ever being able to return to the level of work . . . he was performing prior to 2016."  LIN402.

Mr. Jackson asked Drs. Hertza and Sood to review the newly submitted materials, and they prepared an addendum to their panel report.  LIN0210.  Dr. Hertza made two more attempts to confer with Dr. Conley, but Dr. Conley did not return the calls.  LIN0211.  Dr. Sood made two more attempts to confer with Dr. Berger, but she did not return his calls.  LIN0213.  Both Dr. Hertza and Dr. Sood concluded that the additional information did not support impairment.  In particular, Dr. Hertza noted that Dr. Berger's letter describes cognitive symptoms that sometimes occur with thyroid disorders, but explained that "in this case, these symptoms are not reported to be observed behaviorally."  LIN0211.

19

On May 21, 2020, following his receipt of the addendum to the panel report and a review

of the entire file, Mr. Jackson upheld Lincoln's determination and wrote to Attorney Osterbind to

notify him of his decision.  *See* LIN0203–08.  In his uphold letter, Mr. Jackson recited the

procedural history of the claim and quoted at length from the panel report and addendum by Drs.

Hertza and Sood.  Ultimately, he concurred with the unanimous peer reviewers that the file

shows "no functional impairment from your client performing his own occupation as of March 5,

2019."  LIN0207.  "We therefore find that your client is no longer Totally Disabled under the

terms of our policy."  LIN0207.

### Standard of Review

ERISA represents "a careful balancing of the need for prompt and fair claims settlement

procedures against the public interest in encouraging the formation of employee benefit plans."

Aetna Health Inc. v. Davila, 542 U.S. 200, 208 (2004) (quoting Pilot Life Ins. Co. v. Dedeaux,

481 U.S. 41, 54 (1987)).  In keeping with this purpose, ERISA gives employers "large leeway to

design disability and other welfare plans as they see fit."  Heimeshoff v. Hartford Life &

Accident Ins. Co., 571 U.S. 99, 108 (2013) (quoting Black & Decker Disability Plan v. Nord,

538 U.S. 822, 833 (2003)).  "And once a plan is established, the administrator's duty is to see

that the plan is 'maintained pursuant to [that] written instrument.'"  *Id.* (quoting 29 U.S.C.

§ 1102(a)(1)).  Since the substantive content of the plan is up to the plan sponsor who need not

provide any benefits at all, ERISA claims administrators are required to administer the plan as

written.  *See*, *e.g*., Boyd v. Metropolitan Life Ins. Co., 636 F.3d 138, 140–41 (4th Cir. 2011)

(citing Kennedy v. Plan Administrator for DuPont Savings & Inv. Plan, 555 U.S. 285 (2009)).

Indeed, Lincoln had a contractual and regulatory duty, in connection with its "full and

fair review," to adhere to and strictly enforce all of the terms of the Group Policy, including its

20

explicit proof of claim requirements.  *See* 29 C.F.R. §§ 2560.503-1(h) (outlining procedures

designed to ensure that administrator determinations are made in accordance with the written

terms of the plan).  This duty does not "favor payment over nonpayment," but rather compels an

"impartial account of the interest of all beneficiaries" and "recognizes the need to preserve assets

to satisfy future, as well as present, claims."  Varity Corp. v. Howe, 516 U.S. 489, 514 (1996);

*see also*, *e.g.*, Conkright v. Frommert, 559 U.S. 506, 520 (2010) (holding that ERISA

administrators "have a duty to all beneficiaries to preserve limited plan assets").[5]

To achieve ERISA's careful balance, Courts must also respect the discretionary authority

of claim administrators where such authority is expressly granted in the plan documents.  *See*,

*e.g.*, Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105, 111 (2008); Firestone Tire & Rubber Co.

v. Bruch, 489 U.S. 101, 109 (1989).  Here, the Group Policy expressly confers discretionary

authority, *see* LIN0144, and accordingly, this Court must give deference to Lincoln's

determination and may overturn it only upon Plaintiff's showing that Lincoln abused its

discretion.  Bruch, 489 U.S. at 109 (1989); *see also*, *e.g.*, Feder v. Paul Revere Life Ins. Co., 228

F.3d 518, 522 (4th Cir. 2000).

Under the deferential standard of review, Lincoln's decision should "not be disturbed if

reasonable even if the court itself would have reached a different conclusion independently."

---

[5] In accordance with the express terms of the Group Policy, the proper allocation of proof to the
Plaintiff is also well established in Fourth Circuit law.  *See*, *e.g.*, Harrison v. Wells Fargo Bank,
N.A., 773 F.3d 15, 24 (4th Cir. 2014) ("It bears repeating that the primary responsibility for
providing medical evidence to support a claimant's theory rests with the claimant."); Elliott v.
Sara Lee Corp., 190 F.3d 601, 609 (4th Cir. 1999) (holding that the burden is at all times on
claimant and "administrator is under no duty to secure specific forms of evidence"); Donnell v.
Metro. Life Ins. Co., 165 Fed. App'x 288, 296 n.9 (4th Cir. 2006) ("[Claimant] has the burden to
prove that she is entitled to receive disability benefits under the Plan."); Band v. Paul Revere
Life Ins. Co., 14 Fed. App'x 210, 212 (4th Cir. 2001) ("The burden is on [claimant] to prove his
or her total disability benefits under a Plan.").

Ellis v. Metro Life Ins. Co., 126 F.3d 228, 232 (4th Cir. 1997); *see also*, *e.g*., Smith v.

Continental Casualty Co., 369 F.3d 412, 417 (4th Cir. 2004); Evans, 514 F.3d at 322.  In the

Fourth Circuit, the non-exclusive factors the Court may consider include:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decision-making process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

Champion v. Black & Decker (U.S.) Inc., 550 F.3d 353, 359 (4th Cir. 2008) (quoting Booth v.

Wal-Mart Stores, Inc., 201 F.3d 335, 342–43 (4th Cir. 2000)).

Finally, the deferential standard of review is not altered by the presence of a so-called

structural conflict.  *See* Glenn, 554 U.S. at 108; Champion, 550 F.3d at 359 ("Courts are to apply

simply the abuse of discretion standard . . . even if the administrator operated under a conflict of

interest.  Under that familiar standard, a discretionary determination will be upheld if

reasonable.").

### Argument

Plaintiff did not establish his entitlement to LTD benefits beyond March 5, 2019, in the

proceedings before Lincoln, and he cannot satisfy his burden here.  The Administrative Record

overwhelmingly supports Lincoln's determination, and Plaintiff's critiques of Lincoln's

determination are meritless.

Both of the treating physicians Plaintiff initially relied upon to establish his disability

claim, Dr. Reed and Dr. Judd, agreed that by March of 2019 he was no longer disabled.  *See*

LIN2667 ("I relayed to [Plaintiff] that he his now biochemically euthyroid and that I can no

22

longer recommend a biochemical basis [for] any disability."); LIN2331 (Plaintiff reported that he

was "not pleased with Dr. Judd" because "Dr. Judd did not feel he was still disabled.").  By that

point, lab tests ordered by endocrinologist Dr. Reed confirmed that Plaintiff's thyroid condition

had been stable for six months, *see*, *e.g*., LIN2667; Exhibit A, and mental status examinations by

psychiatrist Dr. Judd consistently showed "good" judgment, "logical" thinking, and "intact"

memory and concentration.  *See*, *e.g*., LIN1984; LIN2797; LIN2798; LIN1945.

Upon Lincoln's termination of benefits, Plaintiff began shopping for new doctors because

Dr. Judd no longer supported his disability claim.  *See*, *e.g*., LIN2331.  However, when pressed

on the issue, Plaintiff's new psychiatrist, Dr. Fore, also declined to support Plaintiff's disability

claim.  *See* LIN0248 (refusing to side "with one party or another").  This was not a surprise

given Dr. Fore's contemporaneous medical records.  At the time Plaintiff first visited Dr. Fore,

he was reportedly in a "happy mood overall," and Dr. Fore assessed his judgment and insight as

"fair to good"—hardly indicative of a mood disorder of sufficient severity to prevent Plaintiff

from working.  *See* LIN2331–32.

Plaintiff also submitted a report by Dr. Conley, who diagnosed a "[m]ild" cognitive

disorder based on neurocognitive testing that overwhelmingly showed "average" and "normal"

results.  LIN2395–96.  While the testing returned a below average result with respect to short-

term verbal memory, the testing lacked stand-alone validity measures.  Absent such safeguards,

there is nothing to confirm that Plaintiff exerted his best effort or any means to rule out symptom

exaggeration.  Thus, as Drs. Critchfield and Hertza subsequently explained, such testing simply

is not reliable for forensic purposes.  *See* LIN2348-49; LIN0420; *compare*, *e.g*., Johnston v.

Prudential Ins. Co., 916 F.3d 712, 716 (8th Cir. 2019) (affirming administrator's denial of

benefits where failed neurocognitive validity tests provided "substantial evidence" of claimant

23

malingering); <u>Gorbacheva v. Abbott Labs. Ext. Disability Plan</u>, 309 F. Supp. 3d 756, 771–73 (N.D. Cal. 2018), *aff'd*, 794 Fed. App'x 590 (9th Cir. 2019) (affirming administrator's decision to give functional capacity examination little weight where exam contained no validity testing to determine whether claimant was putting forth full effort).

The validity of Dr. Conley's May 2019 neurocognitive testing is further drawn into doubt by the results of mental status examinations administered by multiple treating practitioners both before and after his examination. Prior to Dr. Conley's tests, Dr. Judd repeatedly found Plaintiff's memory and concentration to be "[i]ntact," LIN2797; LIN2789; LIN1945, and after the tests, Dr. Fore wrote that Plaintiff's thought process was "goad directed" and "logical." LIN2336. On September 5, 2019, at a follow-up visit with Dr. Reed, Plaintiff "denie[d] depression, anxiety, impaired cognition, impaired memory, confusion, or being emotionally labile." LIN2076. On November 27, 2019, as part of a depression screening examination, Dr. Berger asked Plaintiff whether he had "[t]rouble concentrating on things, such as reading a newspaper or watching television." LIN2078. Plaintiff responded, "Not at all." LIN2078. On April 15, 2020, Dr. Fore again found Plaintiff to be "cognitively intact." LIN0397.

Moreover, Dr. Conley refused to respond to Dr. Hertza's repeated inquiries. *See* LIN04169; LIN0211. Dr. Conley's refusal to stand behind his report, particularly in response to the peer reviewers' criticism of his failure to include stand-alone validity measures, speaks volumes.

Next, Plaintiff sought support from Dr. Berger. But her analysis is entirely retrospective and concerns impairments that manifested during Plaintiff's so-called "thyroid storm" from 2016 to 2018. *See* LIN2107; LIN0401. Dr. Berger speculated that such thyroid fluctuations could have contributed to the kinds of cognitive symptoms that Plaintiff self-reported when he was

24

receiving negative job performance reviews, but she seems to take no account of Plaintiff's repeatedly normal TSH, Free T4, and Free T3 levels during the time period leading up to and following Lincoln's termination of benefits.  *See* LIN2107; LIN0401; *see also* Exhibit A.  Moreover, Dr. Berger fails to cite any medical evidence of the cognitive impairments Plaintiff alleges—even she does not rely on Dr. Conley's un-validated test results.  *See*, *e.g*., LIN2107; LIN0401.  Instead, she merely takes Plaintiff's subjective complaints at face value.

Dr. Berger's advocacy may be understandable from a treatment perspective, in which a physician must credit her patient's subjective complaints, but Lincoln, as an ERISA administrator must look to the underlying medical evidence to assure that it only pays eligible claimants consistent with its duty to preserve fund assets for the benefit of all future claimants.  *See*, *e.g*., Black & Decker Disability Plan v. Nord, 538 U.S. 822, 833–34 (2003) (holding that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician," because, among other reasons, a "treating physician, in a close case, may favor finding of 'disabled'"); Scott v. Eaton Corp. LTD Plan, 454 Fed. App'x 154, 160 (4th Cir. 2011) (affirming administrator's determination in crediting the unanimous assessment of peer reviewers over the contrary opinion of claimant's treating physician, "a well meaning family doctor"); Williams v. UNUM Life Ins. Co., 250 F. Supp. 2d 641, 649 (E.D. Va. 2003) ("In this case, the conclusions of [claimant's] treating physicians were based almost entirely on [claimant's] subjective complaints . . . for which there was insufficient objective corroboration.  Although a treating physician must accept a patient's subjective complaints, the same is not required of a plan administrator in deciding eligibility for benefits.").

Where a plan, as here, requires "proof" of continued disability, Courts in the Fourth Circuit, as elsewhere, regularly hold that the concept of proof connotes an "objective"

component to such evidence.  *See* <u>Coffman v. Metropolitan Life Ins. Co.</u>, 217 F. Supp. 2d 715, 732 (S.D. W.Va. 2002), *aff'd*, 77 Fed. App'x 174 (4th Cir. 2003); *see also*, *e.g.*, <u>Maniatty v. Unum Provident Corp.</u>, 218 F. Supp. 2d 500, 504 (S.D.N.Y. 2002), *aff'd*, 62 Fed. App'x 413 (2d Cir. 2003), *cert. denied*, 540 U.S. 966 (2003).  "Where an opposite rule to apply, LTD benefits would be payable to any participant with subjective and effervescent symptomology simply because the symptoms were first passed through the intermediate step of self-reporting to a medical professional."  <u>Coffman</u>, 217 F. Supp. 2d at 732.  "Without an objective component to this proof requirement, administrative review of a participant's claim for benefits would be meaningless because a plan administrator would have to accept all subjective claims of the participant without question."  <u>Williams</u>, 250 F. Supp. 2d at 648.  Furthermore, the administrator's "fiduciary role" in "scrutinizing self-reporting," "preventing malingering," "guard[ing] the assets of the [plan]," and paying only "legitimate claims" would be "greatly hampered."  <u>Coffman</u>, 217 F. Supp. 2d at 732 (quoting <u>Brogan v. Holland</u>, 105 F.3d 158, 164 (4th Cir. 1997)).

Here, Dr. Berger's conclusory opinions are simply not worthy of substantial weight because they stand in opposition to the overwhelming objective evidence in the record that Plaintiff's thyroid condition all but resolved by the end of 2018.  *See* <u>Silva v. Voya Servs. Co. Employee Welfare Benefit Plan</u>, 2020 WL 2537454 at \*10 (D.S.C. May 19, 2020) (administrator properly credited contemporaneous medical records over "prepared letters and statements" that conflicted with such records); <u>Teague v. Hartford Life & Accident Ins. Co.</u>, 2006 WL 8455977 at \*14 (W.D.N.C. March 17, 2006) (administrator properly discounted treating physician's opinion in support of claimant where that opinion conflicted with observations contained in the doctor's own contemporaneous office notes); *see also*, *e.g.*, <u>Wilson v. Reliance Standard Life</u>

26

Ins. Co., 2018 WL 994327 at *6 (E.D. Mich. Feb. 21, 2018) ("It appears that rather than providing objective findings and evidence of [claimant's] pain, the doctors simply rubber-stamped her claim."). Although consulting physician Dr. Sood made three attempts to confer with Dr. Berger during the appeal process, in an effort to understand her opinions, Dr. Berger did not return his calls. LIN0423.

Apart from treating physicians, Plaintiff relies on the testimony of friends and family members. But such statements contain no objective medical evidence of impairment, and accordingly, Courts routinely discount such lay testimonials. See, e.g., Childers v. United of Omaha Life Ins. Co., 2013 WL 683498 at *27 (S.D. W.Va. Feb. 22, 2013) (noting that letters of support describing "the author's observation of the deterioration of the [claimant's] condition" do not provide "the type of evidence required by [ERISA plans] to satisfy proof of loss"); Withey v. Metropolitan Life Ins. Co., 1994 WL 731584 at *4 (D. Colo. Mar. 7, 1994) (to rely on "self-serving, uncorroborated testimonials of [claimant] and her several friends" would be "beyond the bounds of reasonable judgment").[6]

Notwithstanding Plaintiff's failure to provide evidence of any continuing functional impairment beyond March 5, 2019, Lincoln afforded Plaintiff a full and fair review of his claim

---

[6] The only remaining opinion concerning the Plaintiff's ability to work comes from the Plaintiff himself, but Plaintiff's own subjective self-assessment of an alleged inability to work, without more, simply cannot satisfy the Group Policy's strict proof requirements. See Williams, 250 F. Supp. 2d at 648; Coffman, 217 F. Supp. 2d at 732; see also, e.g., Pettaway v. Teachers Ins. & Annuity Ass'n, 699 F. Supp. 2d 185, 202 (D.D.C. 2010) ("[I]f objective medical evidence was not required, reviewing the validity of long term disability claims would be meaningless because plan administrators would be forced to accept as adequate all subjective claims of participants."); Whitten v. Hartford Life Group, 2006 WL 1214060 at *5, n.2 (E.D. Va. April 28, 2006) ("After a review of the administrative record, however, it is clear that the portions relied upon by [claimant] are merely statements in which [claimant's] doctors summarized the symptoms that he reported, not the doctors' own findings."). A claimant's subjective complaints do not become objective medical findings simply because a doctor writes them down. See Joyner v. Continental Casualty Co., 2013 WL 865846 at *13 (W.D. Va. March 7, 2013).

27

through two levels of administrative appeal, each conducted by personnel not previously involved with Lincoln's decision. Lincoln consulted no less than seven medical professionals, including four independent board-certified physicians, to evaluate all of the medical evidence in the case. *See*, *e.g*., LIN2411; LIN2318; LIN0416. Lincoln correctly gave more weight to these reliable reports.

Even where there are disagreements between consulting physicians and treating physicians as to a claimant's reasonable limitations, administrators need not defer to the opinions of treating physicians, who may be motivated by desire to advocate for their own patients. *See* Nord, 538 U.S. at 834 (" . . . nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."); Elliot v. Sara Lee Corp., 190 F.3d 601, 606 (4th Cir. 1999) ("[I]t is not an abuse of discretion for a plan fiduciary to deny . . . benefits where conflicting medical reports are presented."). Here, however, there is no disagreement between the consulting physicians and the physicians who actually treated Plaintiff during the time period in question.

On administrative appeal, Attorney Osterbind argued that Lincoln should have requested an independent in-person medical examination ("IME"). *See* LIN2267. But here, no such examination was necessary because there was no conflict in the underlying medical facts. In light of the periodic laboratory tests, multiple physical and mental-status examinations, and other objective evidence already in the record, yet another medical examination would have simply been redundant and served no purpose other than to needlessly increase the time and expense of Lincoln's review. *See* Piepenhagan v. Old Dominion Freight Line, Inc., 395 Fed. App'x 950, 957 (4th Cir. 2010) ("[A] plan administrator has no duty to develop evidence that a claimant is not disabled prior to denying benefits. . . . Nothing in the language of the Plan document or in

our precedents required [the administrator] to seek out IME evidence as a condition to its denial of [the] claim."); *see also*, *e.g*., <u>Killen v. Reliance Standard Life Ins. Co.</u>, 776 F.3d 303, 308, n.3 (5th Cir. 2015); <u>Hobson v. Metropolitan Life Ins. Co.</u>, 574 F.3d 75, 91 (2d Cir. 2009); <u>Rutledge v. Liberty Life Assurance Co.</u>, 481 F.3d 655, 661 (8th Cir. 2007).  As the Second Circuit explained in following the weight of such precedent, "We share the . . . concern that requiring a plan administrator to order an IME . . . risks casting doubt upon, and inhibiting, 'the commonplace practice of doctors arriving at professional opinions after reviewing medical files,' which reduces the 'financial burden of conducting repetitive tests and examinations.'"  <u>Hobson</u>, 574 F.3d at 91 (quoting <u>Davis v. Unum Life Ins. Co.</u>, 444 F.3d 569, 577 (7th Cir. 2006)).

Finally, this is not a case where Lincoln's so-called structural conflict is an important factor.  The Supreme Court holds that the existence of such a conflict does not alter ERISA's deferential standard.  Rather, the conflict factor "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy." *See* <u>Glenn</u>, 554 U.S. at 117; <u>Champion</u>, 550 F.3d at 362.  Here, the record demonstrates Lincoln's "active steps" to reduce bias and promote accuracy—including its use of two levels of appeal and use of different reviewers and different consulting physicians at each level of review.  *See*, *e.g*., <u>Bess v. Mutual of Omaha Ins. Co.</u>, 2011 WL 5858815 at *11 (S.D. W.Va. Nov. 22, 2011) ("Beyond the second appeal, it is noteworthy that each review was undertaken systematically and by a different reviewer each time.").  In addition, Lincoln has further documented its procedural safeguards in the Declaration of Richard Tom, filed herewith as <u>Exhibit B</u>. *See*, *e.g*., <u>Fine v. Sun Life Assurance Co.</u>, 97 F. Supp. 3d 799, 812–13 (E.D. Va. 2015); <u>Patel v. United Omaha Life Ins. Co.</u>, 2012 WL 2370129 at *2–3 (D. Md. June 21, 2012) (citing <u>Denmark v Liberty Life Assurance Co.</u>, 566 F.3d 1, 10 (1st Cir. 2009)).

There is nothing in the record indicating that bias improperly influenced Lincoln's determination, and Plaintiff's subjective complaints do not "closely balance" the extensive medical evidence and reliable opinions (from treating and consulting physicians alike) that show Plaintiff was not medically impaired from his own occupation after March 5, 2019.  <u>Glenn</u>, 554 U.S. at 117.  Thus, this is truly a case where the conflict factor's importance recedes to the "vanishing point."  <u>Id</u>.

**Conclusion**

Based on this record, Lincoln made the only determination it could have made.  Plaintiff did not meet his burden of proving any continuous disability beyond March 5, 2019, and Plaintiff cannot meet his burden here to show that Lincoln's determination was incorrect and unreasonable.  For the foregoing reasons, Plaintiff is not entitled to further LTD benefits, and this Court should grant judgment in favor of Lincoln and dismiss Plaintiff's claims with prejudice.

Dated: July 9, 2021

Respectfully Submitted,

THE LINCOLN NATIONAL LIFE
INSURANCE COMPANY,

By Its Attorneys,

/s/ A. Tevis Marshall
Tevis Marshall (VSB No. 68401)
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
Riverfront Plaza, West Tower
901 E. Byrd Street, Suite 1300
Richmond, Virginia 23219
Telephone: 804.663.2333
Facsimile: 804.225.8641
tevis.marshall@ogletreedeakins.com

-and-

Kyle N. Kirby (admitted *Pro Hac Vice*)
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.

Two Monument Square, Ste. 703
Portland, Maine 04101
Tel: (207) 387-2984
Fax: (207) 387-2986
kyle.kirby@ogletreedeakins.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 9th day of July, 2021, the foregoing Memorandum in Support of Defendant's Motion for Judgment on the Administrative Record was filed with the Clerk of Court using the CM/ECF system which will provide notification of such filing upon counsel of record in this matter:

| | |
|---|---|
| Brandon S. Osterbind, Esq. | Joshua F. P. Long, Esq. |
| Kelly Ann Osterbind, Esq. | WOODS ROGERS PLC |
| OSTERBIND LAW, PLLC | 10 S. Jefferson St., Suite 1400 |
| 1216 Greenview Dr., Suite A | Roanoke, VA 24011 |
| Lynchburg, VA 24502 | (540) 332-3710 |
| (434) 515-2807 | jlong@woodsrogers.com |
| bosterbind@osterbindlaw.com | |
| kosterbind@osterbindlaw.com | |

/s/ A. Tevis Marshall
Tevis Marshall (VSB No. 68401)

47544745.3

31