**IN THE UNITED STATES DISTRICT COURT FOR**
**THE WESTERN DISTRICT OF VIRGINIA**
**(Lynchburg Division)**

| | | |
|---|---|---|
| **ROBERT LEARN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 6:20-cv-00060-** |
| | ) | **NKM** |
| **THE LINCOLN NATIONAL LIFE INSURANCE** | ) | |
| **COMPANY** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION**
**FOR SUMMARY JUDGMENT**
**(ERISA LONG-TERM DISABILITY BENEFITS)**

Plaintiff, by counsel, submits this brief in support of his Motion for Summary Judgment. Summary judgment is appropriate where, as here, the Court is presented with an established administrative record and is reviewing a decision based on the record.

Pursuant to 20 U.S.C. § 1132(a)(1)(B), Plaintiff seeks (a) recovery of benefits due under the terms of his disability plan and (b) enforcement of rights under the terms of the plan. Plaintiff is an eligible participant of the plan. He was disabled as required by the plan and has complied with the claim requirements. Plaintiff is due back benefits, interest, and attorney fees and costs. He has an adverse benefit determination at the administrative level. For these reasons, the court should grant Plaintiff's Motion for Summary Judgment.

**Overview of Case and Summary of Claim Process**

This is a lawsuit under ERISA seeking payment of past due long-term disability benefits and reinstatement of payments of monthly benefits going forward. The Plaintiff ("Rob"), applied and was approved for long-term disability benefits through his plan with Defendant, The Lincoln

National Life Insurance Company or Lincoln Financial Group[1] ("LFG") on July 17, 2017. On March 4, 2019, LFG sent a letter to Rob notifying him that LFG had reviewed his claim file and "determined that [Rob] do[es] not meet the definition of Total Disability" and that "no additional benefits are payable beyond 03/05/2019." [LIN002404-05]. Rob appealed the termination first on his own on June 6, 2019, but was denied on August 30, 2019. [LIN002313]. Rob hired counsel to file his final appeal with LFG on February 25, 2020. LFG denied Rob's second appeal on May 21, 2020. Rob then filed this lawsuit against his employer's long-term disability plan. LFG was then substituted as the defendant since any award of benefits and attorney fees will be paid by LFG.

## BACKGROUND

Throughout his life, Rob has been a hard worker, an avid outdoorsman, and a highly intelligent professional. Before developing symptoms from Graves' Disease, Rob enjoyed a variety of rigorous outdoor activities including camping, hiking, fishing, canoeing, and skiing. [LIN001182]. Around the house, he liked being a handyman, often working on home construction projects. Rob enjoyed over twenty years of success working in physical therapy. [Id.]

In early 2016, Rob developed Graves' Disease. In fact, Rob had the "most extreme case" of hyperthyroidism, known as Thyroid Storm. [LIN000401, LIN000616, LIN002107]. His symptoms were extreme and developed suddenly. These included uncontrolled anxiety and depression, irritability, rapid weight loss, trouble sleeping, constant exhaustion, lethargy, and steep cognitive dysfunction. [LIN000616]. For a few months, Rob tried to hide these issues from his coworkers by coming into work early and staying late to just to complete basic duties of his job.

---

[1] The Defendant notes on its letterhead throughout the administrative record that "Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates."

[LIN001185-86]. However, as his symptoms increasingly worsened and his cognitive functions declined, putting in extra hours was not enough.

LFG approved Rob's long-term disability claim in July 2017. [LIN002923]. Rob continued treatment but, unfortunately, saw little improvement in his symptoms. Rob experienced a roller coaster of effects with his two primary caregivers, Drs. Michael Judd and H. Lester Reed, unable to provide any sustained relief despite prescribing Rob a laundry list of medications. [LIN002108]. For 21 months, LFG paid total disability benefits to Rob.

On March 4, 2019, LFG notified Rob that it no longer considered Rob "totally disabled" and that benefits would not be paid beyond March 5, 2019. [LIN002404-2409]. Needing a source of income, Rob searched for employment and started working as a home-health physical therapist in May 2019. [LIN001189]. Sadly, Rob's cognitive shortfalls prevented him from performing this job and he had to quit after two weeks. [Id.] Later that year, Rob attempted another physical therapy position, but, again, could not perform the job duties and had to leave after seven days. [LIN001190]. His appeals to LFG were unsuccessful. [LIN000203-209].

Rob has always been known as a sharp, hardworking guy. [LIN001199]. Today, he cannot muster the mental acuity to participate in conversations around the dinner table—let alone perform the main duties of his occupation. [LIN001194]. Many of Rob's close friends and family detailed his substantial cognitive decline in affidavits to LFG. [LIN001180-81, LIN001197-98, LIN001199]. Rob's wife, Wendy Learn, described how Rob now has "extreme difficulty following simple instructions," and is "far removed from all conversations." [LIN001194-95]. Once a man full of laughter and a natural, "type A" leader, Wendy noted that he now "stutters" and "repeats himself a lot." [Id.]  He "rarely smiles," sleeps an average of fourteen hours a night, and gets confused with basic tasks like ordering food from a menu. [Id.] If there's one person who wants to

work, it is Rob Learn. [LIN001192]. He and his physicians are hopeful that he will return to normal, but he isn't there today and certainly was not on March 5, 2019.

### I.   Work History / Occupation

Rob enjoyed over twenty years of success in physical therapy. [LIN001182-85]. From 1994 to 2005, Rob worked at facilities in West Virginia and Virginia. [Id.]. He quickly rose to Senior Physical Therapist and then a Clinical Director. [LIN00183]. In 2005, Rob shifted to the classroom to serve as the Program Director/Regional Director for the Physical Therapist Assistant Program at ECPI University in Newport News, Virginia. [Id.]. In 2006, His work there included developing and implementing the Physical Therapist Assistant program for the University. [*Id*.]

In August 2015, Rob transitioned to Centra Health, Inc. in Lynchburg, VA to serve as Centra's Regional Director of Outpatient Rehabilitation. [LIN001185]. Rob's duties included collaborating with other high-level leaders in the Centra organization, overseeing the budget, ensuring his department met quality outcomes, supervising employees, developing relationships with physicians, leaders, and various stakeholders. [*Id*.] Moreover, Rob was responsible for the department meeting patient satisfaction benchmarks, recruiting and retaining staff, mentoring employees, representing his department in various projects, and frequently traveling to various Centra locations to work on projects. [*Id*.]

Rob thrived in this role until the onset of his thyroid condition in 2016. [*Id*.] On February 10, 2017, Rob's cognitive decline and resulting performance issues at work boiled to the point that his supervisor, Kristina Jones, issued a disciplinary write-up to Rob. [LIN001213-14].  In it, Ms. Jones wrote that Rob "doesn't listen and retain information easily," "becomes visibly frustrated when tasks have ambiguity," and "[l]acks composure at times, [is] easily rattled, and doesn't handle stress well," to the point that others asked Ms. Jones "to not include [Rob] in high level

meetings" anymore. [LIN001214]. Of the 19 principle duties Centra lists for Rob's position, he cannot perform at least 8 of the 19. [LIN001188].

Acknowledging that his illnesses had taken control of him, Rob was forced to stop working on February 23—two weeks after receiving the reprimand. [Id.]

## II.     Disabling Condition and Symptoms

Rob's symptoms appeared in early 2016. [LIN001185]. He started experiencing headaches, fatigue, aches, increased heart rate, difficulty thinking, rapid loss of weight totaling sixty pounds (when he had not made any lifestyle changes that would incur weight loss), feeling restless, agitated, frequent bowel movements, anxiousness, diarrhea, sweating, trouble concentrating, and frequently tiring for no discernable reason. [LIN001185]. His symptoms occurred constantly. [Id.]

On May 16, 2016, the symptoms reached a point where Rob had to leave work early and go to Lynchburg General Hospital. [LIN001186]. There, Rob was diagnosed with hyperthyroidism. [Id.] Rob's primary care physician, Dr. Peter Gibbs, started consulting with Dr. H. Lester Reed, an endocrinologist, on how to treat Rob's hyperthyroidism. Subsequent testing revealed that Rob had Graves' Disease. [LIN002005]. In a visit on June 10, 2016, Dr. Gibbs noted that Rob was "feeling very frustrated and quite poorly physically" and Rob "desperately want[ed] to move forward w[ith] definitive treatment . . ." [LIN00001871]

Rob presented to Dr. Michael Judd on July 1, 2016, and Dr. Judd diagnosed Rob with Generalized Anxiety Disorder and Depression. [LIN001903]. As part of Dr. Reed's treatment plan, Rob began taking radioactive iodine treatments and submitting to regular testing of his TSH levels. [LIN001865]. In August 2016, Rob briefly experienced improved symptoms but dropped back off by September to his previous lows. [LIN001856, LIN001837]. By December 22, 2016, Dr. Reed noted that he felt that Rob was slowly recovering but that "he does very poorly with suppressed

TSH and has mood and cognitive decline disproportionate to the amount of TSH suppression." [LIN001784].

From 2016 through 2019, Rob's physicians, including Dr. Reed, continuously changed Rob's laundry list of prescriptions and dosages in attempts to get his symptoms and thyroid levels under control. [*See* "Background" LIN001165-1166]. For instance, on January 22, 2017, after noting that Rob's TSH and T4 levels indicated his thyroid reserve continued to decline, Dr. Reed decreased Rob's Methimazole from 20 mg/day to 15 mg/day to see if the TSH reduced in the following week. [LIN001766]. One day later, Dr. Reed noted a phone call where Rob said this change only made Rob's symptoms worse, including his cognitive focus. [LIN001757]. On January 26, 2017, Dr. Reed adjusted the methimazole again to 10mg/day and increased his thyroxine from 600 mcg/week to 700 mcg/week. [*Id*.]

By February 12, 2017, Dr. Reed reported that Rob's TSH had fallen from 24.7 to 0.88, which indicated to Dr. Reed that "there is underlying thyroid function and that the [radioactive iodine] therapy has not been complete." [LIN001745]. Dr. Reed indicated that he expected Rob to transition to a euthyroid state (normal thyroid state) over the next 14 days. [Id.] Dr. Reed's euthyroid prediction was proven wrong when Rob submitted to a nuclear medicine thyroid image/uptake procedure on May 2, 2017, which revealed that his thyroid levels had gotten worse. [LIN001668]. He then started his second radioactive iodine treatment on May 9. [*See* LIN001653]. On May 18, Dr. Reed noted that he expected Rob to achieve biochemical hypothyroidism by July 9 and predicted that the hormone replacement therapy may take until September 2017 before Rob achieved a euthyroid state. [*Id*.]

Rob continued treatments with Drs. Reed and Judd with little change in his depression and anxiety. On January 5, 2018, Dr. Reed noted that Rob's ideal TSH level was between 1-3.

[LIN001583]. By June 10, 2018, Dr. Reed opined that Rob's TSH levels were in the "ideal euthyroid range" and he notes that range to be between 1-2. [LIN001526]. At this time, Dr. Reed did not evaluate or see Rob to examine him but he noted that his symptoms "include tremor, hyperactivity, anxiety, fatigue, and neck mass." [*Id*.] Dr. Reed stated that Rob's labs could be done in 90 days and his "short-term disability may now be re-evaluated" and that he could consider moving to full-time employment status. [*Id*.] On July 24, 2018, Rob saw Dr. Judd's physician's assistant Antionette Theodore and noted "no sustainable improvement in his mood . . ." [LIN001966]. His symptoms continued to include "decreased energy, depressed mood, difficulty concentrating, fatigue, irritability, and loss of interest." [*Id*.]

Though notes from Drs. Reed and Judd from this period until March 2019 refer to his thyroid as "normalized," his symptoms largely did not improve. [LIN001935]. As had been the case since 2016, Rob would experience brief periods of relief—sometimes following a change in medication—followed by abrupt crashes.

Nevertheless, on March 4, 2019, LFG terminated Rob's long-term disability benefits. Just three days later, on March 7, Rob followed up with Dr. Judd. [LIN01935]. Dr. Judd noted that although his thyroid had "normalized," there was no notable improvement in his depressive symptoms, motivation remained low, and concentration was fair. [*Id*.] His mental status examination reflected nearly the same findings as throughout Rob's treatment with Dr. Judd. [*Id*.]

Rob started searching for a job shortly after LFG terminated his benefits. Rob also started seeing a new physician, Dr. Kenneth Fore, as Rob had grown frustrated with Dr. Judd's treatment and felt Dr. Judd had already dismissed him as a patient. [LIN001396]. Dr. Fore first examined Rob on April 29, 2019, when he diagnosed him with a mood disorder due to known physiological condition with depressive features. [*Id*.]

Rob returned to Dr. Fore on May 20, 2019, and reported that he could not perform his job as a home-health worker and had to quit after one week. [LIN001392]. Rob stated that he "could not do it" and felt his "cognition is in the toilet." [*Id*.] Dr. Fore noted that while Rob's mood had improved, he was cognitively far from baseline with difficulty in work performance and that, overall, his planning and execution skills were suffering to the point of quitting his job. [*Id*.] Dr. Fore recommended that Rob submit to further neuropsychological testing with Dr. Joseph Conley. [*Id*.]

Rob submitted to neuropsychological testing with Dr. Conley on May 24, 2019. [LIN002058]. Dr. Conley administered a variety of tests and concluded that Rob's results were "positive for the presence of neurocognitive dysfunction, specifically impaired sustained attention and mnestic dysfunction (i.e., rapid decay of recently encoded verbal memory traces) and a cormorbid [sic] neuropsychiatric disturbance characterized by depression, anxiety, irritability, weakness, chronic fatigue, fearfulness, inadequacy, moodiness, social alienation, and inability to cope with everyday stress and responsibility." [LIN002060]. Dr. Conley diagnosed Rob with "Mild Neurocognitive Disorder Due to Thyroid Disease." [*Id*.] Dr. Conley clearly opined that neurocognitive deficits and neuropsychiatric disorder render Rob "disabled and incapable of maintaining employment at the present time." [*Id*.]

The following months proved increasingly worse for Rob as his symptoms intensified. Rob returned to Dr. Reed on September 5, 2019, complaining of ongoing cognition problems, fatigue, exhaustion, heart palpitations, muscle aches, and occasional tremors, among other issues. [LIN002075]. While Rob's TSH levels stayed around a 1 for the two labs in 2018, in April of 2019 it was 3.19 and in July of 2019 it was .97. [*Id*.] Dr. Reed noted that these symptoms were similar to what Rob had suffered in the past and opined that Rob had mild neurocognitive disorder due to

thyroid disease and major depressive disorder with anxious distress single episode. [*Id*.] Dr. Reed's assessment was that Rob was "biochemically **near euthyroid** but has ongoing difficulty with depression and anxiety." [LIN002074].

Dr. Reed suspected Rob had Hashimoto's Encephalopathy but was not comfortable treating that, so he referred Rob to Dr. Meredith Berger, an endocrinologist who had seen Rob once in 2016 to provide a second opinion on the early stage of Rob's thyroid treatment. [LIN002070]. Given her lengthy experience in this area, Dr. Berger immediately disagreed that Rob had Hashimoto's Encephalopathy. [LIN000616]. Instead, she concluded, Rob suffered from "uncontrolled hypothyroidism exacerbating his sleep apnea, depression, anxiety, and cognitive dysfunction." [LIN000617]. Dr. Berger stated that after reviewing Rob's records, "it was obvious that subsequent to his radioactive iodine treatment, he developed severe hypothyroidism." [*Id*.] She added that of the 17 TSH labs Rob took between 2017-2019, only 3 revealed a normal value. [*Id*.] She continued, noting "[h]is levels fluctuated widely from under treatment causing significant hypothyroidism resulting in worsening depression and lethargy, cognitive dysfunction to over treatment which worsened his irritability, anxiety, depression[,] and sleep disturbance." [*Id*.]

Dr. Berger wrote that **"[i]t is unclear how his physicians deemed him clinically euthyroid when his thyroid levels were obviously not controlled and not stable at any point."** [*Id*. (Emphasis added).] In other words, Rob had been receiving inadequate medical treatment for his thyroid disease.

Dr. Berger changed Rob's medication routine and dosages as she reported that Rob's current regimen (which he had been on for over two years) was overdosing him six days a week and underdosing him on Sundays when he took a half-dose. [LIN000617]. This medication imbalance, she wrote, "[c]linically . . . creates a roller coaster effect for patients and exacerbates

any underlying mental disorders especially depression and anxiety….” [*Id*.] Unlike the opinions of Drs. Reed and Judd that Rob's thyroid had "normalized," Dr. Berger described Rob's levels as "erratic" and "obviously not controlled and not stable at any point." [LIN000616-617]. Rob is still under the care of Dr. Berger and he has not been released to return to work. [LIN000402].

## STANDARD OF REVIEW

This action for long-term disability benefits is governed by the Employee Retirement Income Security Act of 1974 ("ERISA") and is brought pursuant to the civil enforcement provision of ERISA, 29 U.S.C. § 1132(a)(1)(B). A denial of benefits challenged under this provision is reviewed *de novo* unless, as here, the benefit plan grants the fiduciary discretionary authority to determine eligibility for benefits and interpret terms of the plan. *Firestone and Rubber v. Bruch*, 489 U.S. 101, 115 (1989). When a plan confers discretionary authority to the plan administrator, courts use an "abuse of discretion" standard to review the administrator's decision. *Hensley v. Int'l Bus. Machines Corp*., 123 F. App'x 534, 537 (4th Cir. 2004). The Plaintiff agrees that LFG granted itself "authority to manage this Policy, interpret its provisions, administer claims and resolve questions arising under it." [LIN000144]. Under an abuse of discretion standard, an administrator's decision must "result from a 'deliberate, principled reasoning process' and be supported by substantial evidence." *Williams v. Metro Life Ins. Co*., 609 F.3d 622, 630 (4th Cir. 2010).

## SUMMARY OF THE LAW

The Court's review is limited to the rationale set forth in the denial letter and not new rational "offered for the first time on judicial review." *Thompson v. Life Ins. Co. of N. Am*., 30 Fed. Appx. 160, 164 (4th Cir. 2002). "Evidence referenced only in an appeals letter cannot be considered, under the rationale that a plaintiff must have some ability to respond to the reasons for the termination of their benefits." *Griffin v. Hartford Life & Accident Ins. Co*, No 6:16-CV-00024,

2017 U.S. Dist. LEXIS 10295, at 31-32 (W.D. Va. Jan. 25, 2017). Consequently, the defendant

cannot introduce new evidence or create new arguments that were not provided in the initial denial

letter it sent to the claimant. *Cox v. Reliance Standard Life Ins. Co.*, 43 Fed. Appx. 606, 610 (4th

Cir. 2002).

To determine the reasonableness of the insurance company's decision, the Fourth Circuit

has provided eight non-exclusive factors that a court may use:

> (1) the language of the plan; (2) the purposes and goals of the plan;
> (3) the adequacy of the materials considered to make the decision
> and the degree to which they support it; (4) whether the fiduciary's
> interpretation was consistent with other provisions in the plan and
> with earlier interpretations of the plan; (5) whether the decision
> making process was reasoned and principled; (6) whether the
> decision was consistent with procedural and substantive
> requirements of ERISA; (7) any external standard relevant to the
> exercise of discretion; and (8) the fiduciary's motives and any
> conflict of interest it may have.

*Booth v. Wal-Mart Stores, Inc.*, 201 F.3d 335, 342-43 (4th Cir. 2000). Each relevant *Booth* factor

will be addressed below.

### RELEVANT POLICY PROVISIONS

**TOTAL DISABILITY** or **TOTALLY DISABLED** will be
defined as follows:

1. During the Elimination Period and Own Occupation Period, it
means that due to an Injury or Sickness the Insured Employee is
unable to perform each of the Main Duties of his or her Own
Occupation.
2. After the Own Occupation Period, it means that due to an Injury
or Sickness the Insured Employee is unable to perform each of the
Main Duties of any occupation which his or her training, education
or experience will reasonably allow.
[LIN000139]

**MAIN DUTIES** or **MATERIAL AND SUBSTANTIAL DUTIES**
means those job tasks that:

1. are normally required to perform the Insured Employee's Own Occupation; and
2. could not reasonably be modified or omitted.
[LIN000136]

**OWN OCCUPATION or REGULAR OCCUPATION** means the occupation, trade or profession:

1. in which the Insured Employee was employed with the Employer prior to Disability; and
2. which was his or her main source of earned income prior to Disability.

It means a collective description of related jobs, as defined by the U.S. Department of Labor Dictionary of Occupational Titles.
[LIN000137]

## ARGUMENTS

### i.   LFG Exceeded the Language of the Plan to Terminate Rob's Benefits

LFG is bound to the terms of the plan, but, a review of its denial letters reveals that LFG stepped beyond the plan's language to terminate Rob's benefits. In LFG's March 4, 2019 letter, it notes Dr. Helding's finding that the "*psychiatric information available is fairly consistent* but, does not describe symptoms of a severity that would typically be expected to cause any functional impairment to the point of not being able to perform work related tasks." [LIN002406] (emphasis added). In LFG's August 30, 2019 letter, it writes that the record reviewer, Dr. Critchfield, found "no evidence [Rob's] depressive symptoms were of a severity that he required elevation to a higher level of care such as intensive outpatient or inpatient psychiatric treatment." [LIN002314]. The third reviewer, Dr. Hertza, also used the same "intensive care" requirement for his analysis, stated he could not review Dr. Conley's exams, and said he did not think Rob's symptoms were severe enough to prevent him from working—despite never examining Rob to know how severe his symptoms were. [LIN000421].

This is tantamount to saying, "eh, it could be worse." Where is the proverbial line in the sand? Is it intensive outpatient or inpatient treatment? Is that really what the plan says? Can LFG deny someone because his condition could be worse?

The truth is that intensive outpatient or inpatient treatment has no relevance to whether Rob is disabled. There is no language in the plan requiring this type of treatment to be considered disabled. It was not just Drs. Helding, Critchfield, and Hertza who based their opinion on irrelevant factors beyond the plan's language, LFG itself wrote that one of its main reasons for denying benefits was that Rob's symptoms never "reached a severity of necessitating a higher level of treatment, such as intensive outpatient or inpatient psychiatric admission." [LIN002315]. This paragraph is essentially a copy and paste job from Dr. Critchfield's opinion.

Requiring that Rob's symptoms to be so severe that he receive "intensive" treatment has no grounds in the language of the plan. Whether Rob received inpatient care has nothing to do with whether he meets the definition of "Totally Disabled." In fact, Rob never received inpatient care, and yet he was approved for long-term disability for almost 2 years. This is purely arbitrary and capricious and equates to moving the goalpost resulting in an abuse of discretion.

Moreover, even though the Plan does not require Rob to receive "intensive" care to be considered disabled—he actually did receive intensive outpatient care to try to combat his symptoms. Rob received Transcranial Magnetic Stimulation (TMS) in an attempt to ease symptoms from his major depressive disorder. Even if LFG did not research TMS to know, Rob's appeal letter apprised LFG that TMS is an intensive treatment option. [LIN000379]. But none of LFG's record reviewers discussed what this treatment is. This oversight again demonstrates that LFG did not perform a principled review of Rob's file.

LFG cannot arbitrarily come up with standards outside of the plan's language that Rob must hurdle to receive benefits. But that is exactly what it has done.

### ii. LFG Violated the Purposes and Goals of the Plan

"ERISA was enacted to promote the interests of employees and their beneficiaries in employee benefit plans, and to protect contractually defined benefits." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 113, 109 S. Ct. 948 (1989) (internal quotation marks and citations omitted). "ERISA imposes higher-than-marketplace quality standards on insurers. It sets forth a special standard of care upon a plan administrator, namely, that the administrator 'discharges [its] duties' in respect to discretionary claims processing 'solely in the interests of the participants and beneficiaries' of the Plan." *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 115 (2008) (citing § 1104(a)(1)).

Through this process, LFG has repeatedly claimed Rob lacked sufficient evidence, but would not state evidence Rob needed to obtain and why it was necessary, as ERISA requires. Rob underwent a neuropsychological evaluation and provided the results to LFG. These results were dismissed without substantive explanation. Only one of LFG's reviewers, Dr. Hertza, commented on this evaluation, only to say that he could not forensically interpret the results because there was no "effort test[]" used. [LIN000419]. He ignores that Dr. Conley said that Rob "was friendly and cooperative, appearing to apply himself diligently to all tasks required of him. Therefore, test results are believed to accurately reflect his current level of neurocognitive functioning." [LIN002059]. Dr. Critchfield's reports noted there were no "standalone measures of performance validity," but acknowledged the "[e]mbedded measures . . . appear[ed] to be within expectations." [LIN002319].

LFG cannot dismiss Dr. Conley's diagnosis or evaluation just because it relies on the treating physician's judgment as to whether the patient was giving a genuine effort. Drs. Reed, Berger, and Fore relied on this evaluation and agreed with it. As LFG knows well, it is routine in the medical field to have to rely on the judgment of the treating physician who performed an in-person evaluation. Given these facts, Rob's counsel wrote LFG's administrators asking what kind of examination or evidence Rob needed. [LIN002299]. No one responded.

This only shows LFG's arbitrariness and conflict of interest. If it did not think the examinations Rob submitted to with Dr. Conley were sufficient, it would have specified which examination Rob needed to take. If LFG did not think Rob's symptoms were severe enough to prevent him from performing the duties of his occupation, despite the opinions of Rob's treating physicians, supervisor, family, friends, and his own personal statements, it could have had another physician examine Rob in person to decide. It chose not to do any of that.

To meet its fiduciary standards, an insurance company must address evidence favorable to the claimant "thoughtfully and at length." *White v. Eaton Corp. Short Term Disability Plan*, 308 F. Appx. 713, 719 (4th Cir. 2009). The insurance company may not "wholesale disregard" evidence from treating physicians. *See Donovan v. Eaton Corp., Long-Term Disability Plan*, 462 F.3d 321 (4th Cir. 2006). Here, LFG completely ignored Drs. Berger and Conley and the evidence related to their examinations and opinions. The final letter from LFG was a copy and paste job from the hired reviewers. There is nothing "thoughtful" about coping and pasting. It ignored queries, offered no explanations, failed to describe what evidence Rob needed, and wholesale ignored evidence favorable to Rob. As will be discussed in part (iii), incorporating Dr. Sood and Hertza's conclusions is likewise insufficient and amounts to "wholesale disregard" because these record reviewers don't offer any rational basis for rejecting Drs. Berger and Conley's opinions.

LFG is tasked with making a determination on the evidence presented whether Rob meets the plan's definition of "totally disabled." Its actions in no way demonstrate the standard a fiduciary is obligated to operate with and violate the purposes and goals of the plan. LFG acted in its own interest, not in the best interest of the beneficiary, Rob Learn.

### iii. The Materials Considered Do Not Support Terminating Rob's Benefits

The Fourth Circuit has said that "when an ERISA plan discontinues an employee's benefits after totally disregarding some portion of a physician's opinion that is favorable to the employee's claim and seizing upon that portion which is adverse to the employee's claim, such decision making is unreasonable." *Piepenhagen v. Old Dominion Freight Line, Inc.*, 395 F.App'x 950, 955-56 (4th Cir. 2010) (*citing Donovan*, 462 F.3d at 329). It is well settled that "[p]lan administrators . . . may not *arbitrarily* refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834, 123 S. Ct. 1965, 1972 (2003) (emphasis added). In the event of conflicting medical reports, the contradictory evidence must be substantial. *DuPerry v. Life Ins. Co. of North America*, 632F.3d 860, 874 (4th Cir. 2011) (citing *Stup v. UNUM Life Ins. Co. of Am.*, 390 F.3d 301, 308 (4th Cir. 2004)). Yet, LFG continued to arbitrarily ignore evidence favorable to Rob, including objective medical testing and the opinions of multiple treating physicians.

LFG arbitrarily dismissed the opinions of Drs. Berger and Conley, without explanation for why it rejected these treating physicians' evidence. LFG favored instead the opinions from Drs. Hertza and Sood, who LFG hired to review the medical records in this case. Drs. Sood and Hertza's opinions are not substantial evidence.

LFG was provided medical records and letters from Dr. Berger analyzing Rob's condition, examining his thyroid levels, and explaining what likely contributed to his symptoms being so

prolonged and extreme. LFG was also supplied the results from the neuropsychological examination by Dr. Conley to support his diagnosis and determination that Rob lacked the cognitive abilities to perform his job. LFG offered no explanation as to why this evidence was rejected and did not offer contradicting evidence that could be considered substantial before simply dismissing Rob's treating physician's opinion.

LFG's termination was based on Rob being classified as euthyroid, which was later proven incorrect. As an initial matter, it is understandable that early on in March 2019, LFG considered Rob clinically euthyroid. After all, Rob's treating physician at the time, Dr. Reed, claimed Rob was euthyroid. Upon appeal, however, it should have been glaringly obvious that LFG was wrong about Rob's status. By September 2019, even Dr. Reed changed his assessment from biochemically euthyroid to "biochemically near euthyroid." [LIN001478]. There is a difference. Dr. Reed turned Rob over to Dr. Berger after misdiagnosing Rob with Hashimoto's Encephalopathy. [*Id*.]

Once Rob was turned over to Dr. Berger, she immediately recognized that Rob did not have Hashimoto's Encephalopathy, had been improperly medicated for over two years (being both overdosed and underdosed weekly for his thyroid condition), and that he had never been euthyroid because of his 17 TSH labs, only 3 were in the normal range. [LIN002108]. She reported "[i]t is unclear how his physicians deemed him clinically euthyroid when his thyroid levels were obviously not controlled and not stable at any point." [LIN002107]. She recommended several adjustments to his medication that would "further fine tune his thyroid medication to truly make him clinically euthyroid—and not just from therapeutic on paper by a lab value." [LIN002108]. LFG has never addressed this and has continued to label Rob as euthyroid.

In other words, Dr. Berger's letters describe how Rob had been receiving inadequate medical treatment for his thyroid disease, which exacerbated his cognitive dysfunction and other symptoms. [LIN000401]. Dr. Berger stated that Rob had "the most extreme case of hyperthyroidism known as Thyroid Storm." [LIN000401, LIN000616, LIN002107]. She added that upon reviewing Rob's medical records "it was obvious that subsequent to his radioactive iodine treatment, he developed severe hypothyroidism…". [*Id*.] As she describes it, "[c]linically, this creates a roller coaster effect for patients and exacerbates any underlying mental disorders especially depression and anxiety related to an imbalance of his dose." [LIN000617, LIN002108].

It is apparent that Drs. Reed and Sood did not fully understand Rob's condition as they were using improper ranges to review Rob's TSH values. This is also why Dr. Reed could not figure out why Rob's symptoms continued. As Dr. Berger explained:

> The therapeutic range for thyroid control lies in the TSH range of 0.34 - 4.8 which is too wide range. For optimal control, The Endocrine Society prefers a TSH [] between 0.5 - 2.5 along with a free T4 level mid-range inside of the therapeutic range of 0.8-1.77, if using Labcorp reference values. Mr. Learn's TSH values from 2017-2019 were the following: TSH = 0.8, 0.07, 0.04, 0.51, 13.5, 0.01, 0.08, 8.31, 27, 13, 7, 5.6, 0.04, 0.18, 0.08, 3.19, 0.97. And a reminder, the higher the TSH value, the more hypothyroid or under treated the patient is. Suppressed TSH levels less than 0.34 are indicative of over replacement of thyroid medication. Either situation exacerbates depression and when over treated, it exacerbates sleep disturbance, depression and anxiety[,] and cognitive dysfunction.

[LIN000617]. Drs. Reed and Sood were clearly unaware of or not considering these nuances with Rob, who had an extreme case. Dr. Sood's "review" glossed over the significance of Rob's fluctuating TSH values when even LFG's own Nurse Disability Consultant recorded how Rob is "significantly affected by minor fluctuations in his thyroid level which result in mood and cognitive decline." [LIN000224]. In a separate writing, Dr. Berger emphasized that:

> Mr. Learn's thyroid condition is not a bread and butter case of Hyperthyroidism with subclinical disease signs and symptoms. Mr. Learn's thyroid case is a true "Endocrine Emergency" of Thyroid Storm with life threatening consequences if not properly diagnosed, treated[,] and managed. The resultant cognitive impairment, cognitive decline, memory difficulties and associated depression and anxiety cannot be argued against. This is a well-documented clinical and neuropsychological researched topic with a multitude of articles to support this association.

[LIN000401]. Dr. Berger stated that Rob's "free T3 level of >30 (ULN under 4) was the second highest I have ever seen in my 23 years of Endocrine experience." [*Id*.] She emphasized that Rob's disease had been "poorly controlled" before being turned over to her, which contributed to his cognitive decline. [*Id*.] Dr. Berger noted "this all played havoc on his depression, anxiety and sleep quality *resulting in sustained cognitive impairment*." [*Id*.] (emphasis added). She concluded that Rob "is not capable of ever being able to return to the level of work of which he was performing prior to 2016." [LIN000402].

That notwithstanding, LFG's record reviewer, Dr. Sood, opined that "[t]here is no functional impairment" and "all [of the labs] were within normal limits." [LIN000214]. This was clearly wrong and Dr. Sood provides no basis for her opinion. And, she had no idea why Rob's doctors kept adjusting his medication. [LIN000423]. She simply concluded that Rob was fine and expected her conclusion to be universally accepted. Even Dr. Reed said that Rob was only "near euthyroid" on September 8, 2019. [LIN001478]. Near euthyroid is not euthyroid. There is a difference.

Even with such strong language in Dr. Berger's letters refuting Dr. Sood's comments and explaining, in detail, why Dr. Sood was wrong, Dr. Sood still did not support or offer even one sentence of explanation for her opinion that Rob was euthyroid. Her response to Dr. Berger was, "nothing supports this" and her Assessment/Rationale was copied and pasted from her original

report. [LIN000213-14]. She references articles but does not provide them, so LFG could not have relied on them. [LIN000214].

Nor did LFG bother defending Dr. Sood's review. Instead, LFG copied and pasted Dr. Sood's review in full, dropped it into a letter, and sent it to Rob without any defense or explanation. [LIN000203-209]. If one only read LFG's letters, one would hardly know Dr. Berger exists. LFG completely ignored her opinions. It relied entirely on Dr. Sood's review, which was conclusory and never addressed the substance of Dr. Berger's opinions. This is anything but a deliberate, principled reasoning process.

After being provided records of Rob's TSH levels and the explanation and diagnosis from Dr. Berger, it should have been clear to LFG that its prior conclusion that Rob was euthyroid was incorrect. The symptoms Rob continued to suffer were the natural consequences of his thyroid disease. Rob was not truly euthyroid, his levels were unstable, and that resulted in "sustained cognitive impairment." [LIN000401]. Still, LFG continued to claim Rob was euthyroid and that he had no evidence supporting his symptoms. Both of which completely ignored the evidence plainly in front of them.

Additionally, Dr. Reed's opinion that Rob was euthyroid or near euthyroid did not mean Rob was not still suffering from the same symptoms he had been since 2016. In fact, in March 2019, Dr. Judd specifically noted Rob had no notable improvement in his depressive symptoms. [LIN001935]. This isn't uncommon, and Rob provided an article from the Journal of Neuropsychiatry stating that "neuropsychiatric symptoms are common in Graves' disease [and] may continue even after peripheral euthyroidism has been achieved. . ." [LIN000623]. Rob also provided an article from the Journal of Clinical and Translational Endocrinology that states, "Several studies have shown that the mental symptoms improve after thyroid function is

normalized, but it is also known that mental symptoms remain in many patients after thyroid function is normalized." [LIN002165].

Dr. Sood, Dr. Hertza, and LFG ignored this. They did not even reference the medical literature Rob provided. Moreover, no one bothered to actually evaluate Rob, as the plan requires, to see if he could perform the duties of his occupation. LFG simply saw the word "euthyroid" in records from Dr. Reed and terminated Rob's benefits—completely ignoring the fact that his symptoms continued to prevent him from working. Two months *after* LFG terminated Rob's benefits, Dr. Conley recorded that Rob was not employable due to the severity of his symptoms. **The error of thinking Rob was euthyroid is understandable given Dr. Reed's error, but ignoring the rest of Rob's medical records and the fact that none of his symptoms had abated is inexcusable.** This was a textbook example of an insurance company emphasizing parts of a record it likes and deemphasizing what it does not. *See Metro Life Ins. Co. v. Glenn*, 554 U.S. 105, 118, 128 S.Ct. 2343, 2352 (2008).

LFG's initial basis for terminating Rob's benefits rested solely on Dr. Reed's records. LFG did not obtain an endocrinologist to review this claim until after the second appeal when counsel for the claimant suggested it. [LIN000088]. Further, by ignoring the fact that Rob's symptoms persisted after Dr. Reed said he was euthyroid, LFG failed to recognize that Rob still could not perform the main duties of his occupation. His cognitive decline was too severe, and too sustained, for him to perform his job. But LFG did not evaluate this. LFG disregarded it instead. Thus, LFG lacked substantial evidence to disregard Dr. Berger's opinion.

LFG also summarily disregarded the test results, diagnosis, and opinions that Rob cannot perform his job from Dr. Conley, because of a review from Dr. Hertza, who stated he *could not interpret the results*. [LIN000419]. It is generous to say that Dr. Hertza provided LFG

contradictory evidence to Rob's treating physicians. It is generous because Dr. Hertza he never denied that Rob experienced the reported symptoms. He did not point to anything "that would cause him to doubt [Rob's] claim and those of [his] treating doctors" that he experienced those symptoms. *See DuPerry*, 632 F.3d at 873. All he said was that he could not interpret Dr. Conley's report forensically. He never explained what that meant. He never asked to examine Rob himself.

Dr. Hertza's final opinion—adopted summarily by LFG—was that the symptoms Rob reported "are not reported to be observed behaviorally," [LIN000212] Yet, it is clear from Dr. Hertza's report that LFG did not provide Dr. Hertza—and Dr. Hertza did not list that he reviewed—certain evidence Rob submitted in his appeal (i.e. affidavits from family, friends, himself). *See* [LIN000216-18, LIN000426-28] omitting these affidavits from Mr. Learn, Wendy Learn, Virginia Penn, Jason Thompson, and Brian Heffernan. Dr. Hertza cannot offer substantial evidence if he was not given all of the information to review.

At the end of the day, Rob went to his psychiatrist, was referred to a neuropsychological examination, provided the results, only for LFG to disregard those tests and again claim he lacks evidence. He got the testing that was available to him. And he submitted it. Rob provided the "type of evidence a claimant in [his] situation could produce." DuPerry, 632 F.3d at 873. Dr. Hertza's only comment is that the results are not interpretable forensically. In other words, LFG had no basis for disregarding Dr. Conley's evidence.

### iv. LFG's Interpretation was Inconsistent with Other Provisions and Earlier Interpretations of the Plan

As discussed above, LFG used a standard inconsistent with the policy's definition of "Totally Disabled" when it claimed Rob is not disabled because he did not receive "intensive" care. This interpretation of the policy is irrelevant to the policy's definition of whether Rob "is unable to perform each of the Main Duties of his or her Own Occupation." LFG never required

"intensive" care before March 5, 2019. Rob was never hospitalized for his depression, anxiety, or cognitive decline caused by his Thyroid storm. LFG hardly mentions the duties of Rob's occupation and never uses the actual job description from Centra. [LFG002199]. LFG and its reviewers ignored the high-level cognitive requirements for his occupation and instead listed the physical requirements of the job and classified it as "light work." [LIN000204].

Moreover, LFG's review applied an inconsistent interpretation by claiming Rob's mental status examinations (MSEs) did not show a disability. The flaws with LFG's claim are multifaceted, but, relevant here is that Rob's MSEs at the time LFG terminated his benefits were nearly identical to his MSEs in 2017 when LFG approved Rob's disability. Dr. Helding admitted as much when he wrote that the MSE's were fairly consistent. [LIN002406]. LFG failed to explain why his MSEs were an issue in 2019 when they were not in 2017, despite being nearly identical.

### v. LFG Lacked a Reasoned and Principled Decision-Making Process

In evaluating a claim and sending a claim denial letter to the claimant, an insurance company must adequately consider or rebut the evidence the claimant provided of his disability, or its decision is not the product of a reasoned and principled process. *Montero v. Bank of Am. Long-Term Disability Plan,* No. 315CV00519RJCDSC, 2016 WL 7444957, at *4 (W.D.N.C. Dec. 27, 2016). It cannot "wholesale disregard" the claimant's evidence, *Scott v. Eaton Corp. Long Term Disability Plan*, No. 8:019-2572-NMH, 2010 WL3522400, at *5 (D.S.C. Sept 3, 2010), rev'd, 545 App'x 154 (4th Cir. 2011), nor arbitrarily refuse to credit the claimant's physicians, *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834, 123 S.Ct. 1965, 1972 (2003).

An insurance company cannot emphasize parts of medical records that it likes and deemphasize the parties of the records that it doesn't like, and it must give all of the records to its independent consultants. *Metro Life Ins. Co. v. Glenn*, 554 U.S. 105, 118, 128 S.Ct. 2343, 2352

(2008). Finally, in order to meet ERISA's strict fiduciary standards, an insurance company must address evidence favorable to the claimant "thoroughly and at length." *White v. Eaton Corp. Short Term Disability Plan*, 308 F. App'x 713, 719 (4th Cir. 2009).

LFG's "reasoned and principled decision-making process" is to cherry pick statements from providers, ignore other providers, and copy and paste the record reviewer's opinion.

LFG did not provide its record reviewers with all of the evidence Rob submitted in his appeal. And, LFG offered no attempt to rebut the evidence Rob submitted. The closest it came to addressing the favorable evidence was to copy and paste the notes of reviewers, who in turn did not address Rob's symptoms or favorable evidence either. Copying and pasting, failing to rebut, and only emphasizing parts of the record it likes fails to adhere to ERISA's standards.

LFG's August 30, 2019 letter states that the "medical records provided are insufficient in volume and content to support any physical restrictions or limitations from 03/05/2019 forward … there are not providers certifying physical disability for the time period of 03/05/2019 and forward." [LIN002314]. This shows a fundamental misunderstanding of Rob's disability.

LFG's red herring argument is correct that there was no physician certifying a *physical* disability. In other words, Rob can still lift, stand, sit, bend, crouch, kneel, crawl, etc. However, LFG possessed records from Dr. Conley's neuropsychological examinations certifying that Rob had a physical condition that manifested in *cognitive and emotional symptoms* causing his disability—which is what Rob's claim was based on in the first place. This is in addition to the records from Rob's other physicians describing his dysfunction as well as the evidence from Rob's affidavit, Rob's supervisor, his family, and close friends—all describing Rob's inability to perform the cognitive functions necessary for his job.

Much of LFG's denial letter was based on Dr. Hertza opinion that (1) there was no indication of higher-level care, (2) he could not interpret Dr. Conley's neuropsychological evaluation, and (3) that Rob's mental status examinations (MSEs) did not describe functional impairment. [LIN000205-207]. Having dealt with the first two bases already above, the problem with LFG's use of Rob's MSE findings is that they have been largely the same throughout the entire process. As has been made clear, Rob went through a series of highs and lows where some months would have easier symptoms than others. But for the most part Rob's MSEs never changed. What is strange about LFG using his MSEs as a basis to terminate benefits is that the MSEs it says is now evidence Rob is not totally disabled, are the same as when LFG approved Rob's disability in 2017. How can the MSEs in 2017 not be an issue, or even support disability, but in March 2019, nearly identical MSEs now be the basis for claiming Rob is not disabled? This is a mystery LFG has continuously failed to address.

This is nothing more than LFG moving the goalpost for Rob. There was virtually no change in Rob's MSEs from 2017 to 2019, so LFG cannot suddenly claim the MSEs show he can perform the duties of his occupation. Besides, a mental status examination reveals very little about whether a person can perform the main duties of his occupation. A MSE is a routine assessment where the treating physician includes general observations during the encounter. It is *not* an evaluation of someone's disability and whether he can perform the duties of his occupation.

This pattern of shortfalls is made abundantly clear in LFG's final appeal letter, which is nothing more than a cacophony of notes from LFG's third-party record reviewers copied and pasted into a letter. It fails to address the merits of Rob's claim and it delegates decision making authority to the record reviewer. A patchwork of copying and pasting under no circumstances reflects a reasoned and principled decision-making process. It is LFG's job to evaluate the

substance of Dr. Berger's opinion and Dr. Conley's opinion versus conflicting opinions. Which is supported by the evidence?

Instead, neither LFG nor the record reviewers responded or addressed Dr. Berger or Dr. Conley's opinions. Dr. Berger pointed out—in direct contradiction to Dr. Sood—how Rob could not be considered euthyroid and his roller-coaster like TSH levels exacerbated his symptoms. Dr Sood's only response to her peer's criticisms was "[n]o, the new information does not at all impact and/or change your prior findings." [LIN000213]. She even used the wrong pronoun! That is, unless she is telling LFG what its finding should be, which only furthers the point. Here, Dr. Berger is the only endocrinologist in this process who provided a citation for her opinion on the TSH values, from the Endocrine Society. [LIN000617]. Dr. Sood did not provide any explanation or evidence to support her conclusions.

It is not reasonable when an insurance company relies on irrelevant evidence, makes red herring arguments, uses arbitrary standards outside the plan's language, and completely ignores evidence favorable to the claimant. But that is exactly what LFG did in this case. All of these problems come from LFG's systemic refusal to actually evaluate the claim. Instead, it adopts whatever position the record reviewer espouses and goes with it. This is not the exercise of discretion, it is the abdication of it, which is an abuse of discretion.

### vi. LFG's Actions Did Not Comply With ERISA

LFG did not meet the standards that federal law imposes on plan administrators. As the Fourth Circuit has recognized, "[p]rocedural guidelines are at the foundation of ERISA and 'full and fair review must be construed . . . to protect a plan participant from arbitrary or unprincipled decision-making.'" *Gagliano v. Reliance Standard Life Ins. Co.*, 547 F.3d 230, 235 (4th Cir. 2008). Specifically, "[p]lans must 'provide adequate notice in writing to any participant or beneficiary

whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant.'" *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 830, 123 S. Ct. 1965, 1970 (2003) (quoting 29 U.S.C. § 1133(1)).

In the August 30, 2019 denial letter, LFG violated 29 C.F.R. 2560.503(g) by failing to provide "[a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary." If, as LFG claimed, it did not find Rob's cognitive symptoms severe enough to prevent him from performing the duties of his occupation, LFG was required to explain what evidence Rob needed to obtain to demonstrate he was still disabled. LFG's denial letters failed to comply with this standard.

In the November 9, 2019 letter, LFG attempts to evade its 2560.503(g) requirement by stating "[w]e do not direct the care needed for your client and therefore are unable to specifically outline the information that would support this claim." [LIN002280]. While this is a clever attempt, it is an evasion of ERISA's standards, nonetheless. If LFG wants to claim the medical evidence and test results Rob provided are insufficient, LFG must state what additional information would satisfy LFG. No one requires LFG to "direct [his] care"—but it does have to be transparent in the decision-making process. This means LFG must specify in its denial letter what information Rob needed to produce to perfect his appeal. LFG did not do so.

In the May 21, 2020 appeal decision letter, LFG also failed to comply with 29 C.F.R. 2560(g)(1)(vii)(A)(i) which required it to explain its "basis for disagreeing with or not following . . .*(i)* The views presented by the claimant to the plan of health care professionals treating the claimant and vocational professionals who evaluated the claimant." LFG did not have these opinions before the August 30, 2019 denial letter. But it did have them before the May 21, 2020

appeal decision. Simply pasting a reviewer's notes into a denial letter without giving any substantive comments does not afford Rob a full and fair review. But that is exactly what the May 21, 2020 denial letter boils down to. [LIN000203]. It shows a lack of effort to review Rob's appeal. LFG did not address the evidence favorable to Rob to explain why it disagreed with that evidence. It simply made conclusory statements from record reviewers claiming there was not enough or that his symptoms were not severe enough.

To make matters worse, the notes of the reviewer's themselves (Drs. Sood and Hertza) both offer a scant analysis. Dr. Hertza states he cannot interpret Dr. Conley's neuropsychological examination and Rob's symptoms haven't been observed behaviorally even though he didn't have the affidavits or medical literature. And, when did that become a requirement of the Plan? Dr. Sood declined to respond to Dr. Berger's substantive analysis showing Dr. Sood's conclusion was not consistent with Rob's TSH results. Even combined, the letter is void of a real discussion of the merits of Rob's claim. What this really shows is that there was no effort to review Rob's claim.

Favorable evidence was ignored, treating physicians like Dr. Berger and Dr. Conley ignored, evaluations ignored, sworn statements ignored, prior queries from Rob's counsel asking LFG to explain the basis for its denial or what evidence it needs from Rob ignored. LFG's obligations under ERISA were simply ignored.

### vii. LFG Has a Conflict of Interest and a Strong Motive to Terminate Rob's Benefits

Because LFG "serves in the dual role of evaluating claims for benefits and of paying benefit claims," LFG has a "structural conflict of interest." *Williams v. Metropolitan Life Ins. Co.*, 609 F.3d 622, 632 (4th Cir. 2010). Rob earned $117,998.40 per year. This translated to his long-term disability benefits being $70,791.83 per year. If Rob remains disabled, the lifetime value of this claim is $943,891.20 from March 5, 2019. Bottom line, Rob being on claim would cost LFG almost

a million dollars for the duration of the policy. As noted in Rob's appeal letter, this conflict was apparent by LFG's lack of effort to even try to explain why it continued to ignore objective evidence of cognitive impairment. [LIN002070]. LFG would simply allege Rob's symptoms were not "of a nature or severity that would be expected to result in a functional impairment"—a ridiculous claim given that it contradicts exam results, numerous treating physicians opinions, and that no one from LFG ever examined Rob to know how severe his symptoms were. [LIN002315].

Consequently, the Court should weigh LFG's conflict of interest in Rob's favor.

**CONCLUSION**

Standing in front of an array of evidence demonstrating Rob continued to suffer from the same serious symptoms as he did in 2017, LFG chose to ignore all of that evidence and exclusively rely on vague comments of record reviewers who either: (1) did not receive all of the appeal documents for review (affidavits and medical research), (2) did not evaluate Rob in person to judge the severity of his symptoms, (3) stated they could not interpret Rob's examination results, (4) declined to defend themselves when their position was attacked by experts in the field, (5) did not examine the cognitive demands of Rob's occupation, (6) did not review the complete medical record provided, (7) disregarded the opinions of Rob's treating physicians without explanation, (8) used arbitrary standards outside the plan's language, and (9) and claimed MSEs identical to those in 2017 when Rob's disability was approved now prevent him from being disabled. In addition, LFG continued to rely on Dr. Reed's opinion that Rob was euthyroid even after the specialist that Dr. Reed turned Rob's treatment over to explained that Dr. Reed was incorrect.

LFG failed to state what evidence Rob needed to perfect his claim, declined to respond to repeated queries from Rob's counsel asking what type of assessment or evidence it would like Rob to take, disregarded evidence from multiple of Rob's treating physicians, used standards outside

the language of the plan, failed to explain why it disregarded Rob's physicians, and failed to provide substantial evidence to justify going against the evidence Rob submitted.

For these reasons and others outlined above, the Court should grant summary judgment to the Plaintiff. Plaintiff is entitled to payment of his back benefits and to be restored to "on claim" status. Moreover, in most lawsuits seeking relief under ERISA, "a reasonable attorneys fee and costs" are available "to either party" at the court's discretion." § 132(g)(1). Plaintiff asks for leave to file an application for fees and cost at the conclusion of this case.

Respectfully submitted,

By Counsel: _____/s/_____
ROBERT LEARN

Brandon S. Osterbind, Esq. (VSB No.: 77159)
Kelly A. Osterbind, Esq. (VSB No.: 74984)
OSTERBIND LAW, PLLC
1216 Greenview Drive, Suite A
Lynchburg, VA 24502
Phone: 434-515-2807
Fax: 434-818-0895
bosterbind@osterbindlaw.com
kosterbind@osterbindlaw.com

**CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that on July 9, 2021, I electronically filed this document with the Clerk of the United States District Court for the Western District of Virginia using the CM/ECF system, which will serve an electronic copy on the following:

Alexander Tevis Marshall, Esq. (Tevis.Marshall@ogletreedeakins.com)
Kyle Kirby, Esq. (kyle.kirby@ogletree.com)
Byrne Decker, Esq. (b.decker@ogletree.com)
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
Riverfront Plaza, West Tower
901 E. Byrd Street, Suite 1300
Richmond, Virginia 23219


_____/s/_____
Brandon S. Osterbind, Esq.
