**IN THE UNITED STATES DISTRICT COURT FOR**
**THE WESTERN DISTRICT OF VIRGINIA**
**(Lynchburg Division)**

| | | |
|---|---|---|
| **ROBERT LEARN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Case No. 6:20-cv-00060-** |
| | ) | **NKM** |
| **THE LINCOLN NATIONAL LIFE INSURANCE** | ) | |
| **COMPANY** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**
**(ERISA LONG-TERM DISABILITY BENEFITS)**

Plaintiff, by counsel, submits this Plaintiff's Memorandum of Law in Opposition to the

Defendant's Motion for Summary Judgment.

1. **LFG's plan does not require objective evidence, and when asked, LFG confirmed**
   **this in a letter.**

Defendant argues that "[w]here a plan, as here, requires 'proof' of continued disability,

Courts in the Fourth Circuit, as elsewhere, regularly hold that the concept of proof connotes an

'objective' component to such evidence." See Def. Br. Summ. J. 25, ECF No. 26. The Defendant

cites to Coffman v. Metropolitan Life Ins. Co., 217 F.Supp.2d 715 (S.D. W.Va. 2002) and argues

that any holding otherwise would allow Rob to pass his self-reported "subjective and effervescent

symptomology" through is doctors. This position requires the Court to believe that Rob is

manufacturing his symptoms and his doctors have bought it hook, line, and sinker. Defendant goes

on to claim that no objective evidence had been provided by Rob or his counsel, even though, as

argued below, objective evidence was offered and ignored by the Defendant.

However, as this Court can clearly see in the administrative record, the undersigned counsel requested from LFG what "specific objective evidence" was missing. [LIN002299]. We further requested LFG to describe what "specific type of objective evidence" Rob should provide in order to adequately support his appeal. LFG's response was underwhelming:

> Objective evidence is not a requirement to satisfy this provision; however, medical evidence supporting the claim being made is needed. This can include office and treatment records, testing results, therapy results, or any other type of documentation that would support the inability to perform the main and substantial duties of one's occupation. We do not direct the care needed for your client and therefore are unable to specifically outline the information that would support this claim.

[LIN002280]. This is LFG's own interpretation of its plan that Rob then followed. But the lawyers for LFG's interpretation is entirely different. "It is not asking too much that, in the course of a 'full and fair review,' see 29 U.S.C. § 1133, administrators notify a claimant of specific information that they were aware was missing and that was material to the success of the claim." Harrison v. Wells Fargo Bank, N.A., 773 F.3d 15, 21 (4th Cir. 2014). To be blunt, it is disingenuous to insist, now, that this Court should require some additional, unspecified objective evidence when LFG specifically negated any such requirement.

The Defendant's brief also omits that the court in Coffman noted that it was "not unreasonable *under these circumstances*," Coffman, 217 F.Supp.2d at 732, to require objective evidence, but the court also noted that in Mitchell v. Eastman Kodak Co., 113 F.3d 433 (3rd Cir. 1997), the result was the exact opposite. In Mitchell, the 3rd Circuit Court of Appeals held that "[a]lthough in some contexts it may not be arbitrary and capricious to require clinical evidence of etiology of allegedly disabling symptoms in order to verify that there is no malingering, . . . it was arbitrary and capricious to require such evidence in the context of this plan and [chronic fatigue syndrome]." Mitchell, 113 F.3d at 442-43.

In Judge Robert E. Payne's words, "[a] denial may be upheld where objective evidence is lacking; but it also may not be, depending on the facts of each case. Wasson v. Media Gen., Inc., 446 F. Supp. 2d 579, 601 (E.D. Va. 2006). In other words, each case rises and falls on its own merits. Under Mitchell, whether it is reasonable to require objective evidence depended on the plan itself and the claimant's medical condition. But, in this case, requiring objective evidence—when the plan language does not require it and after specifically telling the Plaintiff that it was not required—in an abuse of discretion.

> **2. Rob offered objective evidence that LFG ignored, further demonstrating the unreasonable and unprincipled length it is determined to go in order to deny Rob's long-term disability benefits.**

LFG is further wrong in asserting that Rob did not present objective evidence. The administrative record is replete with objective evidence documenting Mr. Learn's diagnosis of Graves' Disease, his fluctuating thyroid levels, and resulting cognitive and psychiatric symptoms. The TSH labs objectively prove his hyper and hypothyroidism. There is no question from LFG that Rob has Graves Disease. There is no question that "has been dealing with hypothyroid phase for many years." [LIN000214]. There is no question that "from 03/05/2019 to [5/1/2020], [Rob's] physicians have been adjusting the dosage of thyroid medication." Id.

The medical literature, which LFG ignored on appeal, verifies that after achieving euthyroid, cognitive and psychological symptoms may persist. Moreover, neither Drs. Hertza nor Sood characterized Dr. Conley's report as subjective.

Dr. Reed, however, specifically characterized Dr. Conley's neuropsychological evaluation as objective. In his letter dated February 5, 2020, Dr. Reed said that he reviewed Dr. Conley's report and he said that it "showed some objective cognitive decline." [LIN02070]. He further opined that his "altered thyroid state could have emphasized changes from his underlying

behavioral health diagnosis and his cognitive decline is objective and its etiology at this time is uncertain." Id. He lastly said that "the link is well supported that thyroid dysfunction when it is elevated or reduced can have clear cognitive deficits." [LIN002070-71].

The Defendant argues throughout its Memorandum in Support of Defendant's Motion for Summary Judgment, that Rob's treating doctors did not rely on Dr. Conley's neuropsychological evaluation. But that is simply not true. Dr. Reed relied on it in his office note dated September 5, 2019 and he also relied on it when he gave his medical opinion on February 5, 2020. The Defendant says that "even [Dr. Berger] does not rely on Dr. Conley's un-validated test results." See Def. Br. Summ. J. 25, ECF No. 26. Again, this is not true and is a gross misrepresentation of the administrative record. Dr. Berger clearly had access to Rob's medical records. She thoroughly recounted Robs course of treatment from 2016 to the date of her letters and she specifically "re-review[ed]" the medical records prior to writing her second opinion letter. [LIN000401]. Assuming, for the sake of argument, that Dr. Berger only had access to Dr. Reed's medical records, Dr. Reed specifically noted in his September 5, 2019 office visit note that Dr. Conley's neuropsychological evaluation will be placed in the record.

LFG argues on brief, that Dr. Critchfield and Dr. Hertza both claim that Dr. Conley's report was unreliable. See Def. Br. Summ. J. 23, ECF No. 26. This is inaccurate.

Dr. Critchfield completed two reports, one on June 27, 2019 and another on August 20, 2019. In second report, he copied and pasted his medical history description and his rationale. The words are identical. Compare LIN002321 with LIN002344. When describing Dr. Conley's report, Critchfield said "[e]valuation did not include any standalone measures of performance validity. Embedded measures of performance validity appeared to be within expectation." Dr. Critchfield opined that "[n]europsychological testing completed 5/24/2019 did not reflect memory or attention

deficits of a nature or severity that would be expected to result in a functional impairment." Dr. Critchfield never said that the testing was not reliable, in either report.

Moreover, the appeal decision issued on August 30, 2019 did not say that Dr. Conley's report was unreliable. Instead, the appeal decision said that the neuropsychological evaluation was not bad enough, i.e., "did not reflect memory or attention deficits of a nature or severity that would be expected to result in functional impairment." [LIN002315].[1] The Defendant did not cite the "lack of validity measures" until it quoted Dr. Hertza's report on May 21, 2020. [LIN000206].

But Dr. Hertza also never said that Dr. Conley's tests were unreliable. He also completed two reports, one on March 27, 2020 and another on May 1, 2020. In his first report he noted "[a]ccording to the provider, results were believed to be accurate; however, no effort tests with regard to cognition were utilized and as a result, this test is not interpretable for forensic reasons." [LIN000419]. To say that Dr. Hertza claimed that the test results are not reliable, when he said they were not interpretable, is, once again, disingenuous.

Contrast this to the evidence before the Plan Administrator in the cases cited by the Defendant, Johnston v. Prudential Ins. Co. of Am., 916 F.3d 712 (8th Cir. 2019) and Gorbacheva v. Abbot Lab. Ext. Disability Plan, 309 F.Supp. 3d 756 (N.D. Cal 2018).

In Johnston, Prudential hired two neuropsychologists to perform examinations on the claimant. In the first examination, "Dr. Denney used multiple tests for the validity of Johnston's responses, both 'embedded' and 'free-standing.' He was unable to determine whether Johnston was cognitively impaired because Johnston failed almost all of the validity tests." 916 F.3d at 713-14. Dr. Denney reviewed Johnston's previous examinations and said, "one examination had failed

---

[1] As illustrated in more detail below, this conclusion was plagiarized from Dr. Critchfield's medical review.

validity indicators, while the other examination had inconsistent results that suggested invalidity." Id. at 714. After Johnston appealed, Prudential hired another neuropsychologist who said Johnston "failed all nine validity measures . . . and she reported that he was attempting to appear more impaired than he actually is. . . ."

In Gorbacheva, the plan administrator's hired doctor noted significant irregularities in the functional capacity evaluation. Id. at 764.

> There was clear catastrophizing behaviors in driving, sitting, standing [and] walking. The exam reports reduced ROM in most body parts tested. The claimant complained during every test of pain and was unable to do several tests due to pain complaint. Examples include carrying eight pounds made her walk differently and caused her knee to lock up. Despite alleged severe pain all day, it should be noted that her heart rate remained low normal at 64 and BP (blood pressure) did not elevate outside normal ranges. The claimant took several breaks during the test including several requests for breaks during 14 minutes of typing. The claimant needed to lie down at the lunch break during the RCE and was fatigued for the afternoon session of day one. The claimant did not report for day two and later the test center received a call from the claimant's attorney that she had a knee injury suffered in a fall in her closet at home. The conclusion was the claimant could not work any job. No validity measures were used during this testing."

Id. Most notably, and absent in this case, the record reviewer opined that the testing "was not done to the standards of usual care and does not appear to have been done using one of the standardized techniques." Id. Moreover, in that case, the plan administrator "explained why the FCE and SSDI decision did not alter her conclusion" and the record reviewer described the plan requirements for meeting "the definition of disability." Id. Instead of explaining, both Younker and Jackson just copied and pasted from the record reviewers and completely ignored Dr. Conley's report, Dr. Reeds February 5, 2020 opinion letter, and Dr. Berger's February and April 2020 opinion letters.

Neither of these cases stand for the proposition that the lack of free-standing validity measures renders the neuropsychological evaluation invalid. Rather, quite the opposite. Dr.

Denney, in the <u>Johnston</u> case, was able to say that the results of the neuropsychological testing was inconsistent and "suggested invalidity." 916 F.3d at 714. Neither Drs. Critchfield, nor Hertza said that here. Dr. Critchfield said that the "[e]mbedded measures of performance validity appear[ed] to be within expectation." Dr. Hertza never questioned the "validity" of Dr. Conley's examination by saying the results are inconsistent. In fact, if the result were to be invalid, one might expect more than 2 poor results out of 10 tests performed. <u>See</u> [LIN002363] (listing tests under section titled "Tests Administered").

Instead, Dr. Hertza based his initial opinion on three things: (1) unremarkable mental status examination, (2) lack of "validity measures" in Dr. Conley's neuropsychological evaluation, and (3) lack of intensive treatment.

After Dr. Hertza's report was provided to Rob for a response, the undersigned counsel responded and argued that (1) the mental status examination were the same throughout his treatment, (2) Dr. Conley's embedded validity measures were sufficient for Dr. Conley, Dr. Conley assessed Rob's credibility in his evaluation, and that Dr. Conley was treating Rob not examining him forensically, and (3) Rob had been referred to transcranial magnetic stimulation treatment, which is intensive outpatient treatment.

After Rob filed his response to Dr. Hertza' opinion, Dr. Hertza was asked to review the case again and provide a response. In his reply dated May 1, 2020, Dr. Hertza no longer maintained his three reasons for his opinion. He did not even mention mental status examinations. [LIN000211-12]. He did not take that opportunity to say that Dr. Conley's test results were unreliable. He never said that these validity measures were a part of the standard of care for a provider like Dr. Conley. And, he did not say anything about his intensive treatment requirement or the TMS treatment that Rob was receiving.

Rather, now Dr. Hertza just said that Rob's symptoms "are often seen with thyroid disorders," but they "are not reported to be observed behaviorally." He says this because the Defendant did not provide him with Dr. Reed's February 5, 2020 Medical Statement, Rob Learn's affidavit, Wendy Learn's affidavit, and all lay witness affidavits. These witnesses observed Rob's symptoms behaviorally. Of Course, Dr. Hertza did not know that when he wrote his opinion.

Dr. Hertza also noted, and LFG ignores, that "formal evaluation is ***not necessary*** to determine functional impairment." (emphasis added). Formal evaluation like the one Dr. Conley performed, only helps to "evidence level of deficit" when "mental status exams are non-descriptive." [LIN000212].

So, in this case, LFG denied long-term disability benefits to Rob because there were no validity measures in a formal evaluation, that was not necessary, but merely helpful, to determine the degree of functional impairment. In other words, Dr. Conley's report was not even necessary to determine that Rob was disabled. This is the extent of Dr. Hertza's opinion. He completely retreated from his earlier three reasons and just opined that Rob's symptoms "were not reported to be observed behaviorally." [LIN000212].

Keri Younker copied and pasted the nurse disability consultant and Dr. Critchfield's opinions in its August 20, 2019 denial letter. And, Joseph Jackson simply block copied and pasted Drs. Hertza and Sood's conclusions in its final decision without weighing the evidence Rob submitted. At least Mr. Jackson did it in block quotes where Ms. Younker simply plagiarized. When the Plan "Administrator's denial letters simply quote the plan language and then conclude [the claimant's] evidence fails to suffice," the record leaves the Court "guessing as to how the Administrator interpreted the plans . . . definition[s]." Corey v. Sedgwick Claims Mgmt. Servs.,

Inc., 858 F.3d 1024, 1028 (6th Cir. 2017). That is exactly what LFG did here. As a result, neither denial letter meets the requirement of a deliberate and reasoned decision-making process.

**3. LFG cannot ignore evidence, ignore conflicts in the evidence, and blindly adopt its record reviewer's opinions without even considering issues raised by the treating doctors on appeal.**

In Donovan v. Easton Corp., Long term Disability Plan, 462 F.3d 321 (4th Cir. 2006), during a review of the claimants any occupation disability, three peer reviewer experts opined that there was no objective evidence of disability. 462 F.3d at 327-28. The claimant's treating physician opined that she could work in a sedentary capacity. Id. at 328. Later, that same treating physician submitted an affidavit that changed his position some four months later. Id. The claim administrator denied ongoing long-term disability benefits saying there was "insufficient objective clinical documented [evidence] to support a level of functional impairment that would render [the claimant] unable to perform any occupation." Id. at 323. The claimant appealed, and, after being denied, filed in her complaint pursuant to 29 U.S.C. § 1132(a)(1)(B). Id.

At first blush, that seems like a cut and dry case. That is until the Fourth Circuit Court of Appeals started listing all of the evidence and contradictions that the claim administrator ignored. The court noted that the reviewing doctor ignored the claimants "statements that she suffered from 'chronic pain in [her] neck, back and legs. In her affidavit she states she is also plagued by 'profound fatigue' and she has difficulty sleeping' which 'also contributes to [her] severe fatigue.'" Id. at 327. The peer reviewer also disregarded the claimant's qualification of her activities on the Resource Questionnaire she filled out. Id.

The court held that the radiology reports—that were taken in between the treating physicians two opinions—lends substantially greater weight to the subsequent opinion that the claimant was totally disabled. Id. at 328. The court concluded that the claim administrator, and the

plan's "wholesale disregard" for the treating physician's opinion in favor of his earlier statement (that was based on incomplete information) was unreasonable. Id. at 329. Even though the Plan had three doctors review and opine that there was no functional impairment, the Fourth Circuit concluded that "Eaton's decision to deny Ms. Donovan long term disability benefits is not supported by substantial evidence in the record. Id.

In discussing the Donovan opinion, the Fourth Circuit Court of Appeals described its own opinion as follows:

> We found that decision unreasonable, however, because of Eaton's "wholesale disregard" of evidence supporting the employee's claim. Specifically, Eaton focused on a statement by the employee's doctor that suggested she was still capable of performing sedentary activities, without addressing a subsequent statement by the same doctor in which the doctor determined that the employee was totally disabled. *Id*. We also observed that Eaton's in-house peer reviewers ignored evidence favorable to Donovan's claim, including Donovan's own statements regarding her pain levels and ability to engage in everyday activities.

White v. Eaton Corp. Short Term Disability Plan, 308 Fed. Appx. 713, 717 (4th Cir. 2009) (citations omitted). In White, the Fourth Circuit Court of Appeals found both cases to be substantially similar in that, in both cases, Eaton "either failed to elaborate on or outright ignored, evidence favorable to the claimant. These deficiencies in the Plan's decision-making process are reflected especially in its treatment of White's FCE, its failure to address conflicting explanations of White's job requirements, and its failure to adequately address medical evidence supporting White's claim." Id. at 717. There, the court noted that a functional capacity evaluation concluded that Mr. White "demonstrated the ability to physically return [to work] without modifications" as a machinist. Id. at 714-15. The FCE, however, also noted that White "did not demonstrate the ability to meet the following job demand categories: Walk and Reach Immediate." Id. at 714.

A record reviewer was hired to say that the "medical records as reviewed fail to support functional impairment that preclude the claimant from returning to his occupational duties . . ." Id. at 715. A second record reviewer was hired to say the "medical records do not support a functional impairment that would prevent him from working . . ." Id. A third record reviewer was hired to say "[a] review of the records does not support the patient's claim of disability. He has continuing complaints of back pain, but multiple physical exams have shown limited objective findings. . . Most importantly, the FCE—the best test of his functional abilities—demonstrates that he is capable of performing his regular work." Id. at 716. Citing the FCE, objective physical findings from the medical records, and three record reviewers, the claims administrator denied White's long-term disability. Nonetheless, the Fourth Circuit Court of Appeals concluded that Eaton abused its discretion and affirmed the district court's ruling granting White benefits. Id. at 720.

This case is entirely contrary to cases like Scott v. Eaton Corp. Long Term Disability Plan, 454 Fed. Appx. 154 (4th Cir. 2011). There, the only doctor to say that Scott was disabled was her "well-meaning family doctor." Id. at 160. But Scott's family doctor was inconsistent in his opinion, Id. at 157, said Scott could perform sedentary work, Id. at 157-58, and Eaton hired three specialist "who gave no indication of unreliability." Id. at 160. The specialist hired by Eaton actually considered all of the conditions relied on by Scott's well-meaning family doctor and considered any side effects of medication that she was on. Id. at 158. All of the issues raised by Scott's treating doctor were addressed by the specialist record reviewer hired by Eaton. Id. at 160-61.

Here, Dr. Berger, who is a board certified endocrinologist, said "[i]t is difficult to pinpoint the exact date when he can return to work, but we are both hopeful that with continuation of medical regimen with any necessary adjustments, that within 6 months he may be able to perform job related duties." [LIN2109]. Two months later she said "[in] my prior letter [I] felt that he could

potentially return to an employable level of functioning but he knows and I concur that he is not capable of ever being able to return to the level of work of which he was performing prior to 2016."

Dr. Conley, who is a neuropsychologist, said that Rob's "acquired neurocognitive deficits, combined with his reactive neuropsychiatric disorder, specifically Major Depressive Disorder, render him disabled and incapable of maintaining employment at the present time. The fact that Mr. Learn's history is positive for strong academic and vocational achievement of a period of many years, prior to his thyroid disease, strongly supports this conclusion." [LIN002365]. Dr. Conley characterized Rob's condition as "Severe (inability to work)."

Dr. Reed reviewed Rob's levels noting his TSH level was normal when he saw Dr. Berger but his antithyroglobulin antibody was significantly elevated (942 IU/ml (ref 0 – 0.9) and his antithyroperoxidase antibody was 306 IU/ml (ref 0-34). [LIN002070]. He then said that Rob's "performance is very difficult to assess until he had been rendered biochemically euthyroid for a period of 8 weeks or more. Many if not all of his described behaviors between 2016 and 2018 could well have been either directly or indirectly accounted for by the coexistent thyrotoxicosis and subclinical hyperthyroidism and hypothyroidism. This altered thyroid state could have emphasized changes from his underlying behavioral health diagnosis and his cognitive decline is objective and its etiology at this time is uncertain." Id.

These opinions were specific, thorough, and provided by specialists in their respective fields. This is not the case of an inconsistent opinion of a well-meaning family doctor that can be disregarded for the opinion of a consistent record reviewer medical specialist. Because these are specialists who provided a thorough analysis of Rob's condition and his ability to work, the Defendant could not simply ignore them.

Just like in <u>Donovan</u>, Dr. Reed changed his opinion after receiving more, objective information (i.e. Dr. Conley's neuropsychological evaluation and Dr. Berger's notes). See [LIN002070]. The Defendant never accounted for that. It does not even appear that the Defendant provided Dr. Reed's February 5, 2020 opinion letter to Drs. Hertza or Sood. <u>See</u> [LIN000216-218] <u>and</u> [LIN000426-28].

Unlike <u>Scott</u>, Dr. Reed relied on Dr. Conley's report as objective evidence. The Defendant never accounted for that. According to Dr. Critchfield, Dr. Conley's embedded validity measures were within expectations. The Defendant never accounted for that. According to Dr. Helding, Rob's mental status exams were consistent throughout his entire treatment even when he was considered totally disabled as defined by the Plan. The Defendant never accounted for that.

As noted in our Memorandum of Law in Support of the Plaintiff's Motion for Summary Judgment, Dr. Reed changed his opinion from saying that Rob was biochemically euthyroid and no longer disabled, to near euthyroid, [LIN001883], and his ability to work was "difficult to assess," [LIN002070]. Rob's lab in April 25, 2019 showed that his TSH was 3.19 and in July 17, 2019 it was a 0.97. LIN001884]. For any normal person, that may be just fine. For Rob, even Dr. Reed wanted it between 1 and 2. [LIN001882]. Fluctuations like this caused significant deterioration in his cognitive and psychological wellbeing. Dr. Reed's notes are replete with references that Rob does poorly with suppressed TSH, and Dr. Reed repeatedly notes his mood and cognitive decline are disproportionate to the amount of TSH suppression. <u>See i.e.</u> [LIN001784]. Even the slightest change can affect him greatly.

Dr. Berger explains that for two years Rob was overdosing during the week and underdosing on Sunday. [LIN002108]. This "played havoc on his depression, anxiety and sleep quality resulting in sustained cognitive impairment." [LIN000401]. Dr. Berger explained in great

detail why Rob was never clinically euthyroid. Clinically euthyroid and biochemically euthyroid may mean two different things. Neither Dr. Sood, nor the Defendant accounted for that.

While the LFG is not required to "automatically . . . accord special weight to the opinion of the claimant's physician," it "may not arbitrarily refuse to credit the claimant's reliable evidence, including opinions of a treating physician." Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003). Of course, whether the administrator arbitrarily refused to credit the claimant's evidence is different in every case. In Nord, the claimant's job was a sedentary job, his disability was mild degenerative disc disease, MetLife sent him to a neurologist for an "independent examination," and that independent specialist opined that he could perform sedentary work. Id. at 826-27. Without those facts, however, the court might reach a different result. It also might make a difference that MetLife's denial letter "summarized the conclusions of Nord's doctors, the results of diagnostic tests, and the opinion of Dr. Mitri," who was the independent medical examiner. Id. at 827.

Here, the result might also be different from Nord given that Rob's job required high level cognitive and psychological ability, that his disability prevented him from doing that, and that no one evaluated him objectively except Dr. Conley who said he could not work any job. And, there was no inconsistency in Dr. Conley's evaluation that would render it unreliable. Unlike MetLife in Nord, LFG did not summarize the conclusions of Rob's doctors, particularly Drs. Berger, Reed, or Conley, or the results of his neuropsychological testing, but rather only summarized the superficial conclusions of LFG's record reviewers. One might also question the veracity of the Defendant's record reviewers knowing that they did not have Dr. Reed's February 5, 2020 opinion, Rob's affidavit, any of the lay witness affidavits, and any medical literature submitted by Rob as a part of his appeal. These questions are especially legitimate, given that Dr. Hertza says Rob's

symptoms have not been observed behaviorally, but yet he was not given the lay witness affidavits or Rob's affidavit showing how his symptoms were observed behaviorally.

Moreover, contrary to the Defendant's argument and Richard Tom's declaration under the penalty of perjury, LFG's appeal decisions were not independent conclusions. Rather, Keri Younker's rationale was a complete copy and paste job. Her analysis was stitched together from the nurse disability consultant and Dr. Critchfield's reports. From the nurse disability consultant:

> The medical records document you were euthyroid (normal) and stable in September 2018. The file indicates you had been released to return to work from a medical perspective as of 03/08/2018, then again in an e-mail in September 2018.
>
> There are no additional medical records beyond 09/11/18, and therefore, the medical records are insufficient in volume and content to support any physical restrictions or limitations from 03/05/19 forward. Also, there are no providers certifying physical disability for the time period of 03/05/2019 and forward.

Compare [LIN000061] with [LIN002315].[2] From Dr. Critchfield's report:

> The available medical records do not provide adequate evidence of cognitive or psychiatric symptoms to result in functional impairment. Neuropsychological evaluation completed 05/24/2019 did not reflect memory or attention deficits of a nature or severity that would be expected to result in functional impairment. Furthermore, multiple mental status exams have reflected intact memory and attention. Anxiety and depression have been longstanding, and present during time periods when you have demonstrated the capacity to work. There is no record that psychological symptoms ever reached a severity necessitating a higher level of treatment, such as intensive outpatient or inpatient psychiatric admission.

---

[2] In black is the nurse disability consultant's comments and in red are the words changed by Kerri Younker in her August 30, 2019 denial letter. This is the central part of her decision-making process and it is merely copied and pasted from the chronological activity report.

Compare LIN002315 <u>with</u> LIN002344 and LIN002321.[3]

These three main paragraphs that Ms. Younker used to explain her reasons for denying Rob's first appeal are simply copied and pasted from other sources. <u>See</u> Exhibit A. The first two paragraphs are copied straight from Lynn Sucha's Nurse Disability Consultant report. The third paragraph is copied directly from Dr. Critchfield's report. Keri Younker uncritically adopts the thought process of record reviewers and make them her own. This is called plagiarism. And, the Defendant touts this process and claims its decisions are above reproach.

This is not a principled and reasoned decision-making process. Copying and pasting a nurse disability consultant and a doctor's report as your rationale rather than properly analyzing and providing her own rationale based on the entirety of evidence is anything but principled and reasoned. And Jackson, incorporated this copy and paste job into his May 21, 2020 final denial letter meaning his analysis suffers from the same defect. [LIN0000205].

At this stage in the litigation, this is entirely relevant to the Defendant's position. The Defendant maintains in the Declaration of Richard Tom that "consulting physicians do not possess authority to make claims decisions" but rather "claims examiners . . . make initial claims decisions and appeals unit examiner . . . make appeal decisions." Tom Declaration ¶ 8. He also claims that "[d]isability claim determinations are not made by physicians or vocational consultants, and they are not made based solely on the reviews of physicians or vocational consultants. Claim examiners make claim decisions based on the entirety of the administrative record, which may include reports

---

[3] In black is Dr. Critchfield's "Rationale," and in red are the words changed by Kerri Younker in her August 30, 2019 denial letter. This is the central part of her decision-making process and it is merely copied and pasted from Dr. Critchfield's report.

of reviewing physicians, medical evidence from treating physicians, vocational assessments, surveillance, interviews, claim forms, and other information." Id. at ¶15.

Given the copy and paste job reflected in the August 30, 2019 appeal decision, this is clearly untrue and relevant to this Court's analysis. By simply copying the record reviewer's rationale, the Defendant practically put the doctor in the position of making the appeal decisions. By failing to give the record reviewer the entire administrative record, practically delegating the decision-making authority, and ignoring the February 25, 2020 appeal letter, Dr. Reed's evolved opinions based on objective evidence, the submitted medical literature, and affidavits (which are very similar to "interviews" or "other information"), the Defendant violated its own policy.

### 4. LFG's arguments justifying its termination of Rob's long-term disability benefits were not made in any denial letters and are contrary to the administrative record.

An administrator's decision is reasonable "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." Bernstein v. CapitalCare, Inc., 70 F.3d 783 (4th Cir. 1995) (quoting Baker v. United Mine Workers of Am. Health & Retirement Funds, 929 F2d. 1140, 1144 (6th Cir. 1991). "Under the abuse of discretion standard, the administrator's decision will not be disturbed if it 'is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence.' Substantial evidence . . . is evidence which a reasoning mind would accept as sufficient to support a particular conclusion . . . [and] consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Wasson v. Media Gen., Inc., 446 F. Supp. 2d 579, 590 (E.D. Va. 2006) (citations omitted).

LFG's final adverse determination relied exclusively on the opinions of Drs. Hertza and Sood. In fact, the letter simply copies and pastes the conclusion of Drs. Hertz and Sood. But the Defendant's argument section in its brief only mentions those two doctors three times in ten pages.

It is clear that on the Defendant's motion for summary judgment, it doesn't rely on the strength of these record reviewers but on manufactured weaknesses in Rob's treating doctors that were never a part of LFG's adverse determinations below.

LFG takes the position that by having 3 of its in-house nurses review this case and 4 hired gun doctors, it has engaged in a deliberate, principled reasoning process. LFG fails to note that only two of those people had the benefit of the information Rob submitted as a part of his appeal on February 25, 2020 and his responsive supplement on April 22, 2020. Only Drs. Hertza and Sood had the benefit of the additional medical records and letters from Rob's treating doctors, medical literature, and affidavits. But even Drs. Hertza and Sood were not provided with all of the information Rob submitted with his final appeal. As a result, their opinions are meaningless, much less substantial evidence.

Additionally, LFG completely ignores that it is required to address evidence favorable to Rob "thoughtfully and at length." White v. Eaton Corp. Short Term Disability Plan, 308 F. App'x 713, 719 (4th Cir. 2009) (citing Evans v. Eaton Corp. Long Term Disability Plan, 514 F.3d 315 (4th Cir. 2008)). LFG "can't issue a conclusory denial and then rely on an attorney to craft a post-hoc explanation." Corey v. Sedgwick Claims Mgmt. Servs., Inc., 858 F.3d 1024, 1028 (6th Cir. 2017).

Here, LFG makes arguments on in is brief that it never made in its denial letters. The denial letters were mere copy and paste of policy language and record review reports, and no meaningful thought or discussion was included. LFG accepted its record reviewers' opinions on disability even though neither record reviewer, Drs. Hertza or Sood, was provided a copy of the plan documents defining the term disability. See [LIN000426-28] (omitting Plan documents in list of reviewed materials). Moreover, these record reviewers were provided with the chronological activity report,

[LIN000426], but they were not provided with Rob's February 25, 2020 appeal letter. See [LIN000426-28] (omitting the February 25, 2020 appeal letter from Osterbind Law). Copying and pasting from a record review is not the reasonable exercise of discretion, rather it is the absolute abdication of it. Practically, LFG allowed these record reviewers to make the disability decision, instead of evaluating the evidence and judging it on its own.

For example, LFG argues on brief that Dr. Berger's medical opinion should be rejected for numerous reasons. Def. Br. Summ. J. 25-27, ECF No. 26. But none of those reasons were mentioned in the April 1, 2020 letter enclosing Drs. Hertza and Sood's report or in the May 21, 2020 final decision letter denying Rob's appeal. Drs. Conley, Reed, Fore, or Berger's names are not even in these letters.

The Defendant cites to cases that suggest its argument is that somehow Dr. Berger's opinion contradicts her contemporaneous medical records and that Dr. Berger is rubber stamping Rob's claim. See Def. Br. Summ. J. 25, ECF No. 26. However, Dr. Berger's opinions are not contradicted by contemporaneous medical records and LFG never claimed that as a basis for denying the appeal in its denial letter. And, Dr. Berger's opinions are the exact opposite of a "rubber stamp." Dr. Berger's opinions are nuanced, reasoned, sophisticated, and specific.

Dr. Berger said in her first letter, that adjusting his medication in November of 2019 was intended to "further fine tune [] his thyroid medication to truly make him clinically euthyroid— and not just therapeutic on paper by a lab value." [LIN002108]. Yet, Dr. Sood says, "[i]t is unclear why the dosages kept being adjusted." [LIN000423]. But Dr. Berger explains why in her first letter:

> Mr. Learn was seen in my office on November 27, 2019. Upon questioning, he reported that he had been taking levothyroxine at bedtime at a higher dose of 200 mcg 6 days per week and half pill on Sundays (100 mcg) until just the month prior, when his dose was

reduced down to 175 mcg every day. He had been on this regimen for the past 2 years, which essentially gives him an overdose of Levothyroxine medication throughout the week and an under dose of levothyroxine once a week. Clinically, this creates a roller coaster effect for patients and exacerbates any underlying mental disorders especially depression and anxiety related to an imbalance of his dose. Secondly, by taking Levothyroxine at bedtime, it is more often affected by evening consumption of food and thus has the highest risk of causing malabsorption resulting in widely fluctuating thyroid levels. Levothyroxine as a generic, is also known to cause varying thyroid levels as demonstrated by his erratic levels over last 2 years. Moreover, during his November 27 visit, he was switched to brand name Synthroid, oved his medication to the morning on empty stomach and wait at least 30 minutes to drink coffee or eat food or take any other medications to ensure a more stable absorption of his medication.

[LIN002108]. This is a reasoned clinical analysis. Dr. Sood had this explanation, but she did not even address it. Neither did the Defendant.

The Defendant argues that Dr. Berger's opinion unduly focuses on the beginning of Rob's thyroid disease and ignores the most recent information. <u>See</u> Def. Br. Summ. J. 24, ECF No. 26. However, that is, once again, false. Dr. Berger describes the entire course of Mr. Learn's thyroid treatment because it is relevant and necessary to understand where Mr. Learn is today. She does it to clearly explain her opinion. She says,

> Despite finally receiving his first dose of RAI treatment in July of 2016, ***his thyrotoxicosis was so severe and resistant, that he remained hyperthyroid for an additional year*** and required a Second round of Radioactive-Iodine treatment in 2017 with the subsequent flair in his thyrotoxicosis followed by Profound and Severe Hypothyroidism.

> This timeline to treat his Thyroid Storm lingered for over a year and a half after he first presented in May 2016. As I outlined in my prior letter, the next 2 years of testing never truly revealed a euthyroid sustainable status for Mr. Learn. Not until the Fall of 2019, was he placed on the correct dose of Levothyroxine. Again, I need to emphasize that Mr. Learn was Never actually truly euthyroid and all of this played havoc on his depression, anxiety and sleep quality resulting in sustained cognitive impairment.

[LIN000401]. Dr. Berger explains the first year and a half of treatment, and then comments on the next two years of testing. This adds up to three and a half years, using simple addition, taking this case from the summer of 2016 to the end of 2019/beginning of 2020 right before Dr. Berger wrote her letters. Yet, LFG argues on brief that Dr. Berger's "analysis is entirely retrospective and concerns impairment that manifested during [Rob's] so-called 'thyroid storm' from 2016 to 2018." See Def. Br. Summ. J. 24, ECF No. 26. The Defendant mischaracterizes Dr. Berger's opinion on brief. It ignored her opinion completely in its final administrative determination. Her opinion encapsulates all of Rob's treatment and it is not just retrospective.

Dr. Berger's opinion is a reasoned, and nuanced opinion. She explains that, in most Graves' Disease patients, the "course [of treatment] lasts for 6 months or so and most patients can return to a normal lifestyle and work load following treatment." [LIN000401]. She then documents why Rob did not have a "bread and butter case of hyperthyroidism with subclinical disease signs and symptoms." [LIN000402]. This is different and, in her 23 years of endocrine experience, one of the worst she has seen. [LIN000401]. She does not "speculate" that this roller coaster effect caused his cognitive and psychological symptoms, she says that it is "a well-documented clinical and neuropsychological researched topic with a multitude of articles to support this association."

Neither Drs. Hertza[4] nor Sood disagree that these cognitive and psychological symptoms are well-documented and correlated to thyroid disease. In fact, Dr. Sood did not evaluate any psychiatric symptoms at all. When Joseph Jackson requested Dr. Sood's opinion he noted "[p]lease

---

[4] It seems that Dr. Hertza agrees when he commented that "[t]he provider accurately describes symptoms which are often seen with thyroid disorders including, but not limited to, impaired sustained attention and amnestic dysfunction and comorbid neuropsychiatric disturbances characterized by depression, anxiety, irritability, weakness, fatigue, fear, inadequacy, moodiness, social alienation, and inability to cope with stress." [LIN00211-12].

only respond to the physical conditions as a separate psychosocial review is being conducted." [LIN000107].

Contrary to Dr. Berger, Dr. Sood started her analysis on with Rob's visit to Dr. Reed on April 25, 2019 ignoring everything that happened prior. [LIN000422]. Her description of the relevant records was about one page long. Then, she answered four questions. Her "Assessment/Rationale" is three paragraphs long. The first two paragraphs are copy and pasted from earlier in the report. [LIN000424-25]. It starts with a copy and paste from the first paragraph of her report (entitled "Clinical History"), and then a copy and paste from the first paragraph of her answer to question 1. The last paragraph contains three sentences. She did not even try to rebut Dr. Berger on the merits. And the Defendant has the audacity to call Dr. Berger's opinion "conclusory." <u>See</u> Def. Br. Summ. J. 26, ECF No. 26.

Dr. Sood is the only endocrinologist who reviewed this file for LFG. Because LFG touts the number of record reviewers it paid for, this is notable.

The Defendant further argues that lay witness affidavits are usually discounted by courts. <u>See</u> Def. Br. Summ. J. 27, ECF No. 26. However, given LFG's response to our request for the type of evidence permitted, LFG still has to consider them. It did not here. LFG ignored all of this evidence and did not even give the affidavits to its doctors to review. LFG told Rob to submit "office and treatment records, testing results, therapy records, or ***any other type of documentation*** that would support the inability to perform the main and substantial duties of one's occupation." [LIN002280] (emphasis added). Rob's witness affidavits are particularly important here because Dr. Hertza said that Rob's symptoms have not been observed behaviorally. But they have, and LFG ignored the evidence with such observations.

"The omission is critical, because the failure to consider evidence that is offered after an initial denial of benefits renders a final denial of benefits arbitrary and capricious." <u>Glenn v. MetLife</u>, 461 F.3d 660, 672 (6th Cir. 2006), <u>aff'd sub nom.</u> <u>Metro. Life Ins. Co. v. Glenn</u>, 554 U.S. 105, 128 S. Ct. 2343, 171 L. Ed. 2d 299 (2008) (citing <u>Williams v. Int'l Paper Co.</u>, 227 F.3d 706, 712–14 (6th Cir.2000)).

**5. The Defendants attempt to characterize Rob's changing treating physicians as "doctor shopping" is simply and demonstrably wrong.**

Defendant's Brief in Support of its Motion for Summary Judgment incorrectly characterizes Mr. Learn's changing treating providers as "doctors shopping." Def. Br. Summ. J. 23, ECF No. 26. This characterization could not be further from the truth. In fact, it demonstrates the lack of legitimate arguments LFG has to make on this issue and how far the Defendant is willing to misrepresent Rob's experience to deny his benefits.

### a. *<u>From Dr. Judd to Dr. Fore and Dr. Conley</u>*

LFG criticized Dr. Judd for not responding to its request for his opinion in 2019. Understandably, Rob was upset about that too. Rob explained in his first appeal that he thought it was wrong that Dr. Judd wrote that he presented with "intact cognition, no thought process difficulties and ok judgment and insight." [LIN0002381-82]. Rob challenged those conclusions and he explained that he never spent more than 15 minutes with Dr. Judd at any one time and Dr. Judd never performed "one single objective cognitive or psychological test." [LIN002382].

After finding out that Dr. Judd wrote this, and that he refused to return the Psychiatric Supplement Information Form, Rob sought help from a provider he thought could treat him. But now, the Defendant criticizes Rob for finding a new doctor, Dr. Fore who could adequately treat him even though he does not, as a practice, comment or give opinions on disabilities. [LIN001384], [LIN000228].

What LFG ignores, is that three days after it terminated Rob's benefits, Dr. Judd changed Rob's psychiatric medications, yet again. [LIN001936]. And Dr. Judd noted that Rob reports "no notable improvement in his depressive [symptoms]." [LIN001935]. LFG also ignores the fact that Rob's PHQ-9 was a 19 which indicates "moderately severe depression." [LIN001935]. On April 28, 2019, Rob's PHQ-9 was a 6 [LIN001955] and then, with Dr. Fore on June 25, 2019, it was a 21. [LIN001388]. A PHQ-9 of 21 indicates "severe depression."

Yet, during this roller coaster, Dr. Judd would not fill out paperwork and would not return phone calls. So, Rob sought a doctor who might be more helpful and who was not associated with Centra. This was not unreasonable. As Rob argued in at the administrative level, Centra was his employer, his Plan Administrator, and his doctors were Centra doctors. He felt as if this had become its own conflict of interest particularly with Dr. Judd, but also with Dr. Reed.

Nonetheless, the Defendant coins this physician change "doctor shopping." Yet, in another breath on brief, the Defendant argues that Dr. Fore would not opine regarding disability. If Rob were really doctor shopping, one would expect him to change psychiatrists again and again, until he received a favorable opinion. But that is not what happened here. Instead, Rob has been treating with Dr. Fore continuously ever since the summer of 2019 to the present.

Rob did not go to Dr. Fore for disability approval. In fact, in Dr. Fore's first office note Rob noted that "Dr. Judd did not feel he was still disabled and [Rob] was recently denied for disability. Luckily, with his improved mood, he found a job at home health therapist. . ." [LIN001396]. If Rob were searching for a doctor to certify his disability, why would he note improved mood and why would he go get a job? Beyond that, the Defendant ignores Dr. Fore's note that Rob was "Currently – happy mood overall but still dealing with some lingering cognitive issues, mild fine tremor." <u>Id.</u> It was not until the next month's office visit that Rob revealed that

he could not perform that home health job because his "cognition was in the toilet." [LIN001392]. Two months later, Rob reveals that he was working with "several organizations for his disability" and Dr. Fore was very clear to "define [his] role in this." [LIN01384]. Rob knew from the first three months with Dr. Fore that he was not a doctor who would give opinions about his ability to work, but that is not why he went to him. He went to him for treatment. And yet he has continued treating with him even through these unreasonable denials two years later.

Moreover, Rob was referred to Dr. Conley directly by Dr. Fore. [LIN002058]. This was a referral that was long past due. But Rob did not request a referral to Dr. Conley. There is nothing in the record that even indicates that Rob knew Dr. Conley existed before Dr. Fore referred him there. [LIN001392]. To infer that Rob was doctor shopping to get to Dr. Conley is an even greater stretch of the truth and belied by the medical records.

This Court should lend no credence to the Defendant's position that Rob's treating doctors' opinions should be discarded because of doctor shopping.

### b. *From Dr. Reed to Dr. Berger*

"Plaintiff changed physicians again, obtained legal counsel, and filed a second-level administrative appeal." See Def. Br. Summ. J. 14, ECF No. 26. Defendant argues, again, that Rob was doctor shopping by going back to Dr. Reed on September 5, 2019 and he sought Dr. Berger on his own accord.

Defendant claims "[a] week after Lincoln's first level uphold, Plaintiff visited Dr. Reed for a follow-up appointment on September 5, 2019." Yet the Defendant ignores the note from Dr. Reed to Dr. Gibbs on April 29, 2019 stating that "[Rob] has not been seen in clinic for almost a year and we need to make him a non urgent appointment that can be in October 2019." [LIN001454]. The Defendant would have this Court incorrectly believe that Rob scheduled this

appointment just to pad the claim file. Yet, the administrative record shows that Dr. Reed wanted an appointment with Rob, in person, around October 2019. That appointment was scheduled for September 5, 2019. And, if Rob were doctor shopping, why would he go back to Dr. Reed?

Dr. Reed explained why he referred Rob to Dr. Berger in his letter dated February 5, 2020:

> Over the next two years his thyroid hormone values remained within the euthyroid range although he continued to have fatigue. I saw him the last time on 5 September 2019 at which time he was evaluated for Hashimoto's encephalopathy given elevated levels of antithyroperoxidase antibody. At that clinic visit we also reviewed cognitive tests carried out by a local psychologist, Joseph Connolly, PhD LCP which showed some objective cognitive decline. With this in mind and his current TSH of 0.97 mU/L. it was decided to attempt optimizing his TSH value representing his thyroid economy at the pituitary to be ideal if the TSH were between 1-2 mU/L. With this in mind his thyroxine was reduced to 175 mcg/day from 185 mcg/day. *Also, with his laboratory values and clinical symptoms, he was referred to an endocrinologist in Richmond, VA who has experience with managing Hashimoto's Encephalopathy. I spoke on the phone with Dr, Meredith Berger who agreed to evaluate Mr. Learn since she had seen him as a second opinion in 2016 as I-131 therapy was considered.* She had this consultation on 11/27/2019 and her report is available. His TSH at that clinic visit was 1.7 mU/L and in an ideal range. His antithyroglobulin antibody was elevated in that encounter also 942 IU/ml (ref 0 0.9) and antithyroperoxidase antibody was 306 IU/ml (ref 0-34). She did not feel that he had Hashimoto's encephalopathy but did feel that his cognitive function was decreased.

[LIN002070] (emphasis added). Dr. Berger even said in her February 25, 2020 letter, "in November of 2019, Dr. Reed contacted me and asked me to once again, see Mr. Learn in consultation." [LIN002107]. That did not stop the Defendant from describing Rob's second visit[5] with Dr. Berger as follows: "[t]hereafter, Plaintiff visited a new endocrinologist, Dr. Meredith Berger, on November 27, 2019, complaining about sleep problems, fatigue, and cognitive decline." See Def. Br. Summ. J. 15, ECF No. 26.

---

[5] The Defendant omits from its section entitled "Undisputed Material Facts" that Dr. Berger evaluated Rob on August 16, 2016 at the request of Dr. Reed. [LIN002052].

This is not doctor shopping. Rob did not seek out Dr. Berger because he felt she could give him a better opinion. He obeyed Dr. Reed's referral and hoped that, perhaps, she might be able to manage his condition better. Dr. Reed set up the transfer to Dr. Berger, not Rob.

**CONCLUSION**

The Defendant's position suffers from critical errors and grossly mischaracterizes the administrative record. To characterize Rob Learn as doctor shopping when all of his doctors, except one are traceable to a referral is outrageous. LFG never said in the appeal stage that objective evidence was necessary under the plan, and in fact said the exact opposite. LFG never accused Rob of doctor shopping at the appeal stage either.

The Defendant asks this court for summary judgment because it claims there was no objective evidence of disability. Yet, that was never a basis for the denial on appeal. While the Defendant wrongly claims there is no objective evidence, it ignored medical literature, doctors reasoned and consistent opinions, the result Conley's neuropsychological testing, Dr. Reed's evolved opinion, Rob's own affidavit and the affidavits of his friends and family. LFG did not even give all of these things to their experts.

The Defendant calls Dr. Berger's opinion conclusory when her analysis exceeds Dr. Sood's cumulatively by at least 3 pages. The Defendant cites cases that had no correlation to this case and are factually distinguishable. This case is more aligned with <u>Donovan</u> and <u>White</u>, and it not at all aligned with <u>Scott</u> or <u>Nord</u> cited by the Defendant. Indeed, the Defendant glosses over the facts of these cases and their nuanced outcomes, just like it did Rob's appeal below.

The arguments made by the Defendant on brief compound LFG's abuse of discretion below and further demonstrate how unprincipled and unreasoned it is, especially with respect to this case.

LFG failed to state what evidence Rob needed to perfect his claim, declined to respond to repeated queries from Rob's counsel asking what type of assessment or evidence it would like Rob to take, wholesale disregarded evidence from Rob's treating physicians, medical literature, and lay affidavits, used standards outside the language of the plan, failed to explain why it disregarded Rob's physicians, copied and pasted medical opinions instead of engaging in a reasoned and principled decision making process, and failed to provide substantial evidence to justify denying Rob's long-term disability benefits.

For these reasons and others outlined above, the Court should deny summary judgment to the Defendant and grant summary judgment to the Plaintiff. Plaintiff is entitled to payment of his back benefits and to be restored to "on claim" status. Moreover, in most lawsuits seeking relief under ERISA, "a reasonable attorneys fee and costs" are available "to either party" at the court's discretion." § 132(g)(1). Plaintiff asks for leave to file an application for fees and cost at the conclusion of this case.

Respectfully submitted,

By Counsel: _____/s/_____
ROBERT LEARN

Brandon S. Osterbind, Esq. (VSB No.: 77159)
Kelly A. Osterbind, Esq. (VSB No.: 74984)
OSTERBIND LAW, PLLC
1216 Greenview Drive, Suite A
Lynchburg, VA 24502
Phone: 434-515-2807
Fax: 434-818-0895
bosterbind@osterbindlaw.com
kosterbind@osterbindlaw.com

**CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that on August 6, 2021, I electronically filed this document with the Clerk of the United States District Court for the Western District of Virginia using the CM/ECF system, which will serve an electronic copy on the following:

Alexander Tevis Marshall, Esq. (Tevis.Marshall@ogletreedeakins.com)
Scott Pomeroy, Esq. (scott.pomeroy@ogletree.com)
Byrne Decker, Esq. (b.decker@ogletree.com)
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
Riverfront Plaza, West Tower
901 E. Byrd Street, Suite 1300
Richmond, Virginia 23219

Joshua F.P. Long (jlong@woodsrogers.com)
Woods Rogers PLC
10 S. Jefferson Street, Suite 1400
Roanoke, VA 24011

/s/
Brandon S. Osterbind, Esq.