# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### LYNCHBURG DIVISION

|  |  |
|---|---|
| ROBERT LEARN,<br>        Plaintiff,<br><br>v.<br><br>GROUP LIFE, DEPENDENT LIFE,<br>ACCIDENTAL DEATH AND<br>DISMEMBERMENT INSURANCE FOR<br>EMPLOYEES OF CENTRA HEALTH,<br>INC.,<br>        Defendant. | CIVIL ACTION NO. 6:20-cv-0060 NKM |

## <u>DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION<br>FOR SUMMARY JUDGMENT</u>

Tevis Marshall (VSB No. 68401)
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
Riverfront Plaza - West Tower
901 East Byrd Street, Suite 1300
Richmond, VA 23219
Tel: (804) 663-2333; Fax: (804) 225-8641
tevis.marshall@ogletree.com

Byrne J. Decker (admitted *pro hac vice*)
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
Two Monument Square, Suite 703
Portland, ME 04101
Tel: (207) 387-2963; Fax: (207) 387-2986
byrne.decker@ogletree.com

Scott K. Pomeroy (admitted *pro hac vice*)
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
One Boston Place, Suite 3500
Boston, MA 02108
Tel: (207) 387-2961; Fax: (207) 387-2986
scott.pomeroy@ogletree.com

**Table of Contents**

Table of Authorities ..................................................................................................... ii

Points and Authorities ................................................................................................. 1

I.    Plaintiff has misstated the proper standard of review and erroneously
      reversed the burden of proof. ................................................................................ 1

II.   Plaintiff's narrative summary, like his later physicians' advocacy,
      highlights Plaintiff's medical condition during the time when Lincoln
      was paying benefits, but fails to show that the record supports disability
      after March 5, 2019. ............................................................................................. 4

III.  Lincoln's examiners correctly applied the terms of the Group Policy
      after duly considering all of the evidence in the record, including the
      views of all treating and consulting physicians. .................................................. 12

IV.   Lincoln advised Plaintiff as to the reasons for its various determinations
      and gave him ample opportunities to summit proof. ............................................ 17

V.    Lincoln correctly chose not to request an in-person medical examination,
      as such an examination in this case would have been unnecessarily
      redundant in light of the medical evidence already in the record. ........................ 23

VI.   There is no record evidence that raises any inference of improper
      motivation, and the mere existence of a so-called structural bias
      does not meaningfully sway the balance of the evidence. .................................... 24

Conclusion .................................................................................................................. 24

**Table of Authorities**

**Cases:**

Austin-Conrad v. Reliance Standard Life Ins. Co., 2016 WL 5400366 (W.D.
Ky. Sept. 26, 2018). ................................................................................................ 4

Beltman v. Sun Life Assurance Co., 2019 WL 1614584 (W.D. Mich.
March 29, 2019). .................................................................................................... 9

Bernstein v. CapitalCare, Inc., 70 F.3d 783 (4th Cir. 1995). ................................................. 17

Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003). ......................................... 9, 16

Blair v. Metropolitan Life Ins. Co., 569 Fed. App'x 827 (11th Cir. 2014). ....................... 9, 22

Bumpas v. Unum Life Ins. Co., 2005 WL 248537 (M.D. Fla. Sept. 30, 2005). ..................... 11

Champion v. Black & Decker (U.S.) Inc., 550 F.3d 353 (4th Cir. 2008). ......................... 1, 24

Cox v. Reliance Standard Life Ins. Co., 43 Fed. App'x 606 (4th Cir. 2002). ....................... 1, 2

Elliot v. Sara Lee Corp., 190 F.3d 601 (4th Cir. 1999). ............................................................. 3

Etkin v. Merk & Co., 2001 WL 1346368 (E.D. Pa. Oct. 30, 2001). ........................................ 9

Evans v. Eaton Corp. LTD Plan, 514 F.3d 315 (4th Cir. 2008). ............................................. 4

Everette v. Liberty Life Assurance Co., 2017 WL 2829673 (D. Md.
June 29, 2017). ..................................................................................................... 24

Gable v. Sweetheart Cup Co., 35 F.3d 851 (4th Cir. 1994). ..................................................... 4

Gagliano v. Reliance Standard Life Ins. Co., 547 F.3d 230 (4th Cir. 2008). ................... 18, 22

Griffin v. Hartford Life & Accident Ins. Co., 2017 WL 384384 (W.D. Va.
Jan. 25, 2017), aff'd, 898 F.3d 371 (4th Cir. 2018). ............................................... 4

Gorbacheva v. Abbott Labs. Ext. Disability Plan, 309 F. Supp. 3d 756
(N.D. Cal. 2018), aff'd, 794 Fed. App'x 590 (9th Cir. 2019). ................................. 8

Harley v. Intern. Paper Co. LTD Plan, 586 F. Supp. 2d 428 (D.S.C. 2007). ......................... 10

Harrison v. UnitedHealth Group, 2018 WL 1528177 (S.D. W.Va.
March 28, 2018). .................................................................................................. 10

Harrison v. Wells Fargo Bank, N.A., 773 F.3d 15, 21 (4th Cir. 2014). ................................... 3

Heimeshoff v. Hartford Life & Accident Ins. Co., 571 U.S. 99 (2013). ........................... 1, 3

Hensley v. Intern. Business Machines Corp., 123 Fed. App'x 534
(4th Cir. 2004). .................................................................................................. 3

Hines v. E.I. DuPont de Nemours & Co. LTD Plan, 2019 WL 1364915 (D.S.C.
March 26, 2019). ............................................................................................. 2, 3

Hobson v. Metropolitan Life Ins. Co., 574 F.3d 75 (2d Cir. 2009). ................................. 18, 22

Hocheiser v. Liberty Mutual Ins. Co., 2021 WL 672660 (D.N.J.
February 22, 2021), *appeal docketed*, No. 21-1533 (3d Cir. March 19, 2021). ....................... 8

Huberty v. Standard Ins. Co., 2008 WL 783407 (D. Minn. March 25, 2008). ........................ 6

Irving v. Unum Life Ins. Co., 2019 WL 1331237 (D. Md. March 25, 2019). ........................ 23

Kearney v. Standard Ins. Co., 175 F.3d 1084 (9th Cir. 1999) (en banc), *cert. denied*,
528 U.S. 964 (1999). ........................................................................................ 18, 22

Maniatty v. UNUM Provident Corp., 218 F. Supp. 2d 500 (S.D.N.Y. 2002), *aff'd*,
62 Fed. App'x 413 (2d Cir. 2003), *cert. denied*, 540 U.S. 966 (2003). ................................ 12

McBurnie v. Life Ins. Co. of N. America, 763 Fed. App'x 596 (9th Cir.
2019). ...................................................................................................... 18, 22

Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105 (2008). ............................................. 1, 24

Minutello v. Hartford Life & Accident Ins. Co., 964 F. Supp. 2d 491
(W.D. Pa. Aug. 12, 2013). ................................................................................... 6

Moore v. Liberty Life Assurance Co., 129 F. Supp. 3d 408 (W.D. Va. 2015). ........................ 3

Mullins v. AT&T Corp., 424 Fed. App'x 217 (4th Cir. 2011). .......................................... 9

Nicely v. Unum Life Ins. Co., 2009 WL 5201852 (M.D.N.C. Dec. 23, 2009). ........................ 15

Niebauer v. Crane & Co., Inc., 783 F.3d 914 (1st Cir. 2015). .......................................... 16

Ortega-Candelaria v. Johnson & Johnson, 755 F.3d 13 (1st Cir. 2014). ................................. 8

Piepenhagan v. Old Dominion Freight Line, Inc., 395 Fed. App'x 950
(4th Cir. 2010). .............................................................................................. 23

Price v. Disability RMS, 2008 WL 763255 (D. Mass. March 21, 2008). ............................... 11

Spenrath v. Guardian Life Ins. Co., 564 Fed. App'x 93 (5th Cir. 2014). ............................... 16

Thompson v. Life Ins. Co. of N. America, 30 Fed. App'x 160 (4th Cir. 2002). ..................... 1, 2

Terry v. Bayer Corp., 145 F.3d 28 (1st Cir. 1998). ................................................... 18, 20, 22

US Airways, Inc. v. McCutcheon, 569 U.S. 88 (2013).   ........................................................... 3

Van Valen v. Employee Welfare Benefits Comm. Northrop-Grumman
Corp., 741 F. Supp. 2d 756 (W.D. Va. 2010).   ........................................................... 6

Varity Corp. v. Howe, 516 U.S. 489 (1996).   ........................................................... 11

White v. Standard Ins. Co., 895 F. Supp. 2d 817 (E.D. Mich. 2012), *aff'd*,
529 Fed. App'x 547 (6th Cir. 2013).   ........................................................... 11

**Other Authorities:**

Employee Retirement Income Security Act of 1974 ("ERISA"),
29 U.S.C. § 1001, *et seq*.   ...................................................................... *passim*

29 C.F.R. § 2560.503-1(g)(1).   ...................................................................... 17, 18

Defendant The Lincoln National Life Insurance Company ("Lincoln") hereby opposes the motion of Plaintiff Robert Learn ("Plaintiff") for Summary Judgment.  Lincoln incorporates by reference its Memorandum in Support of its own Motion for Judgment on the Administrative Record (ECF Doc #26).

## Points and Authorities

**I.     Plaintiff has misstated the proper standard of review and erroneously reversed the burden of proof.**

This case is subject to ERISA's highly-deferential "abuse of discretion" standard of review.  *See*, *e.g*., Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105, 111 (2008); Champion v. Black & Decker (U.S.) Inc., 550 F.3d 353, 359 (4th Cir. 2008).  Contrary to Plaintiff's assertion, Lincoln did not "grant[] itself" discretionary authority, *see* Pl.'s Memo. at 10, rather, the benefit plan's sponsor vested Lincoln with such authority.

Relying on Cox v. Reliance Standard Life Ins. Co., 43 Fed. App'x 606 (4th Cir. 2002); Thompson v. Life Ins. Co. of N. America, 30 Fed. App'x 160 (4th Cir. 2002), Plaintiff seems to argue that this Court must disregard both levels of internal administrative review in this case and limit its judicial review to only the evidence and arguments contained in Lincoln's initial determination letter of March 4, 2019.  *See* Pl.'s Memo. at 10–11.  If so, Plaintiff misunderstands Cox, Thompson, and ERISA's two-tier review structure.  *See*, *e.g*., Heimeshoff v. Hartford Life & Accident Ins. Co., 571 U.S. 99, 110 (2013) ("The first tier of ERISA's remedial scheme is the internal review process required for all ERISA disability-benefit plans. . . .  Upon exhaustion of the internal review process, the participant is entitled to proceed immediately to judicial review, the second tier of ERISA's remedial scheme.").

In both Cox and Thompson, the defendant administrator cited one policy provision as grounds for denial, but following completion of ERISA's mandated administrative review

1

process, the administrator abandoned its prior position and argued at the time of judicial review that denial was justified on the basis of some other completely different policy provision. *See* Cox, 43 Fed. App'x at 609 ("Reliance contends that even if the felony exclusion does not apply, it properly denied Joan's claim on the ground that Brian's death was not an accident."); Thompson, 30 Fed. App'x at 163 ("LINA also relied on the pre-existing condition limitation to affirm the denial on appeal. . . . Not until the summary judgment stage . . . did LINA assert the Plan's 'active service' provision as the rationale for its denial of benefits."). Accordingly, both cases stand for the unremarkable proposition that an ERISA defendant may not assert one basis for a decision during the administrative review stage and then assert some other basis for the decision during judicial review. *See*, *e.g*., Thompson, 30 Fed. App'x at 164 ("A court may not consider a new reason for claim denial offered for the first time on judicial review.").

Here, Lincoln has not changed the rationale for its determination. Now, as during the administrative process, Lincoln contends that Plaintiff failed to meet his burden to prove any continuing disability, within the meaning of the Group Policy, beyond March 5, 2019. *See*, *e.g*., LIN2404; LIN2311; LIN0203. Moreover, it would be contrary to the purposes of administrative review, and contrary to this Court's obligation to evaluate the administrator's exercise of discretion, if it were to exclude from its consideration events that occurred during either of the two internal administrative reviews. As the record makes clear, Lincoln afforded Plaintiff ample opportunity, in accordance with ERISA regulations, to meaningfully respond to the reasons Lincoln gave for terminating benefits. *See*, *e.g*., LIN2338 (transmitting copies of Nurse Sucha's and Dr. Critchfield's reports during the first administrative appeal and seeking Plaintiff's response); LIN0411 (transmitting copies of Dr. Hertza's and Dr. Sood's reports during the second administrative appeal and seeking Plaintiff's response).

2

Throughout Plaintiff's memorandum, he also erroneously reverses the applicable burden of proof by arguing, variously, that Lincoln was required to affirmatively show that Plaintiff was able to work, that Lincoln's prior approval of short-term disability ("STD") benefits required proof of some improved medical condition before long-term disability ("LTD") benefits could terminate, and that Lincoln otherwise "failed to provide substantial evidence to justify going against the evidence [Plaintiff] submitted." Pl.'s Memo. at 30; *see also*, *e.g.*, *id.* at 14, 16, 21, 24–26.

Fourth Circuit law is clear that the burden to prove an ERISA disability claim—and the burden to produce evidence supportive of that claim—remain at all times with the Plaintiff. *See*, *e.g.*, Harrison v. Wells Fargo Bank, N.A., 773 F.3d 15, 21 (4th Cir. 2014) ("[T]he primary responsibility for providing medical proof of disability undoubtedly rests with the claimant."); Champion, 550 F.3d at 361 (4th Cir. 2008) ("Champion produced no evidence showing or tending to show that she could substantiate her disability claim on just her epilepsy."); Elliot v. Sara Lee Corp., 190 F.3d 601, 603 (4th Cir. 1999) ("The burden of proving the disability is on the employee."); Moore v. Liberty Life Assurance Co., 129 F. Supp. 3d 408, 424 (W.D. Va. 2015) ("[T]he claimant in an ERISA case bears the burden to show that [he] is disabled within the terms of the relevant policy."). Indeed, and perhaps more importantly, the Group Policy here also places the burden of proof squarely upon Plaintiff. *See*, *e.g.*, LIN0142 (outlining the proof of claim requirement). As the Supreme Court has repeatedly admonished, the plan "is at the center of ERISA" and "should be enforced as written." Heimeshoff, 571 U.S. at 108 (quoting US Airways, Inc. v. McCutcheon, 569 U.S. 88, 101 (2013)).

Moreover, as disability benefits do not vest, the burden of proof never shifts to an administrator simply because it previously decided to grant benefits. *See*, *e.g.*, Hensley v. Intern.

3

Business Machines Corp., 123 Fed. App'x 534, 538 (4th Cir. 2004) ("[T]he decision to grant

benefits initially cannot create an obligation by which a plan fiduciary is estopped from later

terminating benefits.") (quoting Gable v. Sweetheart Cup Co., 35 F.3d 851, 855 (4th Cir. 1994));

Griffin v. Hartford Life & Accident Ins. Co., 2017 WL 384384 at *12 (W.D. Va. Jan. 25, 2017),

*aff'd*, 898 F.3d 371 (4th Cir. 2018) ("This burden does not shift simply because benefits were

previously granted."); Austin-Conrad v. Reliance Standard Life Ins. Co., 2016 WL 5400366 at

*8 (W.D. Ky. Sept. 26, 2018) ("[T]here is no requirement that the claim administrator must

demonstrate a change or improvement in the claimant's condition before terminating benefits

previously awarded.") (internal quotation omitted).

Plaintiff simply failed to meet his burden below, and he comes nowhere near to proving

an abuse of discretion.  As the Fourth Circuit explained in Evans v. Eaton Corp. LTD Plan, 514

F.3d 315 (4th Cir. 2008), "standards of review do matter," and ERISA's abuse of discretion

standard serves to "keep judges within the limits of their role and preserve other decision

makers' functions against judicial intrusion." *Id.* at 326.  "Where an ERISA administrator rejects

a claim to benefits on the strength of substantial evidence, . . . there can be no abuse of

discretion—even if another, and arguably a better, decision-maker might have come to a

different, and arguably a better, result." *Id.*  Here, unlike Evans where the evidence was closely

balanced, the substantial evidence submitted and generated during the administrative process

overwhelmingly shows that Lincoln's determination was correct, let alone reasonable.

II.    **Plaintiff's narrative summary, like his later physicians' advocacy, highlights Plaintiff's medical condition during the time when Lincoln was paying benefits, but fails to show that the record supports disability after March 5, 2019.**

Lincoln paid Plaintiff LTD benefits for some twenty-one months, until March 5, 2019.

*See*, *e.g.*, LIN02923; LIN2404.  To be entitled to further benefits here, Plaintiff was required to

prove to Lincoln that he continued to be disabled beyond that date.  *See*, *e.g.*, LIN0150 ("The

4

Company will pay a Total Disability Monthly Benefit to an Insured Employee . . . if he or she . . . at his or her own expense, submits proof of continued Total Disability . . . . The Total Disability Monthly Benefit will cease on the earliest of . . . the date the Insured Employee ceases to be Totally Disabled . . .").

Rather than highlight evidence of his alleged inability to work after March 5, 2019, Plaintiff devotes the first seven pages of his Memorandum, and much of the balance, to evidence of his alleged "thyroid storm" during the years 2016, 2017, and 2018. While the contemporaneous medical records from that time period may well have supported Plaintiff's original claim for LTD benefits—and at the time, Lincoln found that they did—by March 5, 2019, when Lincoln terminated benefits, none of Plaintiff's treating physicians believed that he continued to be disabled. On September 12, 2018, Dr. Reed, Plaintiff's treating endocrinologist, told Plaintiff that he could "no longer recommend a biochemical basis [for] any disability." LIN2667. As Dr. Reed explained,

> I will not be able to recommend further disability on the basis of hypothyroidism as [Plaintiff's] serum TSH is now in the middle of the reference range that we would target . . . and [his] free T4 [is] in the same range. And it [has] been this way now for approximately 6 months.

LIN2667. Thereafter, Plaintiff continued to visit Dr. Judd, his treating psychiatrist, and Dr. Judd repeatedly noted that Plaintiff's "thyroid condition has normalized." LIN2797; LIN2789; LIN1945. Dr. Judd recorded objective examinations of the Plaintiff in September, November, and December of 2018, and he consistently found Plaintiff's cognition, attention, memory, concentration, and judgment to be "Intact." LIN2797; LIN2789; LIN1945. Dr. Judd consistently found Plaintiff's thought process to be "[l]ogical and goal directed." LIN2797; LIN2789; LIN1945. Shortly thereafter, Plaintiff switched to Dr. Fore, another psychiatrist, because he was displeased that "Dr. Judd did not feel he was still disabled." LIN2331. But even Dr. Fore

5

refused to offer an opinion that Plaintiff was disabled.  When specifically asked for his opinion as to any potential impairments that might affect Plaintiff's ability to work, Dr. Fore refused to do so because "this will start to cause stress in the patient-doctor relationship as some see me 'siding' with one party or another."  LIN248.

The limited contemporaneous evidence that Plaintiff does cite for the relevant time period does not show that he was then suffering symptoms of such severity—whether physical, cognitive, or emotional—that he was functionally unable to work.  *See*, *e.g*., Van Valen v. Employee Welfare Benefits Comm. Northrop-Grumman Corp., 741 F. Supp. 2d 756, 763 (W.D. Va. 2010) ("It is not unreasonable to require objective proof of the extent of impairment.  To hold otherwise would invite fraudulent claims, and would, in the long run, be detrimental to all concerned parties."); *see also*, *e.g*., Minutello v. Hartford Life & Accident Ins. Co., 964 F. Supp. 2d 491, 508 (W.D. Pa. Aug. 12, 2013) (distinguishing between evidence of a claimant's diagnosis and evidence suggesting "limitations resulting from" that diagnosis); Huberty v. Standard Ins. Co., 2008 WL 783407 (D. Minn. March 25, 2008) ("Diagnosis and disability, however, are separate issues.").

On March 7, 2019, for example, Plaintiff told Dr. Judd that his "anxiety is improved" and his "concentration is fair."  LIN1935.  Dr. Judd's objective assessment at the time was that Plaintiff's mood was "Fair," his cognition, concentration, and judgment were all "Intact," and that his speech was "[s]pontaneous with normal rate and tone."  LIN1935.  At his March 28, 2019 visit, Plaintiff confided that,

> He tolerated the med adjustment and note[d] some overall improvement in his depression.  Mood and energy are now good.  His thyroid condition has normalized.  His anxiety remains improved.  His motivation has normalized. . . .  His disability ran out.  He is now seeking employment.

LIN1955.  Dr. Judd's objective assessment on that date was that Plaintiff's mood was now "Good," his cognition, concentration, and judgment continued to be "Intact," and his speech and language continued to be "normal."  LIN1955.

When Plaintiff first saw Dr. Fore on April 29, 2019, Plaintiff told him that he had a "happy mood overall but was still dealing with lingering cognitive issues."  LIN2331.  Dr. Fore's examination on that day shows Plaintiff had "fair to good" judgment and insight and a "goal directed" thought process, and Dr. Fore's note contains nothing to corroborate any self-reported inability to work.  LIN2332.  When Plaintiff next visited Dr. Fore on May 20, 2019, Plaintiff told him he "quit" his new job and complained that his "cognition is in the toilet."  LIN2318. Notably, Plaintiff did not say that he was fired due to performance concerns.  Nevertheless, to evaluate Plaintiff's claim of cognitive symptoms, Dr. Fore referred him to Dr. Conley for a neuropsychological examination.

Although Plaintiff relies on Dr. Conley's stated opinion that he is "disabled and incapable of maintaining employment," the substance of Dr. Conley's report hardly supports such an extreme conclusion.  *See* LIN2058–60.  Plaintiff told Dr. Conley that it was the mere "failure of his previous treating psychiatrist to complete required paperwork"—rather than his treating physicians' unanimous opinion that Plaintiff was no longer impaired—that caused the end of his disability benefits.  LIN2058.

Dr. Conley's battery of tests placed Plaintiff in the 70th percentile for overall intellectual function.  LIN2059.  According to Dr. Conley, Plaintiff's test scores contraindicated any impairment of auditory or visual attention, any impairment of related mental tracking, or any difficulty retrieving long-term verbal memories.  LIN2059.  The testing confirmed "normal word-reading and color-naming fluency," "normal abstract concept formulation ability and

7

mental flexibility," and Plaintiff's ability "to quickly adapt to novel stimuli."  LIN2059.  On a test designed to evaluate executive function, Plaintiff scored "average to above average . . . contraindicating impaired executive planning ability (*i.e*., the ability to delineate, organize and integrate the behaviors necessary to achieve a goal)."  LIN2059.

While Plaintiff did obtain a below average score on one test of his mnestic function, which involves recall of recently-encoded verbal memories, that score was an outlier when viewed in comparison to the balance of the testing administered by Dr. Conley.  Moreover, as explained by consulting physicians Drs. Critchfield and Hertza, both of whom are board-certified neuropsychologists, Dr. Conley's testing lacked the essential validity measures necessary to confirm that the test subject was putting forth his best effort.  *See* LIN2348–49; LIN0419; *compare*, *e.g*., Ortega-Candelaria v. Johnson & Johnson, 755 F.3d 13, 22 (1st Cir. 2014) (testing entitled to little weight where claimant "failed eighty-six percent of the validity criteria" used to assess whether he was putting forth his best efforts); Hocheiser v. Liberty Mutual Ins. Co., 2021 WL 672660 at *10 (D.N.J. February 22, 2021), *appeal docketed*, No. 21-1533 (3d Cir. March 19, 2021) ("[U]nless the [functional capacity examination] contains robust validity testing, the claimant can influence the results based on the amount of effort he puts forth during the evaluation."); Gorbacheva v. Abbott Labs. Ext. Disability Plan, 309 F. Supp. 3d 756, 771–73 (N.D. Cal. 2018), *aff'd*, 794 Fed. App'x 590 (9th Cir. 2019) (functional testing given little weight due to insufficient validity safeguards).

Both Dr. Critchfield and Dr. Hertza also noted that Dr. Conley's opinion of disability was inconsistent with the many contemporaneous medical observations in the record from Plaintiff's other treating physicians.  *See* LIN2349–51; LIN2320–21; LIN0419–21; LIN0211–12.  That evidence weighs against any finding of functional impairment, but there is no indication that Dr.

Conley ever reviewed any of those records.  *See*, *e.g*., <u>Beltman v. Sun Life Assurance Co.</u>, 2019 WL 1614584 at \*8 (W.D. Mich. March 29, 2019) ("The Court also gives greater weight to [the administrator's] experts as they are the only practitioners in the case to have reviewed the whole of [claimant's] medical records before offering their assessments."); <u>Etkin v. Merk & Co.</u>, 2001 WL 1346368 at \*6 (E.D. Pa. Oct. 30, 2001) ("[I]t is not improper to rely on the opinions of non-examining physicians who had before them the entire record of medical evidence, more evidence that was available to any one doctor who saw [claimant] previously.").  When Dr. Hertza attempted to speak with Dr. Conley to better understand his reasoning, Dr. Conley repeatedly refused to discuss the case.  LIN419; LIN211.

Finally, Plaintiff devotes a large portion of his Memorandum to the apparent dispute between treating endocrinologists Dr. Reed and Dr. Berger over whether, at the time benefits ended, Plaintiff was "euthyroid" or only "near euthyroid."  *See*, *e.g*., <u>Pl.'s Memo.</u> at 9–10, 17–18, 20–21.  As an initial matter, if Plaintiff's own treating physicians cannot agree that his thyroid condition was occupationally limiting at the time under review, then it is hardly an abuse of discretion for Lincoln to side with one of those treating physicians over the other, especially where, as here, Lincoln's decision was also supported by the opinions of no less than seven other consulting medical professionals, including two other board-certified endocrinologists.  *See*, *e.g*., <u>Black & Decker Disability Plan v. Nord</u>, 538 U.S. 822, 825 (2003) ("[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."); <u>Mullins v. AT&T Corp.</u>, 424 Fed. App'x 217, 223 (4th Cir. 2011) ("Resolving such conflicts in the opinions of [claimant's] treating physicians was [the administrator's] responsibility and well

within the discretion conferred to under the terms of the LTD Plan."); Harrison v. UnitedHealth Group, 2018 WL 1528177 at *6 (S.D. W.Va. March 28, 2018) ("[W]hen conflicting medical results are presented, it is the administrator's obligation to resolve the conflict based on its discretion."); Harley v. Intern. Paper Co. LTD Plan, 586 F. Supp. 2d 428, 441–42 (D.S.C. 2007) ("[I]t is not an abuse of discretion to deny benefits when conflicting medical reports exist.").

While Plaintiff relies heavily on the *post-hoc* advocacy letters Dr. Berger wrote on February 25, 2020, and April 21, 2020, *see*, *e.g*., Pl.'s Memo. at 1–7 (repeatedly citing LIN2107 and LIN0401), he pays little attention to Dr. Berger's own contemporaneous treatment records dating from closer to the relevant time period.  When Plaintiff saw Dr. Berger on November 27, 2019, for example, she administered a depression screen, on which Plaintiff achieved a score of "1," which Dr. Berger interpreted to mean only "Minimal Depression."  LIN2078.  In the course of that test, she asked Plaintiff if he had "[t]rouble concentrating on things, such as reading the newspaper or watching television."  And he replied, "Not at all."  LIN2078.  Dr. Berger's physical exam on that date was unremarkable, showing, for example, "motor strength normal [in] upper and lower extremities, sensory exam intact, deep tendon reflexes normal."  LIN2079.  The lab test results stated in Dr. Berger's note include a "Thyroid Panel with TSH" which shows that Plaintiff's Thyroxine (T4), T3 Uptake, Free Thyroxine Index, and TSH levels were all well within normal reference ranges.  LIN2080.  Other than repeating Plaintiff's own subjective self-report that he is "still struggling with mental symptoms," there is nothing in Dr. Berger's November 27, 2019 note which supports any functional limitation or inability to work.

On February 4, 2020, Dr. Berger administered another depression screening test, and this time, Plaintiff scored "0," meaning no depression.  LIN2042.  That day Plaintiff also reported "[f]eeling better than he was," and he said he "[c]an now remember multiple step processes

where he could not before." LIN2042. No updated lab results were reported in the February 4, 2020 note, and it contains absolutely nothing that supports the claims in Dr. Berger's *post-hoc* advocacy letters that Plaintiff's 2016–2018 "thyroid storm" symptoms, or anything like them, continued beyond March 5, 2019. *Compare*, *e.g*., LIN2042–44 *with* LIN2107 (alleging worsening symptoms) *and* LIN0402 ("Once he developed Thyroid storm everything changed and he could no long[er] perform his work duties . . . "). Indeed, Dr. Berger's contemporaneous notes plainly refute the conclusory assertions of ongoing disability she makes in her *post-hoc* advocacy letters.

Courts across the country have long recognized that such advocacy is not proof of disability. *See*, *e.g*., White v. Standard Ins. Co., 895 F. Supp. 2d 817, 848 (E.D. Mich. 2012), *aff'd*, 529 Fed. App'x 547 (6th Cir. 2013) (acknowledging "the well-known propensity for treating physicians to act as disability advocates" and observing that the treating physician acted "more as an advocate than a doctor rendering objective opinions") (internal quotations omitted); Price v. Disability RMS, 2008 WL 763255 at *18 (D. Mass. March 21, 2008) (discounting treating physician opinions that conflicted with those physicians' own contemporaneous treatment records); Bumpas v. Unum Life Ins. Co., 2005 WL 248537 at *5 (M.D. Fla. Sept. 30, 2005) ("It was not unreasonable for [the administrator] to rely on the contemporaneous treatment notes of [claimant's] physicians rather than [their] *post hoc* certification of disability.").

Rather than blindly accept Dr. Berger's advocacy, Lincoln's obligation here, as claim administrator, was to ensure an accurate claim determination for the benefit of all plan participants. *See*, *e.g*., Varity Corp. v. Howe, 516 U.S. 489, 514 (1996) (explaining that an ERISA administrator's duty "does not necessarily favor payment over nonpayment," but instead "recognizes the need to preserve assets to satisfy future, as well as present, claims" and thus

11

requires an "impartial account of the interests of all beneficiaries"); Maniatty v. UNUM

Provident Corp., 218 F. Supp. 2d 500, 504 (S.D.N.Y. 2002), *aff'd*, 62 Fed. App'x 413 (2d Cir.

2003), *cert. denied*, 540 U.S. 966 (2003) ("In these circumstances, it was not unreasonable for

the administrator to conclude that the only material reason the treating physicians were reaching

their diagnoses was based on their acceptance of [claimant's] subjective complaints: an

acceptance more or less required of treating physicians, but by no means required of the

administrator.").

**III.    Lincoln's examiners correctly applied the terms of the Group Policy after duly
         considering all of the evidence in the record, including the views of all treating and
         consulting physicians.**

Plaintiff argues that Lincoln "[e]xceeded" or otherwise misapplied the language of the

Group Policy because the consulting physicians discussed the extent of Plaintiff's symptoms and

his level of treatment in rendering their opinions and because Lincoln's claim professionals, in

turn, discussed those opinions in their determination letters.  *See* Pl.'s Memo. at 12–13.  Plaintiff

also attacks Lincoln for "hardly mention[ing] the duties of [Plaintiff's] occupation."  *Id.* at 23.

Both of these arguments demonstrate Plaintiff's profound misunderstanding of the ERISA

benefits determination process.

As explained at length in Richard Tom's Declaration (ECF Doc. #26-2), only Lincoln's

claim professionals are authorized to make benefit determinations, and they do so based on the

terms of the Group Policy and the entirety of the administrative record.  *See* Aff. Tom at ¶¶ 5–6.

Pursuant to Department of Labor regulations requiring administrators to consult appropriate

healthcare professionals in certain types of claims, Lincoln utilizes consulting physicians in

various medical specialty areas, to review medical evidence and answer medical questions that

arise in connection with evaluating certain claims.  *Id.* at ¶ 8.  Such questions typically concern

the extent of functional limitations supported by the medical evidence (limitations which may or

may not limit a claimant's ability to work depending upon the functional requirements of his or her occupation). *Id.* at ¶ 10. Neither the independent consulting physicians nor the outside vendors who select them have the authority to make a benefits determination. *Id.* at ¶¶ 8, 10.

Where the claim professional determines that functional limitations are supported, based on the opinions of treating and consulting physicians and the record as a whole, that professional may also seek the opinion of a vocational consultant on the extent to which, if at all, any supported limitations might restrict a claimant's ability to work in a particular occupation. *See id.* at ¶ 15. Accordingly, medical and vocational reviews, when they are undertaken, are just one variable in claim determination. *Id.* And such reviews may only take place with respect to more difficult claims, as every claim involves a unique set of facts, occupational requirements, and medical circumstances. *Id.*

Here, Lincoln's claim professionals, at the different levels of review, sought input from medical consultants concerning ***both*** Plaintiff's thyroid condition ***and*** his claimed cognitive and psychological symptoms. *See*, *e.g*., LIN2411; LIN2346; LIN2347; LIN2318; LIN0416–28. These medical consultants, in reaching their own opinions about Plaintiff's claimed functional limitations, considered and discussed many aspects of the medical evidence presented in the record, including examination and test results, observed and reported symptoms, and intensity of treatment measures. Their analysis was not limited to Plaintiff's alleged "physical" limitations. *Compare* Pl.'s Memo. at 24. For example, Dr. Helding, a board-certified psychiatrist, opined in his February 22, 2019 peer review report that the medical evidence, from a psychiatric perspective, simply did not support any functional restrictions. *See* LIN2412–14. In support of his opinion, Dr. Helding said,

> The psychiatric information offered and available is actually fairly consistent. It does not describe symptoms of the severity that would typically be expected

13

to cause any functional impairment to the point of not being able to perform work related tasks.

LIN2414.  Separately, Dr. Critchfield, a board-certified neuropsychologist, reached the same conclusion—*i.e.*, no functional impairment.  As he summarized the basis of his opinion,

> Overall, it is this reviewer's opinion that the available medical records do not provide adequate evidence of cognitive or psychiatric symptoms to result in functional impairment.  Neuropsychological evaluation completed 5/24/2019 did not reflect memory or attention deficits of a nature or severity that would be expected to result in functional impairment.  Furthermore, multiple mental status exams have reflected intact memory and attention. . . .  There is no record that psychological symptoms ever reached a severity necessitating a higher level of treatment, such as intensive outpatient or inpatient psychiatric admission.

LIN2350.  Dr. Hertza, another board-certified neuropsychologist, also found the medical evidence insufficient to support functional limitations.  LIN0416–20.  As he explained,

> Given mental status exams that do not describe functional impairment, formal assessment with no validity measures, and no indication of high level care, the available medical record is found to not support functional impairment, from 03/05/2019 to present.

LIN0420.  Given such opinions, which align with the similar contemporaneous views of Plaintiff's own treating physicians Dr. Reed and Dr. Judd, *see* LIN2667 ("I can no longer recommend a biochemical basis [for] any disability."); LIN2331 ("Dr. Judd did not feel [Plaintiff] was still disabled."), Lincoln's claim professionals reasonably determined that the medical evidence did not support any functional limitations beyond March 5, 2019.  And accordingly, there was no need for Lincoln to consult a vocational expert for an opinion comparing Plaintiff's ***alleged-but-not-supported*** limitations to his occupational requirements.

That Lincoln's claim professionals, in preparing their determination letters, chose to quote portions of the medical consultants' reports does not mean that Lincoln imposed some extra-contractual "intensive care" requirement.  *Compare* Pl.'s Memo. at 12–13.  Rather, each of

14

the determination letters in the record makes clear that Lincoln at all times applied the Group

Policy's "Own Occupation" standard in full accordance with the policy terms and Lincoln's

obligation to enforce those terms as written.  *See*, *e.g*., LIN2407 ("In summary, the medical

documentation contained in your claim file does not support Total Disability as defined by the

policy."); LIN2315 ("[O]ur review of the medical documentation . . . does not support that you

were unable to perform the main duties of your own or any occupation beyond your date benefits

were last paid 03/05/2019."); LIN0205 ("Our review of the medical documentation . . . does not

support that your client was unable to perform the main duties of your client's own occupation

beyond your client's date last paid.").

Indeed, Courts in this Circuit have rejected other claimants' attempts to similarly

mischaracterize the review process.  In Nicely v. Unum Life Ins. Co., 2009 WL 5201852

(M.D.N.C. Dec. 23, 2009), for example, the claimant argued that Unum improperly imposed

extra-contractual proof requirements because it denied her claim after discussing the record's

lack of cognitive or functional testing.  In upholding the denial of benefits, the Court explained,

> [Unum's] letter did not impose any additional, or "extracontractual"
> requirements, as argued by [the claimant], but merely addressed the evidence
> in the medical record upon which Unum based its decision.  The burden of
> proof was on [claimant], not Unum, and the fact that there were no objective
> test findings was [claimant's] responsibility.  It was her responsibility to
> establish her disability through something more than her subjective
> complaints.

Id., 2009 WL 5201852 at *10.

Plaintiff also argues, somewhat bizarrely, that the fact that Lincoln's claim professionals

quoted portions of the medical consultants' reports demonstrates that they "completely ignored,"

"arbitrarily dismissed," or otherwise failed to "adequately consider" the medical evidence

submitted by Plaintiff.  *Compare* Pl.'s Memo. at 15 ("There is nothing 'thoughtful' about

copying and pasting."); *see also*, *e.g.*, *id.* at 14, 16, 22, 23–25, 28.  To the contrary, the claim professionals' selection and inclusion of direct quotes to support their own reasoning shows just the opposite.

On the face of the peer review reports, it is clear that each of the consulting physicians received the entirety of the medical evidence submitted in the case, reviewed that evidence carefully, and even summarized many of the treatment notes, physical examinations, and test results that they found particularly important in reviewing the Plaintiff's claimed limitations and restrictions, whether from an endocrinology, mental health, or neuro-psychological perspective, as the case may be.  *See*, *e.g.*, LIN2411–14; LIN2346; LIN2347–49; LIN2318–20; LIN0418–28; LIN0210–18.  The very fact that the consulting physicians explicitly discussed, *inter alia*, the extent of Plaintiff's symptoms and his level of treatment demonstrates the substantive depth and thoroughness of their respective reviews.  It was entirely proper, let alone reasonable, for Lincoln's claim professionals, in turn, to consider the consulting physicians' reliable opinions, and to quote portions of the peer review reports, in preparing their determination letters.  *See* Nord, 538 U.S. at 825.

Implicit in the Plaintiff's argument is also the erroneous notion that Lincoln's reviewers should have specifically discussed each and every individual piece of evidence.  But just as there is no "discrete burden of explanation" when an administrator chooses to credit reliable evidence that is contrary to a treating physician's opinion, Nord, 538 U.S. at 834, there can be no similar discrete burden to specifically discuss every piece of evidence in the record.  *See*, *e.g.*, Niebauer v. Crane & Co., Inc., 783 F.3d 914, 928 (1st Cir. 2015) (rejecting similar argument and holding that "the denial letter need not detail every bit of information in the record"); Spenrath v. Guardian Life Ins. Co., 564 Fed. App'x 93, 98 (5th Cir. 2014) ("[I]t would be impractical to

require the plan administrator to mention each piece of evidence it considered in reaching its conclusion.").

If there was some requirement to discuss every item submitted by a claimant, it would not only impair the discretion afforded to administrators under ERISA, but would also encourage claimants to pile irrelevant and unnecessary materials into the claim file with the hope that an administrator's failure to specifically discuss every piece of it might lead to reversal of an otherwise correct determination.  That would run directly counter to ERISA's underlying interests.  Bernstein v. CapitalCare, Inc., 70 F.3d 783, 788 (4th Cir. 1995) (administration of plans should be "left to plan fiduciaries, not federal courts," in furtherance of "ERISA's goals of expeditiously, efficiently, and inexpensively resolving coverage disputes").

**IV.    Lincoln advised Plaintiff as to the reasons for its various determinations and gave him ample opportunities to summit proof.**

Plaintiff asserts—contrary to the record—that Lincoln failed its regulatory obligation to advise him as to the reasons for Lincoln's determinations and what additional information might be adequate or sufficient to prove his claim.  *See*, *e.g*., Pl.'s Memo. at 14, 27–28.  When viewed as a whole, the record clearly shows that Lincoln explained the basis for its determination "in a manner calculated to be understood," including the "reasons for the adverse determination," the "specific plan provisions on which the determination [was] based," and what was necessary to "perfect the claim."  29 C.F.R. § 2560.503-1(g)(1).  Plaintiff's argument to the contrary misconstrues the regulations, all but ignores the actual content of the parties' correspondence, and relies on a deceptive quotation of one Lincoln letter to make it falsely appear to omit the very information that satisfies the regulation.

First, it is apparent that Plaintiff construes the regulation to mean that Lincoln should have told him what was needed in order for him to win his appeal.  Plaintiff argues, for example,

17

"If [Lincoln] wants to claim the medical evidence and test results [Plaintiff] provided are insufficient, [Lincoln] must state what additional information would satisfy [Lincoln]." Pl.'s Memo. at 27. As many Courts have made clear, that is not what the regulations mean. In Terry v. Bayer Corp., 145 F.3d 28 (1st Cir. 1998), for example, the First Circuit rejected the same argument Plaintiff makes here and held that "perfect the claim" is not synonymous with "win the appeal." Id. at 39. "Perfect," in this context, explained the Court, "means to bring to completion." Id. at 39 n.8 (internal quotation and alteration omitted). "Thus, a complete claim is not necessarily the same as a successful claim because even a complete claim can be denied." Id.; see also, e.g., Kearney v. Standard Ins. Co., 175 F.3d 1084, 1091 (9th Cir. 1999) (en banc), cert. denied, 528 U.S. 964 (1999) ("The argument is without force because [claimant's] claim did not fail because he failed to submit needed evidence. It failed because [the administrator], having considered the evidence, concluded . . . that [claimant] was not disabled."). Like the claimants in Terry and Kearney, Plaintiff's benefits ended not because he failed to submit information necessary to complete his claim, but because the complete evidence he did submit showed that he was no longer disabled.

Properly understood, the purpose of ERISA's notice requirements is simply "to provide claimants with enough information to prepare adequately for further administrative review or appeal to the federal courts." Hobson v. Metropolitan Life Ins. Co., 574 F.3d 75, 87 (2d Cir. 2009); see, e.g., Gagliano v. Reliance Standard Life Ins. Co., 547 F.3d 230, 235 (4th Cir. 2008) ("That process enables a claimant who is denied benefits to have an impartial administrative review, but also make an administrative record for a court to review if that later occurs."); see also, e.g., McBurnie v. Life Ins. Co. of N. America, 763 Fed. App'x 596, 599 (9th Cir. 2019) (finding compliance with § 2560.503-1(g) where denial letter "quoted the definition of

18

disability," described the information and rationale for the administrator's determination, and "concluded by informing [the claimant] that she could submit additional medical records, test results, and therapy records . . . that depict her functional abilities."); Blair v. Metropolitan Life Ins. Co., 569 Fed. App'x 827, 831 (11th Cir. 2014) (no violation where notice letter "taken as a whole, . . . supplied [the claimant] with a statement of reasons that, under the circumstances of the case, permitted a sufficiently clear understanding of the administrator's position to permit effective review.").

Lincoln fully complied. Throughout the administrative process, Lincoln repeatedly advised Plaintiff of his ongoing obligation to prove—by reliable medical evidence—that his medical condition functionally limited his ability to work. Starting with its initial approval of the claim, Lincoln told Plaintiff, "Your policy provides benefits as long as you are unable to perform the main duties of your Own Occupation, as defined in your policy." LIN2924. "Occasionally, we will send you supplementary claim forms to provide us with continuing proof of disability, which will include requesting current medical records." LIN2924.

Upon terminating benefits effective March 5, 2019, Lincoln's notice letter quoted the Group Policy's definition of "Total Disability," summarized the information Lincoln and its medical consultants reviewed, and explained the reason benefits were terminated. Indeed, the letter's explanation specifically noted Dr. Reed's opinion that Plaintiff was no longer disabled by his thyroid condition and Dr. Helding's opinion that no behavioral health conditions supported functional limitations. LIN2407. After describing the available appeal procedures, the letter concluded with a request that, as part of any appeal, Plaintiff submit "any additional documentation" supporting any ongoing functional limitations, "such as medical treatment records, laboratory results, x-rays or other testing results." LIN02408.

19

Plaintiff understood the grounds for Lincoln's determination well enough to submit additional information, including an explanation for his then-recent change of treating psychiatrists and a copy of Dr. Conley's May 24, 2019 Neuropsychological Evaluation, with his first appeal. *See*, *e.g*., LIN2381; LIN2394. Plaintiff's submission of Dr. Conley's report shows that he was well aware of Lincoln's reasons for terminating benefits and was submitting additional evidence on the crucial point. *Compare*, *e.g*., Terry, 145 F.3d at 39.

On June 10, 2019, Lincoln wrote to acknowledge Plaintiff's first appeal. *See* LIN2359. In that letter, Lincoln explained, "It is important that we have all available medical records so that we have a clear picture of your current condition." LIN2359. To give Plaintiff a meaningful opportunity to respond to the views of Dr. Critchfield and Nurse Sucha during the first administrative review, Lincoln provided Plaintiff with copies of their written reports on July 3, 2019 and suggested that Plaintiff share them with his own treating physicians. LIN2338. In response, Plaintiff submitted additional progress notes from Dr. Fore. *See* LIN2324–37. In its first uphold letter, Lincoln again quoted the relevant Group Policy language, summarized the evidence considered on appeal, and explained the basis for its decision. LIN2311–16. In explaining Plaintiff's right to a second-level appeal, Lincoln again advised Plaintiff that any further appeal ought to be supported by medical evidence, if any, that shows functional limitations beyond March 5, 2019. *See* LIN2316.

On October 18, 2019, Attorney Osterbind requested a complete copy of Lincoln's claim file, LIN2304, and Lincoln complied with his request. *See* LIN2279. In Plaintiff's Memorandum, however, Plaintiff now selectively quotes only a portion of Lincoln's November 1, 2019 response. *Compare* Pl.'s Memo. at 27 *with* LIN2279–80. As relevant here, Plaintiff deceptively omits the part where Lincoln said,

20

> Please refer to the denial letters for any additional information needed to
> perfect his claim or any internal guidelines used.  To be eligible for benefits
> under this policy, an insured must meet all of the provisions of the policy to
> include, but is not limited to, Total Disability and Pre-Existing conditions.
> Objective evidence is not a requirement to satisfy this provision; however,
> medical evidence supporting the claim being made is needed.  This can
> include office and treatment records, testing results, therapy records, or any
> other type of documentation that would support the inability to perform the
> main and substantial duties of one's occupation. . . .  For specific details
> regarding the basis of our determination, the information previously reviewed,
> and the contractual limitations afforded by the policy, please refer to our
> letters dated 03/04/2019 and 08/30/2019.

LIN279–80.  In context, this letter directs Plaintiff's counsel to the proper standard for proving the claim and explains what kinds of documentation might satisfy that standard.  In no way does this letter "attempt to evade" Lincoln's regulatory obligations.  *See* Pl.'s Memo. at 27.

Indeed, the adequacy of Lincoln's explanation of its reasons for terminating the claim were sufficiently clear for Attorney Osterbind, in preparing Plaintiff's second appeal, to craft a detailed, 35-page appeal argument which included, *inter alia*, Attorney Osterbind's own summary of the reasons for Lincoln's determination and a seven-point attack on those reasons. *See* LIN2242–76.  In addition, Attorney Osterbind submitted additional advocacy letters from Dr. Reed and Dr. Berger in his effort to counter the reasons offered by Lincoln for its decision. *See* LIN2069; LIN2107.  After Dr. Hertza and Dr. Sood reviewed those letters, and all of the medical evidence in the file, Lincoln shared a copy of their panel peer review report with Attorney Osterbind on April 1, 2020, and told him, "We are not making a final determination on your client's disability claim at this time as we want to provide your client every opportunity to review our assessment and provide a response."  LIN0411.  In response, Attorney Osterbind submitted yet another eight pages of medical and legal argument, as well as additional advocacy letters from Drs. Fore and Berger.  *See* LIN0376; LIN0248; LIN0401.

21

Particularly in light of the record of Plaintiff's and Attorney Osterbind's actions at the administrative review stage, their present contention that they did not know the reasons for Lincoln's determination or how to "perfect" the claim simply does not withstand scrutiny. Contrary to Plaintiff's accusations of "red herring" reasoning, for example, Lincoln's August 30, 2019 uphold letter does not say that Lincoln's decision was exclusively based on Plaintiff's failure to prove "physical disabilities." *See* Pl.'s Memo. at 24. Rather, the letter makes plain that Lincoln examined all of the medical evidence, including the opinions of Plaintiff's treating physicians, and that such evidence did not support "physical, cognitive, or behavioral impairments." LIN2314.

In a similar vein, Plaintiff now argues that it is a "mystery" why Lincoln decided to grant benefits and then terminate them when, in Plaintiff's words, his mental status exams "never changed." *See* Pl.'s Memo. at 25. But as the record makes clear, Plaintiff's claim was initially approved on the basis of his thyroid condition and the effects of ongoing Iodine-131 treatments, not on the basis of his mental health status. *See*, *e.g*., LIN0020 ("Primary disabling condition is Thyrotoxicosis."). Thus, as explained in Lincoln's initial termination letter, once Plaintiff's hormone levels stabilized and Dr. Reed withdrew his support for disability, the evidence concerning Plaintiff's alleged cognitive and mental health symptoms did not support continued benefits. *See* LIN2407.

In sum, Lincoln's determination letters and its other communications fully explained the basis for Lincoln's determination and what Plaintiff needed to do and needed submit if he wanted to challenge that determination on appeal. *See*, *e.g*., McBurnie, 763 Fed. App'x at 599; Blair, 569 Fed. App'x at 831; Hobson, 574 F.3d at 87; Gagliano, 547 F.3d at 235; Kearney, 175 F.3d at 1091; Terry, 145 F.3d at 39.

22

**V.      Lincoln correctly chose not to request an in-person medical examination, as such an examination in this case would have been unnecessarily redundant in light of the medical evidence already in the record.**

Plaintiff argues that Lincoln was required to conduct an in-person medical examination ("IME") before making a benefits determination. *See* Pl.'s Memo. at 21 ("[N]o one bothered to actually evaluate [Plaintiff], as the plan requires . . ."). Plaintiff's argument is contrary to the written terms of the Group Policy, which allows but does not require Lincoln to conduct an IME. *See*, *e.g*., LIN0142 ("The Company may have the Insured Employee examined . . ."). Plaintiff's argument also erroneously reverses the burden of proof. *See*, *e.g*., Piepenhagan v. Old Dominion Freight Line, Inc., 395 Fed. App'x 950, 957 (4th Cir. 2010) ("[A] plan administrator has no duty to develop evidence that a claimant is not disabled prior to denying benefits. . . . Nothing in the language of the Plan document or in our precedents required [the administrator] to seek out IME evidence as a condition to its denial of [the] claim.").

Moreover, no IME was necessary or appropriate in this case because the record already contained multiple examination reports, mental status exam results, lab results, and extensive other evidence that showed Plaintiff's medical condition and functional abilities at the relevant time. That evidence overwhelmingly supports Lincoln's determination that Plaintiff was not functionally limited after March 5, 2019. As previously explained, Lincoln's medical consultants reviewed the entirety of that evidence, and even Plaintiff's treating physicians at the time opined that Plaintiff was no longer unable to work.

Under such circumstances, there was no need for another needlessly duplicative examination likely to result only in additional expense and delay. *See*, *e.g*., Hines v. E.I. DuPont de Nemours & Co. LTD Plan, 2019 WL 1364915 at *16 (D.S.C. March 26, 2019) ("The Court finds that the factual record developed by Defendant is sufficient and that no IME was necessary based on the circumstances and medical evidence in the administrative record"); Irving v. Unum

Life Ins. Co., 2019 WL 1331237 at *7 (D. Md. March 25, 2019) (finding that no IME was necessary where administrator already "had an abundance of medical evidence and did not require an independent examination").

**VI.     There is no record evidence that raises any inference of improper motivation, and the mere existence of a so-called structural bias does not meaningfully sway the balance of the evidence.**

Lastly, Plaintiff asserts that Lincoln's so-called structural conflict gave it a "Strong Motive" to terminate benefits, *see* Pl.'s Memo. at 28, but Plaintiff did not—indeed cannot—point to any evidence in the record that shows that structural conflict actually influenced Lincoln's decision-making process.  Instead, Plaintiff calculates future benefits speculatively based on how long Plaintiff's alleged disability might last, even though the evidence shows that he was not disabled after March 5, 2019.  That argument does not show bias influenced Lincoln's determination, nor does it undercut any of the procedural safeguards adopted by Lincoln to ensure accurate determinations.  *See*, *e.g*., Decl. Tom at ¶¶ 3–15 (ECF Doc. #26-2); *see also*, *e.g*., Everette v. Liberty Life Assurance Co., 2017 WL 2829673 at *11 (D. Md. June 29, 2017). ("Generalized allegations of bias are not a sufficient basis to find a plan administrator's decision to be an abuse of discretion.").  As set forth in Lincoln's opening memorandum, this is a case where the conflict factor is unimportant because it recedes to "the vanishing point." Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105, 117 (2008); Champion v. Black & Decker (U.S.) Inc., 550 F.3d 353, 362 (4th Cir. 2008).

**Conclusion**

Plaintiff has shown nothing arbitrary or unprincipled about Lincoln's decision-making. On the basis of the evidence that was before Lincoln concerning Plaintiff's claimed limitations

24

beyond March 5, 2019, Lincoln's decision was correct, let alone reasonable.  Accordingly,

Plaintiff's motion should be denied, and Lincoln's motion should be granted.

Dated: August 6, 2021

Respectfully Submitted,

THE LINCOLN NATIONAL LIFE
INSURANCE COMPANY,

By Its Attorneys,

/s/ A. Tevis Marshall
Tevis Marshall (VSB No. 68401)
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
Riverfront Plaza, West Tower
901 E. Byrd Street, Suite 1300
Richmond, Virginia 23219
Tel: 804.663.2333; Fax: 804.225.8641
tevis.marshall@ogletreedeakins.com

/s/ Byrne J. Decker
Byrne J. Decker (admitted *pro hac vice*)
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
Two Monument Square, Suite 703
Portland, ME 04101
Tel: (207) 387-2963; Fax: (207) 387-2986
byrne.decker@ogletree.com

/s/ Scott K. Pomeroy
Scott K. Pomeroy (admitted *pro hac vice*)
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
One Boston Place, Suite 3500
Boston, Massachusetts 02108
Tel: (207) 387-2961; Fax: (207) 387-2986
scott.pomeroy@ogletree.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 6th day of August, 2021, the foregoing Memorandum in Support of Defendant's Motion for Judgment on the Administrative Record was filed with the Clerk of Court using the CM/ECF system which will provide notification of such filing upon counsel of record in this matter:

Brandon S. Osterbind, Esq.
Kelly Ann Osterbind, Esq.
OSTERBIND LAW, PLLC
1216 Greenview Dr., Suite A
Lynchburg, VA 24502
(434) 515-2807
bosterbind@osterbindlaw.com
kosterbind@osterbindlaw.com

Joshua F. P. Long, Esq.
WOODS ROGERS PLC
10 S. Jefferson St., Suite 1400
Roanoke, VA 24011
(540) 332-3710
jlong@woodsrogers.com

/s/ A. Tevis Marshall
Tevis Marshall (VSB No. 68401)

47994210.3

26