# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## LYNCHBURG DIVISION

ROBERT LEARN,
  Plaintiff,

v.

GROUP LIFE, DEPENDENT LIFE,
ACCIDENTAL DEATH AND
DISMEMBERMENT INSURANCE FOR
EMPLOYEES OF CENTRA HEALTH,
INC.,
  Defendant.

CIVIL ACTION NO. 6:20-cv-0060 NKM

## DEFENDANT'S REPLY

> Tevis Marshall (VSB No. 68401)
> OGLETREE, DEAKINS, NASH, SMOAK &
> STEWART, P.C.
> Riverfront Plaza - West Tower
> 901 East Byrd Street, Suite 1300
> Richmond, VA 23219
> Tel: (804) 663-2333; Fax: (804) 225-8641
> tevis.marshall@ogletree.com
>
> Byrne J. Decker (admitted *pro hac vice*)
> OGLETREE, DEAKINS, NASH, SMOAK &
> STEWART, P.C.
> Two Monument Square, Suite 703
> Portland, ME 04101
> Tel: (207) 387-2963; Fax: (207) 387-2986
> byrne.decker@ogletree.com
>
> Scott K. Pomeroy (admitted *pro hac vice*)
> OGLETREE, DEAKINS, NASH, SMOAK &
> STEWART, P.C.
> One Boston Place, Suite 3500
> Boston, MA 02108
> Tel: (207) 387-2961; Fax: (207) 387-2986
> scott.pomeroy@ogletree.com

**Table of Contents**

Table of Authorities  ................................................................................................ ii

Points and Authorities  ............................................................................................. 1

   1.  Lincoln correctly determined that Plaintiff failed to meet his burden
      to prove any functional limitations beyond March 5, 2019.  .................................. 1

   2.  Although Plaintiff did submit some "objective" evidence, that
      evidence showed that his thyroid levels stabilized well before
      March 5, 2019.  Moreover, other reliable evidence in the record
      also showed that he was not psychologically or cognitively limited
      after that date.  ..................................................................................................... 3

   3.  Lincoln duly considered all of the medical and non-medical
      evidence that Plaintiff submitted, and Lincoln reasonably resolved
      conflicts in the evidence—including the conflicting opinions
      of Plaintiff's own treating physicians.  ................................................................. 7

   4.  Lincoln fully explained the rationale for its determination, and
      Lincoln's Memorandum properly explains why that rationale
      was correct, let alone reasonable.  ........................................................................ 9

   5.  Plaintiff did change doctors after his treating physicians opined
      that he was no longer disabled.  ........................................................................... 10

Conclusion  ............................................................................................................. 10

**Table of Authorities**

**Cases:**

Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003). .......................................... 3, 5

Brogan v. Holland, 105 F.3d 158 (4th Cir. 1997). ................................................. 1, 2

Coffman v. Metropolitan Life Ins. Co., 217 F. Supp. 2d 715 (2002), *aff'd*,
77 Fed. App'x 174 (4th Cir. 2003). ...................................................... 1, 3

Donovan v. Eaton Corp., 462 F.3d 321 (4th Cir. 2006). .......................................... 7

Gorbacheva v. Abbot Lab. Extended Disability Plan, 309 F. Supp. 3d 756
(N.D. Cal. 2018). .................................................................. 5

Johnston v. Prudential Ins. Co., 916 F.3d 712 (8th Cir. 2019). ................................. 5

Laws v. Celebrezze, 368 F.2d 640 (4th Cir. 1966). .................................... 3

LeFebre v. Westinghouse Elec. Corp., 747 F.2d 197 (4th Cir. 1984). ................................. 1, 3

Maniatty v. Unum Provident Corp., 218 F. Supp. 2d 500 (S.D.N.Y. 2002),
*aff'd*, 62 Fed. App'x 413 (2d Cir. 2003), *cert. denied*, 540 U.S. 966 (2003). .......................... 3

Niebauer v. Crane & Co., Inc., 783 F.3d 914 (1st Cir. 2015). .................................. 5

Varity Corp. v. Howe, 516 U.S. 489 (1996). ............................................. 1

Vaughan v. Celanese Americas Corp., 339 Fed. App'x 320 (4th Cir. 2009). .......................... 2

Wasson v. Media General, Inc., 446 F. Supp. 2d 579 (E.D. Va. 2006). .................................. 3

White v. Eaton Corp., 308 Fed. App'x 713 (4th Cir. 2009). .................................... 7

**Other Authorities:**

Employee Retirement Income Security Act of 1974 ("ERISA"),
29 U.S.C. § 1001, *et seq.* ................................................................ *passim*

20 C.F.R. § 2560.503-1(h)(3)(iii) and (h)(4). ........................................ 9

Lincoln hereby files this Reply in support of its Motion for Judgment on the

Administrative Record, ECF Doc. #25.  Lincoln incorporates by reference its prior Memorandum

(ECF Doc. #26) and its Opposition (ECF Doc. #35) to Plaintiff's Motion for Summary

Judgment.

**Points and Authorities**

**1.      Lincoln correctly determined that Plaintiff failed to meet his burden to prove any functional limitations beyond March 5, 2019.**

As in his other motion papers, Plaintiff's Opposition (ECF Doc. #34) presents the record

and his arguments in a manner that seems calculated to obscure both the relevant time frame at

issue and the quality of evidence actually required to meet his burden of proof.

The relevant time frame runs from after March 5, 2019, because Lincoln paid LTD

benefits through that date.  *See*, *e.g.*, LIN0150 (requiring "proof of continued Total Disability" as

a condition for the receipt of ongoing monthly benefits).

At all times, the burden was on the Plaintiff to prove his claim.  Lincoln had no burden to

prove that Plaintiff was able to work, but as the Court recognized in Coffman v. Metropolitan

Life Ins. Co., 217 F. Supp. 2d 715 (2002), *aff'd*, 77 Fed. App'x 174 (4th Cir. 2003), Lincoln, as

an ERISA claim administrator, did have a duty "to guard the assets of the trust from improper

claims."  *Id.* at 731 (quoting Brogan v. Holland, 105 F.3d 158, 164 (4th Cir. 1997), and LeFebre

v. Westinghouse Elec. Corp., 747 F.2d 197, 207 (4th Cir. 1984)); *see also*, *e.g.*, Varity Corp. v.

Howe, 516 U.S. 489, 514 (1996).

Throughout the administrative process, Lincoln repeatedly advised Plaintiff of his

burden, and it repeatedly explained what proof he needed to provide in order to satisfy that

burden.  At the time it first approved benefits, for example, Lincoln told Plaintiff, "Your policy

provides benefits as long as you are unable to perform the main duties of your Own Occupation,

1

as defined in your policy." LIN2924. At the time benefits ended, Lincoln advised Plaintiff of his appeal rights and said he should submit "any additional documentation" supporting his claim "such as medical treatment records, laboratory results, x-rays or other testing results." LIN2408. In connection with Plaintiff's first appeal, Lincoln said, "It is important that we have all available medical records so that we have a clear picture of your current condition." LIN2359. In response to Attorney Osterbind's October 18, 2019 request for a copy of the claim file in preparation for Plaintiff's second appeal, Lincoln told him,

> Objective evidence is not a requirement . . . ; however, medical evidence supporting the claim being made is needed. This can include office and treatment records, testing results, therapy records, or any other type of documentation that would support the inability to perform the main and substantial duties of one's occupation.

LIN2280.

Lincoln neither demanded "some additional, unspecified objective evidence," *see* Pl.'s Opp. at 2, nor did it terminate benefits simply because some specific item of objective evidence was "lacking." *Id.* at 3. Rather, Lincoln terminated benefits because the reliable and substantial medical evidence contained in the record overwhelmingly showed that by March 5, 2019, Plaintiff was no longer "Totally Disabled" within the meaning of the Group Policy. *See* LIN2404–08; LIN2311–16; LIN0203–08.

Regardless of whether any one particular item of evidence might be characterized as "objective" or "subjective," it was entirely proper for Lincoln to consider all of the medical evidence that Plaintiff submitted along with all of the opinions offered by treating and consulting physicians alike. *See*, *e.g*., Vaughan v. Celanese Americas Corp., 339 Fed. App'x 320, 321 (4th Cir. 2009) ("A decision is reasonable when it is the 'result of a deliberate, principled reasoning process and if it is supported by substantial evidence.'") (quoting Brogan, 105 F.2d at 161).

2

> Substantial evidence, it has been held, is evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.

Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966); *see also*, *e.g.*, Wasson v. Media General, Inc., 446 F. Supp. 2d 579, 590 (E.D. Va. 2006) (same) (quoting LeFebre, 747 F.2d at 208).

Lincoln's determination here is supported by far more than a "scintilla" of evidence. Indeed, the record evidence that supports Lincoln's determination is overwhelming.  Lincoln certainly had no obligation to give more weight to Plaintiff's subjective complaints or the *post-hoc* views of Drs. Conley and Berger, than to the mountain of contrary objective evidence in the record.  *See*, *e.g.*, Black & Decker Disability Plan v. Nord, 538 U.S. 822, 833–34 (2003) ("[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."); Coffman, 217 F. Supp. 2d at 732 ("Although the word 'objective' does not appear in the Plan document, that interpretation is not unreasonable under these circumstances.").  While an uncritical acceptance of Plaintiff's subjective complaints may be "more or less required of treating physicians," such indulgence is "by no means required of [an ERISA] administrator" charged with protecting plan assets.  Maniatty v. Unum Provident Corp., 218 F. Supp. 2d 500, 504 (S.D.N.Y. 2002), *aff'd*, 62 Fed. App'x 413 (2d Cir. 2003), *cert. denied*, 540 U.S. 966 (2003).

2.   **Although Plaintiff did submit some "objective" evidence, that evidence showed that his thyroid levels stabilized well before March 5, 2019.  Moreover, other reliable evidence in the record also showed that he was not psychologically or cognitively limited after that date.**

Contrary to arguments in Plaintiff's Opposition, Lincoln never denied that Plaintiff provided some objective evidence.  Plaintiff seeks to highlight evidence of his Graves Disease

3

diagnosis, his fluctuating thyroid levels, and his "resulting cognitive and psychiatric symptoms."

Pl.'s Opp. at 3.  But when viewed in context, such evidence, whether labeled "objective" or not,

actually supports Lincoln's determination and not Plaintiff's claim.

For example, Plaintiff submitted thyroid tests that showed fluctuating hormone levels

prior to June 7, 2018.  *See*, *e.g.*, LIN3004; LIN3007; LIN2750; LIN2725.  But test results on

June 7, 2018, and again on September 11, 2018, showed that Plaintiff's hormone levels were

normal.  *See* LIN2702; LIN2680.  As Dr. Reed, Plaintiff's treating endocrinologist at the time,

confirmed,

> I will not be able to recommend further disability on the basis of
> hypothyroidism as [Plaintiff's] serum TSH is now in the middle of the
> reference range that we would target . . . and [his] free T4 is in the reference
> range.  And it [has] been this way for now approximately 6 months.

LIN2667.  Thereafter, test results from July, November, and December 2019 showed that

Plaintiff's hormone levels remained stable.  *See*, *e.g.*, LIN1509; LIN2085–86; LIN2056–57.

Plaintiff relies on Dr. Berger's *post-hoc* advocacy letters which assert that Plaintiff's

thyroid levels "were obviously not controlled and not stable at any point."  LIN2107.  But Dr.

Berger's letters are clearly written to emphasize Plaintiff's "Thyroid Storm" of 2016–2018, and

they do not acknowledge the repeatedly normal test results occurring after March 5, 2019.  *See*

LIN2107; LIN0401–02.  And contrary to the advocacy contained in her letters, Dr. Berger's own

contemporaneous treatment notes—to the extent they contain thyroid test results—show that

Plaintiff's hormone levels were within normal limits during the relevant period and while he was

under her care.  *See*, *e.g.*, LIN2080.

With respect to his alleged cognitive limitations, Plaintiff asserts that Lincoln "ignored"

the medical literature he submitted.  Pl.'s Opp. at 3.  But the record is clear that Lincoln did not

ignore any of the evidence.  Indeed, Lincoln's nurse reviewer on the second appeal specifically

4

cited the "several Medical Journal Articles" submitted by the Plaintiff in recommending that Lincoln obtain a panel review.  LIN0415.  More to the point, however, the articles only addressed the range of symptoms generally possible, not the Plaintiff's individual impairments, if any, during the relevant time period.  Particularly given the articles' generic nature, and their recitation of information likely already known to the board-certified specialists who reviewed the record, there was simply no reason—let alone a requirement—for Lincoln or its medical consultants to specifically discuss each of the articles submitted.  *See*, *e.g*., Nord, 538 U.S. at 834 ("[N]or may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."); Niebauer v. Crane & Co., Inc., 783 F.3d 914, 928 (1st Cir. 2015) ("[T]he denial letter need not detail every bit of information in the record.").

Plaintiff also relies on Dr. Conley's neurocognitive testing, but that testing lacked robust validity measures.  In the absence of such safeguards, Plaintiff cannot rehabilitate Dr. Conley's conclusions by trying to distinguish cases like Johnston v. Prudential Ins. Co., 916 F.3d 712 (8th Cir. 2019), or Gorbacheva v. Abbot Lab. Extended Disability Plan, 309 F. Supp. 3d 756 (N.D. Cal. 2018).  *See* Pl.'s Opp. at 5–7.  Indeed, Plaintiff has completely missed the point.  It is self-evident that in the absence of robust validity measures, any cognitive or functional testing can be influenced by a test-taker's failure to exert best efforts.  Accordingly, such un-validated testing is simply not reliable for the forensic purpose of determining a claimant's alleged impairments or limitations.  Courts across the country recognize this.  *See*, *e.g*., Johnston, 916 F.3d at 716 ("On review of the validity tests administered to Johnston, we see no basis to conclude that Prudential's evidence of malingering was subjective or otherwise manipulable by bias."); Gorbacheva, 309 F. Supp. 3d at 773 ("Given Dr. Lobel's explanation of validity testing, the Plan

5

Administrator's reliance on Dr. Lobel's conclusion was not illogical, implausible or without support in the record.").

Plaintiff criticizes Lincoln's statement that even Dr. Berger did not rely on Dr. Conley's un-validated testing. *See* Pl.'s Br. at 4. But she did not. Whether she had access to Dr. Conley's report or not—something that remains unclear—she did not cite that report or any other neurocognitive or functional testing to support her conclusory assertion that Plaintiff "is not capable of ever being able to return to the level of work which he was performing prior to 2016." *See* LIN0402.

Moreover, the "mild" cognitive impairment that Dr. Conley purportedly found, conflicts with other reliable examination evidence in the record dating from both before and after the un-validated May 2019 testing. For example, Dr. Judd recorded objective examinations of the Plaintiff in September, November, and December of 2018, and he consistently found Plaintiff's cognition, attention, memory, concentration, and judgment to be "intact." *See* LIN2797; LIN2789; LIN1945. Dr. Judd also consistently found Plaintiff's thought process to be "[l]ogical and goal directed." LIN2797; LIN2789; LIN1945. When Plaintiff visited Dr. Berger in November 2019, she asked him, as part of a depression screening test, whether he had "[t]rouble concentrating on things, such as reading the newspaper or watching television." LIN2078. Plaintiff replied, "Not at all." LIN2078. Reviewing such evidence, and the entirety of the medical record in context, Dr. Hertza reasonably concluded, "Given mental status exams that do not describe functional impairment, formal assessment with no validity measures, and no indication of high level care, the available medical record is found to not support functional impairment, from 03/05/2019 to present." LIN420.

**3.**     **Lincoln duly considered all of the medical and non-medical evidence that Plaintiff submitted, and Lincoln reasonably resolved conflicts in the evidence—including the conflicting opinions of Plaintiff's own treating physicians.**

Plaintiff asserts that Lincoln ignored conflicts in the evidence, but it is Plaintiff that asks the Court to blindly adopt the *post-hoc* opinions of Drs. Conley and Berger—opinions which conflict with those of Plaintiff's other treating physicians and fail to account for other conflicting evidence in the record, including repeatedly normal thyroid tests, normal physical examinations, and normal mental status examinations during the relevant time period.  Such evidence overwhelmingly supports Lincoln's determination that Plaintiff was not functionally limited after March 5, 2019.

This case bears no resemblance to Donovan v. Eaton Corp., 462 F.3d 321 (4th Cir. 2006), or White v. Eaton Corp., 308 Fed. App'x 713 (4th Cir. 2009).  In Donovan, the Court found an abuse of discretion after the administrator's reviewers failed to account for x-ray and MRI imaging studies and electro-diagnostic nerve testing that confirmed the severity of the claimant's degenerative back condition.  Despite such objective evidence, the administrator's reviewers repeatedly said, "There is no documentation of any radiographic abnormalities, and no evidence of a herniated disc or spinal canal stenosis." *Id.* at 327.  But in fact, that is exactly what the imaging and electro-diagnostic evidence in that case showed.

In White, 308 Fed. App'x at 713, the administrator relied primarily on a functional capacity exam that, with appropriate validity measures, showed that the claimant could lift no more than 50 pounds.  Yet, claimant's occupation as a machinist actually required him to lift up to 100 pounds.  Thus, the Court found an abuse of discretion in the administrator's conclusion that the FCE supported the claimant's ability to return to work. *Id.* 718–19.  The reviewers in White also overlooked other objective evidence of disability.  Specifically, the Court found that the administrator "credited the independent reviewer's opinion that White's MRI findings are

7

'unimpressive,' despite the fact that the MRI clearly evidenced abnormalities, including 'degeneration,' a 'very small left posterolateral disc protrusion with no nerve root impingement' of the L4–5, and an 'asymmetric left posterolateral disc bulge or broad-based disc protrusion' of the L5–S1." _Id._ at 719.

Here, by contrast, Plaintiff has identified no such glaring errors in the reports of Lincoln's medical consultants or in Lincoln's determination letters.  Instead, Plaintiff urges the Court to overlook any and all reliable evidence that conflicts with the opinions of Drs. Conley and Berger—evidence which they fail to acknowledge in their advocacy for Plaintiff's disability claim.

Dr. Berger's advocacy letter, for example, asserts that Plaintiff's "thyroid levels were obviously not controlled and not stable at any time."  LIN2107.  But Dr. Berger's statement is contrary to test results showing Plaintiff's consistently normal hormone levels from June 7, 2018 onward.  _See_, _e.g._, LIN2702; LIN2680; LIN2667; LIN1509; LIN2085–86; LIN2056–57; _see also_, Exhibit A to Def.'s Memo. (ECF Doc. #26-1) (summarizing test results).  In making such a statement, Dr. Berger even overlooked her own earlier progress notes which record normal Thyroxine (T4), T3 Uptake, Free Thyroxine Index, and TSH levels during the relevant period. _See_, _e.g._, LIN2080.

Similarly, Dr. Conley's report does not mention Dr. Judd's consistent reports of "intact" cognition, Dr. Fore's normal mental status exams, or any other evidence in the file that might conflict with his conclusory assessment of Plaintiff's alleged inability to maintain employment. _See_ LIN2394–96.

Instead of addressing the actual evidence in the file that pertains to Plaintiff's condition after March 5, 2019, Plaintiff repeatedly accuses Lincoln's claims professionals of "copying"

8

and "plagiarism" because they quoted, or in some cases paraphrased, the analyses offered by Lincoln's various medical consultants. *See*, *e.g*., Pl.'s Br. at 8, 15–17, 19. In this context, the plagiarism accusation makes absolutely no sense. It is not any form of cheating or academic dishonesty for Lincoln's claims professionals to specifically engage board-certified medical consultants to assist with an evaluation of complicated and specialized medical evidence. Indeed, where appropriate, the Department of Labor regulations actually require such collaboration. *See* 20 C.F.R. § 2560.503-1(h)(3)(iii) and (h)(4).

**4.      Lincoln fully explained the rationale for its determination, and Lincoln's Memorandum properly explains why that rationale was correct, let alone reasonable.**

Plaintiff asserts that Lincoln relied "exclusively" on the opinions of Drs. Hertza and Sood in ending benefits, but Lincoln's opening Memorandum in this litigation "only mentions those two doctors three times in ten pages." Pl.'s Opp. at 17. From this faulty premise, Plaintiff then argues that Lincoln "makes arguments in its brief that it never made in its denial letters." Pl.'s Opp. at 18.

Here, Plaintiff has mischaracterized the record and again seems to misunderstand the applicable standard of review. As Lincoln's determination letter makes clear, Lincoln did not rely on Drs. Hertza and Sood to the exclusion of everything else: "In our appeal review process, all information previously submitted as well as any new documentation was used to make a determination." LIN0203.

Throughout the administrative stage, Lincoln also fully explained the reasons for its determination and uphold decisions. *See* LIN2404–08; LIN2311–16; LIN0203–08. Those reasons have not changed, but now, in the context of Plaintiff's lawsuit, it is entirely appropriate for Lincoln to also argue why its determination was reasonable and point out Plaintiff's failure to show any abuse of discretion.

9

**5.      Plaintiff did change doctors after his treating physicians opined that he was no longer disabled.**

Plaintiff objects to any implication of "doctor shopping," but the facts are clear.  The treating physicians that he first relied upon to support his claim—endocrinologist Dr. Reed and psychiatrist Dr. Judd—both opined, before March 5, 2019, that he was no longer disabled. Dissatisfied with their consensus in this regard, *see*, *e.g*., LIN23331 ("Chief Complaint: 'not pleased with Dr. Judd.'"), Plaintiff sought new physicians and then proceeded to appeal Lincoln's termination of benefits relying on Dr. Conley's un-validated testing and Dr. Berger's unsupported and counter-factual opinion of continuing thyroid instability.

Plaintiff's elaborate explanations of why he changed from Dr. Judd to Dr. Fore and from Dr. Reed to Dr. Berger do not undercut the reliability of the former physicians' views.  Plaintiff may subjectively disagree with what Dr. Judd recorded in his progress notes, but that does not erase Dr. Judd's clinical observations from the record.  Likewise, Dr. Berger's willingness to advocate on behalf of Plaintiff's disability claim does not expunge Dr. Reed's opinion or the record of repeatedly normal thyroid tests after June 2018 which informed his opinion.

<strong>Conclusion</strong>

Even though it was Plaintiff's burden to prove his claim, the reliable and substantial medical evidence in the record overwhelmingly supports Lincoln's determination.  Thus, Lincoln's determination was correct, let alone reasonable and well within the bounds of its considerable discretion.  Accordingly, this Court should grant Lincoln's motion for judgment on the record and deny Plaintiff's motion for summary judgment.

10

Dated: August 20, 2021

Respectfully Submitted,

THE LINCOLN NATIONAL LIFE
INSURANCE COMPANY,

By Its Attorneys,

/s/ A. Tevis Marshall
A. Tevis Marshall (VSB No. 68401)
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
Riverfront Plaza, West Tower
901 E. Byrd Street, Suite 1300
Richmond, Virginia 23219
Tel: 804.663.2333; Fax: 804.225.8641
tevis.marshall@ogletreedeakins.com

/s/ Byrne J. Decker
Byrne J. Decker (admitted *pro hac vice*)
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
Two Monument Square, Suite 703
Portland, ME 04101
Tel: (207) 387-2963; Fax: (207) 387-2986
byrne.decker@ogletree.com

/s/ Scott K. Pomeroy
Scott K. Pomeroy (admitted *pro hac vice*)
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
One Boston Place, Suite 3500
Boston, Massachusetts 02108
Tel: (207) 387-2961; Fax: (207) 387-2986
scott.pomeroy@ogletree.com

11

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 20th day of August, 2021, the foregoing Defendant's Reply was filed with the Clerk of Court using the CM/ECF system, which will provide notification of such filing upon counsel of record in this matter:

| | |
|---|---|
| Brandon S. Osterbind, Esq. | Joshua F. P. Long, Esq. |
| Kelly Ann Osterbind, Esq. | WOODS ROGERS PLC |
| OSTERBIND LAW, PLLC | 10 S. Jefferson St., Suite 1400 |
| 1216 Greenview Dr., Suite A | Roanoke, VA 24011 |
| Lynchburg, VA 24502 | (540) 332-3710 |
| (434) 515-2807 | jlong@woodsrogers.com |
| bosterbind@osterbindlaw.com | |
| kosterbind@osterbindlaw.com | |

/s/ A. Tevis Marshall
A. Tevis Marshall (VSB No. 68401)

48155616.1

12