**IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF VIRGINIA
(Lynchburg Division)**

| | | |
|---|---|---|
| ROBERT LEARN, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Case No. 6:20-cv-00060-NKM** |
| | ) | |
| THE LINCOLN NATIONAL LIFE INSURANCE COMPANY | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S REPLY MEMORANDUM OF LAW TO DEFENDANT'S OPPOSITION
TO THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
(ERISA LONG-TERM DISABILITY BENEFITS)**

Plaintiff, by counsel, submits this Plaintiff's Reply Memorandum of Law to Defendant's Opposition to the Plaintiff's Motion for Summary Judgment.

1. **The Defendant is limited to the basis stated in its denial letters and cannot rely on *ad hoc* explanations written by its lawyers in federal court.**

This Court has held that the "Court's review is limited to the rationales given by a Defendant in the initial termination letter." Griffin v. Hartford Life & Accident Ins. Co., No. 6:16-CV-00024, 2017 WL 384384, at 10 (W.D. Va. Jan. 25, 2017), aff'd, 898 F.3d 371 (4th Cir. 2018). "Evidence referenced only in an appeals letter cannot be considered, under the rationale that a plaintiff must have some ability to respond to the reasons for the termination of their benefits." Id. The source of this rule is found in the administrative regulation:

> [T]he claims procedures of a plan will not be deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination unless the claims procedures— . . .
>
> (ii) Provide claimants the opportunity to submit written comments, documents, records, and other information relating to the claim for benefits;

. . .

> (iv) Provide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

29 C.F.R. § 2560.503-1(h)(2)(ii) and (iv). "This rule is based upon the premise that to allow the insurer to present new arguments for the first time on judicial review would deny the insured the 'full and fair' review procedural safeguards that ERISA and its implementing regulations require." Ferguson v. United of Omaha Life Ins. Co., 3 F. Supp. 3d 474, 489 (D. Md. 2014) (citing Ellis v. Metro. Life Ins. Co., 126 F.3d 236-37 (4th Cir. 1970)).

The difference between Griffin and in this case is, here, there were two administrative appeals. Rob agrees that he was given an opportunity to respond to Drs. Hertza and Sood's March 27, 2020 letters. Yet, Rob was not given an opportunity to respond to their May 1, 2020 opinions as he learned about them for the first time from the May 21, 2020 first denial letter.

Our position is not that the Court cannot consider the entire administrative record. Indeed, our opening brief and brief in opposition to the defendant's motion for summary judgment makes arguments about the entire administrative process including all of the denial letters. Rather, our position is that the entire process from denial through two administrative appeals illustrates the Defendant's abuse of that discretion by constantly moving the goal post, relying on record reviews that are paper thin, changing the reasons for its denial, and even on judicial review, creating post-hoc justifications for why Rob's claim should be denied while never actually addressing the substantive medical issues presented in Rob's appeals.

The Court cannot look to the administrative record to find reasons to uphold the Defendants determination, but rather must look to the denial letters and appeal decision letters to determine

what was the Defendant's basis for denial. <u>See</u> <u>Robinson v. Aetna Life Ins. Co.</u>, 443 F.3d 389, 393 (5th Cir. 2006) (holding that "Aetna failed to comply with section 1133(2) when it terminated Robinson's benefits without reviewing the specific ground for that decision.").

### a. Rob's opportunities to respond

Rob had an opportunity after the first denial, and after the first administrative appeal, to submit additional evidence including Dr. Conley's report, Dr. Berger's opinions, a different opinion from Dr. Reed,[1] additional treatment information from Dr. Reed, additional treatment information from Dr. Fore, treatment information from Dr. Berger, medical literature detailing Graves' Disease and how it impacts people cognitively and psychologically even after biochemical euthyroid is achieved, and affidavits from Rob and his friends and family. [LIN002207], [LIN002381].

Dr. Berger's opinions were not addressed in the initial denial letter or the first appeal decision because they did not exist at that time. Later, Mr. Jackson did not even mention Dr. Berger's name in his appeal decision letter and yet the Defendant spends pages upon pages writing about how her opinions are unreliable. [LIN000203-209]. Furthermore, Mr. Jackson never mentioned Dr. Conley's name or Dr. Reed's name in his final appeal decision. <u>Id.</u>

The Defendant addressed none of the materials we submitted in support of Rob's appeal but spends significant time on brief discussing why that evidence was assigned no weight on judicial review. The Defendant claims that these issues were considered during the appeal process, but none of them were addressed in the final denial letter on May 21, 2020. <u>Id.</u> In other words, there is no evidence that these opinions were substantively considered or that counsel for the

---

[1] Dr. Reed changed his position on whether Rob was euthyroid and stated that his ability to work was difficult to assess until he became euthyroid.

defendant's arguments were a part of LFG's rationale. While the Defendant allowed Rob the opportunity to submit additional information, it failed to provide for a review that took all of that into account. See 29 C.F.R. § 2560.503-1(h)(2)(ii) and (iv).

In the March 4, 2019 denial letter, Charles Zimmer based his denial letter on the following:

(1) Dr. Reed's opinion that Mr. Learn had achieved euthyroid state and that he would fully recovery by July of 2018 and Dr. Reed said that Mr. Learn was no longer considered disabled due to Graves' Disease as of September 12, 2018, and

(2) Dr. Phillip Helding's opinion that there was no medical evidence to support any impairments related to his behavior health conditions that would result in functional limitations preventing the performance of the essential duties of his own occupation.

[LIN002404-9].

In the August 30, 2019 denial letter, Keri Younker based her decision on the following:

(1) insufficient medical records,

(2) no physician certifying continuing disability after 3/5/2019,

(3) symptoms were not severe enough,

(4) medical records did not support limitations,

(5) medical documentation does not support inability to perform main duties,

(6) no physical restrictions or limitations after 3/5/19, and

(7) cognitive/psychological symptoms not severe enough to necessitate higher level of treatment such as intensive outpatient or inpatient psychiatric admission.

[LIN002311-17].

The undersigned counsel for Rob listed these reasons in his February 25, 2020 appeal letter. [LIN002228-29]. If those were not the reasons for denial, LFG should have said so. It did not. Notice, particularly, that this list does not include, and Keri Younker's opinion does not include the alleged invalidity of Dr. Conley's report. Therefore, any argument made concerning the validity of Dr. Conley's report is new and Rob did not have the ability to address it.

Indeed, Rob, by counsel, asked what type of evidence is missing, what opinion evidences is missing, what clinical findings might be missing, and what else Rob could do "to support his claim of physical, cognitive, and behavioral impairment." [LIN002287]. The Defendant had a duty to respond.

> It is not asking too much that, in the course of a "full and fair review," see 29 U.S.C. § 1133, administrators notify a claimant of specific information that they were aware was missing and that was material to the success of the claim. A similar and limited rule has been recognized by a number of our sister circuits. See Harden v. Am. Express Fin. Corp., 384 F.3d 498, 500 (8th Cir.2004) ("In the limited circumstances of this case, we conclude that [the plan administrator's] failure to obtain Social Security records amounted to a serious procedural irregularity that raises significant doubts about [the] decision."); Quinn v. Blue Cross and Blue Shield Assoc., 161 F.3d 472, 476 (7th Cir.1998) ("We agree that [trustee] was under no obligation to undergo a full-blown vocational evaluation of [claimant's] job, but she was under a duty to make a reasonable inquiry into the types of skills [claimant] possesses and whether those skills may be used at another job.") abrogated on other grounds by Hardt v. Reliance Standard Life Ins. Co., 560 U.S. 242, 130 S.Ct. 2149, 176 L.Ed.2d 998 (2010); Booton v. Lockheed Med. Benefit Plan, 110 F.3d 1461, 1463 (9th Cir.1997) ("In simple English, what this regulation calls for is a meaningful dialogue between ERISA plan administrators and their beneficiaries.").

Harrison v. Wells Fargo Bank, N.A., 773 F.3d 15, 21–22 (4th Cir. 2014). The Defendant replied on November 1, 2020 and declined to answer. [LIN002279-80].

As a result, Rob filed his appeal on February 25, 2020 and addressed each argument Keri Younker listed for denying his long-term disability benefits. Rob submitted Dr. Berger's opinion, Dr. Reed's February 5, 2020 opinion, additional treatment information from Dr. Reed, additional treatment information from Dr. Fore, treatment information from Dr. Berger, medical literature detailing Graves' Disease and how it impacts people differently (particularly cognitively and mentally), and affidavits from Rob and his friends and family. [LIN002228-29]. Importantly, neither Charles Zimmer nor Keri Younker had this information.

In Joseph Jackson's May 21, 2020 final denial letter, the Defendant lists the following reasons why the appeal was denied:

(1) Dr. Hertza said (1) mental status exams do not describe functional impairment, (2) formal assessment with no validity measures, and (3) no indication of high level care.

(2) Dr. Sood said (1) the claimants thyroid labs have been normal, (2) TSH values are within normal range and it is unclear why the dosages kept being adjusted, (3) it is unclear as to what values the providers were addressing by changing doses.

After sending the reports drafted by Drs. Hertza and Sood, the undersigned responded by letter addressing each one of these concerns. [LIN000220-227]. Rob argued to Dr. Hertza, (1) Rob's mental status exams never described functional impairment, (2) Dr. Fore referred Rob to Dr. Conley for treatment purposes not for forensic purposes, and (3) Rob had been prescribed Transcranial Magnetic Stimulation, which is intensive outpatient treatment. Dr. Hertza received and listed Rob's April 22, 2020 response letter.

In response, Dr. Hertza retreated from his prior position. [LIN000210-212]. Dr. Hertza did not respond to a single point raised in the April 22, 2020 response. In his second report, Dr. Hertza only said that Dr. Berger and Conley "accuratey describes symptoms which are often seen with thyroid disorders . . . However, in this case, these symptoms are not reported to have been observed behaviorally." [LIN000212]. Mr. Jackson copied and pasted this paragraph in his final denial letter. [LIN000207]. This is a new basis for denying Rob that he has not had a chance to rebut in the administrative process.

In response to Dr. Sood, we pointed out that Rob's TSH range should be within .5-2.5, which is much narrower than the average person. [LIN000225]. It was unclear from Dr. Sood's report, which scale she was looking at to declare Rob permanently biochemically euthyroid when both Dr. Berger and Dr. Reed disagree with that statement. We also noted that Dr. Berger noted Rob's medication history that has contributed to his significant cognitive decline. Id. She explained that Rob was being overdosed throughout the week and underdosed on the weekend. Id. This is what created the "roller-coaster effect" for Rob and his cognitive and behavioral health symptoms. Id. We noted that Dr. Sood's medical citations ended in 2012 while we have provided medical literature from 2019 studying the connection between Graves' Disease and Rob's symptoms. Id. We noted that it appears LFG and its record reviewers ignored the medical literature we submitted. Id.

Dr. Sood's response to our April 22, 2020 letter was simply, "the letter states the claimant had Graves' disease unstable, now in the hypothyroid phase, but nothing supports this again. No, the new information does not at all impact and/or change your[2] prior findings expressed."

---

[2] It is not clear why Dr. Sood used the pronoun "your" here in her report. The question is whether the new information changed Dr. Sood's opinion. It appears, however, to the casual observer, that she copied part of the question and pasted it into the answer.

[LIN000213]. Mr. Jackson copied and pasted this into his final denial letter without further analysis. [LIN000207]. This became the final decision that Rob did not have an opportunity to rebut on appeal.

**b. The Defendant's New Arguments on Judicial Review**

It appears that the Defendant agrees that an "ERISA defendant may not assert one basis for a decision during the administrative review stge and then assert some other basis for the decision during the judicial review." Def. Opp. To Pl. M. Summ. J 2, ECF No. 35. Indeed, the Defendant calls this statement of law "unremarkable." Id. It even goes through great lengths to argue that Rob knew the basis for denial enough to file a substantial appeal. Id. at 17-22.

Yet, Defendant asks this court to consider new arguments and new reasons for its denial of benefits that were never raised in any of the denial letters. Rob has never had an opportunity to respond to these arguments. While the Defendant claims that its position is the same, Id. at 2, the reasons for why it denied Rob's claim have very much changed over the course of the appeal process and in this litigation. Indeed, the majority of the Defendant's briefs are spent discounting Dr. Berger's opinion and Dr. Conley's opinion and other evidence submitted by Rob during the administrative process. However, those positions, particularly the attacks on Dr. Berger, were never a basis for the Defendant's original denial or the two administrative appeal denials.

Here is a list of new arguments made on judicial review that were never made in any of the three denial letters:

1. Rob was "doctor shopping,"

2. Dr. Conley's report is not "reliable" because it lacked stand-alone validity measures,

3.  Mental status exams contradict Dr. Conley's report,[3]

4.  Dr. Conley "refused to respond to Dr. Herza's repeated inquiries,"

5.  Dr. Berger's "analysis is entirely retrospective" and speculative,

6.  Dr. Berger failed to cite medical evidence of cognitive impairment and she did not rely on Dr. Conley's report,

7.  Dr. Berger's letter is more an advocacy letter than a medical opinion,

8.  The plan requires objective evidence to support a disability claim,

9.  Dr. Berger's opinions are conclusory and "stand in opposition to the overwhelming objective evidence in the record . . .",

10. Dr. Berger did not return Dr. Sood's phone calls,

11. Testimony of friends and family members should be discounted summarily,

12. There are disagreements between consulting physicians and treating physicians and LFG did not have to defer to the opinions of treating physician who may be motivated to advocate for their patient,

13. There was "no conflict in the underlying medical facts,"[4]

14. Rob was not fired from his jobs post March 5, 2019, he quit.[5]

---

[3] Dr. Hertza only said that the mental status exams did not describe functional impairment, he never said that they contradicted Dr. Conley's report. Even more, the only part of Dr. Hertza's opinion that was referenced in the final appeal denial letter was that the mental status exams did not describe functional impairment. The Defendant's argument is different on judicial review.

[4] Arguing that Dr. Reed's opinion that Rob was biochemically euthyroid was not contradicted in 2019 but ignoring Dr. Reed changed his opinion and Dr. Berger's opinion went even further.

[5] Of course, in typical LFG fashion, the Defendant ignored Rob's unrebutted explanation for why he quit Blue Ridge Physical Therapy in paragraphs 49-53 of his affidavit and his unrebutted explanation for why he quit HCA Manor Care in paragraphs 58-60. [LIN001357].

As the Court can see in our Brief in Opposition to the Defendant's Motion for Summary Judgment, these arguments are meritless and should be rejected. It is remarkable that these arguments could have been raised and addressed in the administrative process had Rob known that this is why the Defendant was denying his claim. The Defendant is suddenly providing an entirely new rationale of why this Court should grant its motion for summary judgment and deny the Plaintiffs Motion for Summary Judgment.

To allow the Defendant to prevail here based on these arguments made for the first time on judicial review would squarely contradict the purpose of 29 C.F.R. § 2560.503-1(h)(2)(ii) and (iv). Moreover, the Defendant listed as its Fourteenth Defense in its Answer filed herein, that the "[p]laintiff is limited to the *evidence and arguments* presented during the administrative process." Def. Answer, 7, ECF No. 7 (emphasis added). We simply submit the same limitation is true for the Defendant. To allow the Defendant to rely on those arguments it did not present to Rob in the administrative process would be patently unfair and contrary to ERISA law. As Judge Joseph F. Anderson, Jr. said, "Unum advanced a number of new arguments that it nowhere mentioned in its administrative decisions on Dr. Schindler's claim. . . this court 'may not' and will not 'consider a new reason for claim denial offered for the first time on judicial review.'" <u>Schindler v. Unum Life Ins. Co. of Am.</u>, No. 3:12-CV-00293-JFA, 2013 WL 4499146, at *24-25 (D.S.C. Aug. 19, 2013).

The Defendant cannot tell Rob at the administrative level that the evidence is insufficient to prove your disability because of a, b, and c, but then argue on judicial review that the evidence is insufficient because of x, y, and z. This is exactly what the Defendant attempts to do here.

   **c. The Defendant misinterprets Rob's argument that its decision was not based on substantial evidence.**

The defendant argues on brief that Rob somehow asserts that the burden of proof shifted to the Defendant to produce evidence supporting his claim for disability. Def. Br. In Opp. to Pl.

Br. Summ. J., 3, ECF 35. But the Defendant ignores that the standard on judicial review is an abuse of discretion which means that the Defendant's decision must "result from a 'deliberate, principled reasoning process' and be supported by substantial evidence." <u>Williams v. Metro Life Ins. Co.</u>, 609 F.3d 622, 630 (4th Cir. 2010). The arguments on judicial review have centered around the process and the evidence. The question for this court, is whether Drs. Hertza and Sood's superficial opinions can be substantial evidence. For so many reasons, the opinions are not even close. At most, they could be called a scintilla of evidence.

**2. The Defendant and its record reviewers view Rob's claim in a vacuum that only starts on 3/5/2019 and ignores the entirety of his disability.**

The Defendant asserts that their record reviewers are better qualified to give accurate opinions regarding Rob's condition because they've reviewed the entirety of the medical records. Def. Br. In Opp. to Pl. Br. Summ. J., 8, ECF 8. However, Drs. Hertz and Sood only reviewed the claim from March 5, 2019 forward. Dr. Hertza was directed to only consider psychological aspect of the claim and Dr. Sood was instructed to only consider the physical aspect. <u>Compare</u> Def. Br. In Opp. to Pl. Br. Summ. J., 13, ECF 35. There was no discussion of any medical records prior to March 5, 2019. This review vacuum created by the Defendant cannot be substantial evidence. Dr. Berger explained, in detail, why Rob's medical history from 2016 up through 2019 was relevant to how he was doing currently. Even having Dr. Berger's opinion regarding the medical history, Drs. Hertza and Sood ignored it. This limited review renders both opinions questionable at best.

The Defendant argues that Rob's medical history has no bearing on whether he was disabled after March 5, 2019. Def. Opp. To Pl. M. Summ. J., 4-5, ECF No. 35. The Defendant agrees that for twenty-one months the medical records supported Rob's claim for long-term disability benefits. <u>Id.</u> at 5. In affirming the benefit termination through the second appeal, however, the Defendant rely on Dr. Hertza's opinion that the "mental status exams do not describe

functional impairment." [LIN000206]. Rob argued on appeal that his mental status exams were essentially the same throughout the entire course of his treatment. [LIN002234-36]. The Defendant ignored this.

Contrary to the Defendant's position on brief, Rob's argument does not shift the burden of proof to the Defendant. Def. Br. In Opp. to Pl. Br. Summ. J., 3, ECF 35. Rather, it merely highlights the Defendant's inconsistent interpretation of the policy and what evidence is required under the plan to award disability benefits. Of course, this is the fourth factor listed in Booth v. Wal-Mart Stores, Inc., 201 F.2d 335, 342-43 (4th Cir. 2000) ("whether the fiduciary's interpretation was consistent with other provision in the plan and with earlier interpretations of the plan"). This Court uses the Booth factors to evaluate every ERISA disability case and should consider and weigh each factor in deciding whether to grant or deny the plaintiff's motion for summary judgment. So, the plan's prior interpretation of the plan language is indeed relevant to this Court's analysis.

In September of 2018, Dr. Judd said that Rob's "Cognition/ Attention/ Memory/ Concentration" were "Intact/Alert and oriented x4," but the Defendant ignores that Dr. Judd also said that Rob noted "ongoing issues with irritability, sweating, and decreased motivation and appetite." [LIN001924]. While his "Thought Process/Associations" were "Logical and goal directed" his mood was "Blah," his affect was "constricted," and his insight was "fair." Id. The Defendant's also ignore that Dr. Judd changed his medication once again to taper and discontinue Lexapro and start Cymbalta. [LIN001925-26].

Compare that September 2018 mental status exam to the one on September of 2016:

> Mental Status Exam is described as the following:
> Patient's affect Is normal. Patients appearance/attitude is appropriate. Speech/Language is normal prosody. Psychomotor behavior is appropriate. Mood Is anxious and depressed. Thought Content/ Perception without suicidal ideation, homicidal ideation, auditory hallucinations, visual hallucinations, hopelessness or

helplessness. Insight and Judgement is good Thinking form is logical Impulse control Is within normal limits.

[LIN001897]. These are practically the same. One could even say that the mental status exam in September 2018 was worse than the one in 2016.

Rob's disability benefits were approved in May of 2017. Consider the mental status exams leading up to his approval:

January 11, 2017

> Mental Status is described as the following:
> Patient's affect is bright. Patient's appearance/attitude is appropriate. Speech/Language is normal prosody. Psychomotor behavior is appropriate. Mood Is good, Thought Content/ Perception without suicidal ideation, homicidal Ideation, auditory hallucinations, visual hallucinations, hopelessness or helplessness. Insight and Judgement Is good Thinking form is logical Impulse control is within normal limits

[LIN001891]

February 16, 2017:

> Mental Status Exam is described as the following:
>
> Patient's affect is normal. Patient's appearance/attitude is appropriate. Speech/Language Is normal prosody. Psychomotor behavior is appropriate. Mood is good, Thought Content/ Perception without suicidal ideation, homicidal ideation, auditory hallucinations, visual hallucinations, hopelessness or helplessness. Insight and Judgement is good Thinking form is logical Impulse control is within normal limit.

[LIN001889].

The Defendant agreed that these medical records supported Rob's disability. Def. Opp. To Pl. M. Summ. J., 5, ECF No. 35. The Defendant has not argued that the initial award of long-term disability benefits was in error. In each mental status examination mentioned by the Defendant, Dr. Judd notes other symptoms that are completely ignored by the Defendant. See [LIN002797,

LIN002789, LIN001945]. The Defendant also ignores that on each visit, Dr. Judd adjusted Rob's medication. If he was doing so well, why adjust his medication?

The Defendant's attorneys point to the medical records from Drs. Judd, Reed, Fore, Conley, and Berger and argue that they contradict Dr. Berger's medical opinion letters. Def. Br. In Opp. to Pl. Br. Summ. J., 6, ECF 35. Yet, the Defendant did present that rationale on appeal at the administrative level. The Defendant never analyzed this material in their denial letters.

The Defendant adopted Dr. Helding's report in the March 4, 2019 denial letter without critically analyzing the mental status examinations it claimed to rely upon. [LIN002404-09]. In fact, that denial letter only mentions one of Dr. Judd's medical records and that was for November 8, 2018. [LIN002406]. It did not occur to Mr. Zimmer to even consider what the mental status exams were prior to Dr. Helding's report.[6]

The Defendant here conveniently ignores what Dr. Helding said about Rob's mental status exams: "[t]he psychiatric information offered and available is actually fairly consistent." [LIN002414]. Dr. Helding noted that initially, Rob "ceased work initially because of a diagnosis of Grave's [sic] Disease and hypothyroidism affecting his heart rate, cognition, motivation, sleep, appetite, and mood." [LIN002412].

Unfortunately, the fact remains that his mental status exams rarely changed. They certainly fluctuated ever so slightly—as one would expect them to—but they were fairly consistent from 2016 through 2020. And yet, the Defendant interpreted, in its discretion, the policy to award benefits to Rob. In other words, the mental status exams never described functional impairment. But other parts of the medical records did. So, LFG interpreted that policy to find that Rob was

---

[6] It is notable that Dr. Helding's report only notes that he reviewed CMG Piedmont Psychiatry (Dr. Judd) records from January 11, 2017 through November 8, 2018. [LIN002411]. He treated with Dr. Judd numerous times in 2016 all with consistent mental status examinations.

totally disabled from his own occupation. [LIN002923]. Yet, Helding, Critchfield, and Hertza all noted the same thing: mental status exams do not describe functional impairments. The Defendant blindly accepted those opinions and ignored everything else in the claim file.

This is why the first 7 pages of the Plaintiff's brief describes the course of this case prior to March 5, 2019. It is notable, that the Defendant also spent the first 7 pages of its brief talking about what happened prior to March 5, 2019. Def. Memo Summ. J, 8, ECF No. 26. Contrary to the Defendant's unprincipled position, it is relevant to weigh the fourth <u>Booth</u> factor, among others.

3. **The Defendant's decision lacks "substantial evidence, careful and coherent reasoning, faithful adherence to the letter of ERISA and the language of the plan, and a fair and searching process. . ."**

"Where an ERISA administrator rejects a claim to benefits on the strength of *substantial evidence, careful and coherent reasoning, faithful adherence to the letter of ERISA and the language in the plan, and a fair and searching process*, there can be no abuse of discretion—even if another, and arguably a better, decision-maker might have come to a different, and arguably a better, result." <u>Evans v. Eaton Corp. Long Term Disability Plan</u>, 514 F.3d 315, 325–26 (4th Cir. 2008) (emphasis added). The Defendant cite to <u>Evans</u> but omits "careful and coherent reasoning, faithful adherence to the letter of ERISA and the language of the plan, and a fair and searching process." <u>Id.</u>, <u>See</u> Def. Opp. To Pl. M Summ. J, 4, ECF No. 35. This omission is significant, namely because the Defendant failed to demonstrate those characteristics in its denial letters.

a. **The Defendant's decision is not based on substantial evidence.**

First, Dr. Helding and Critchfield's opinions cannot be substantial evidence for the Defendants ultimate denial because neither of them had the opportunity to review the materials submitted with Rob's February 25, 2020 appeal. If the Defendant is relying on those two record

reviewers to support its ultimate decision to uphold the termination of benefits, those doctors did not consider all of the evidence and their opinions lack the appropriate foundation to support them.

If the Defendant maintains that these two record reviewers support their ultimate decision, that position defeats the entire purpose of allowing a claimant the "opportunity to submit written comments, documents, records, and other information" and then requiring the plan to review the evidence by "tak[ing] into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination." 29 C.F.R. § 2560.503-1(h)(2)(ii) and (iv).

Dr. Helding, Critchfield and Dr. Hertza do not claim that the "contemporaneous medical records" were "inconsistent" with Dr. Conley's report. Def. Br. In Opp. to Pl. Br. Summ. J., 8, ECF No. 35. Instead, they said that the report and the mental status exams are not bad enough to support functional impairment. [LIN002414], [LIN002321], [LIN000421]. These are two different statements, and, on judicial review, the Defendant conflates them. But that is neither here nor there because the Defendant never claimed the issue of a conflict between "contemporaneous medical records" and Dr. Conley's report in any of its denial letters.

Moreover, contrary to the Defendant's arguments on brief, neither Dr. Helding nor Dr. Critchfield said Dr. Conley's report was invalid. See, Def. Br. In Opp. to Pl. Br. Summ. J., 8, ECF 35, [LIN002344], [LIN002351], [LIN002414]. Dr. Hertza did not even say that, but he said in his March 27, 2020 record review that it was "not interpretable for forensic purposes." [LIN000419-20]. Assuming for the sake of argument, that the lack of validity measures did impact the outcome of Dr. Conley's report, would we not expect to see Rob sabotage more than just two out of ten tests? Everything was either average or above average except for the Continuous Performance Test

– II Version 5 and the Recognition Memory for Words (RMW) subtest of the Recognition Memory Test (RMT). The Defendant lists all the tests that Rob scored well on and then argues that the whole test was valid because Rob likely failed on purpose. Def. Br. in Opp. to Pl. Br. Summ. J., 7-8, ECF 35. The Defendant argues that Dr. Conley's report is not valid yet, then argues that it's not that bad. This argument defeats itself.

Dr. Fore referred Rob to Dr. Conley for evaluation. [LIN002058]. This was a treatment evaluation, as Dr. Fore made clear that he was not participating in disability claims. [LIN000384], [LIN001384]. This was an objective report that Dr. Conley felt was reliable per embedded validity measures. [LIN002058-60]. Dr. Conley interpreted the results based on his objective examination of Rob and opined that he could not work at all. Id. The Defendant arbitrarily disregarded this.

Second, Dr. Hertza's opinion cannot be substantial evidence because Dr. Hertza was not provided with all of the materials submitted in the February 25, 2020 appeal to consider. See [LIN000216-218], [LIN000000426-428]. He was not provided with our appeal letter, the affidavits from Rob or his friend and family, Dr. Reed's February 5, 2020 opinion letter, and the medical literature on Graves' Disease. These omissions appear intentional. At the very least, they are grossly negligent. But Dr. Hertza received and reviewed Dr. Critchfield's opinion which certainly likely tainted his ultimate conclusion. [LIN000428].[7] Dr. Hertza was not given Dr. Reed's new opinion but was given the opinion of a prior record reviewer hired by the Defendant. And, then he came to essentially the same conclusion as Dr. Critchfield. If you put garbage in, you'll get garbage out. That is exactly what the Defendant did here.

Additionally, Dr. Hertza retreated from his initial positions when substantively challenged. His final response did not even mention the mental status exams, validity measures, or lack of

---

[7] Dr. Critchfield's opinion is listed as MLS Medical Evaluation 6/27/19 & 8/20/19.

intensive treatment. [LIN000210-212]. The Defendant argues that Dr. Conley should have defended his position but ignores the fact that Dr. Hertza actively retreated from his own position when challenged. Instead, he listed an entirely new reason why he did not support disability. [LIN000212]. Dr. Conley stood by his report and there is no evidence otherwise. Not accepting a phone call is not a retreat from an opinion. It was Dr. Hertza who retreated from his positions.

Third, contrary to the Defendant's argument, the Defendant only hired one endocrinologist. See Def. Br. In Opp. to Pl. Br. Summ. J., 9, ECF 35. Drs. Helding, Critchfield, and Hertza were all neuropsychologist. The other three reviewer were nurse case managers (Billiejo Mullet, Lynn Sucha, and Sheila Cordero) hired employed by the Defendant. The seventh "medical professional" the Defendant relies on was Dr. Sood, who is the only endocrinologist it consulted.

Dr. Sood's opinion cannot be considered substantial evidence. Her opinion ignores substantive medical opinions of Dr. Berger and simply concludes that the medical record is insufficient to justify any restrictions and limitations because his "labs have been normal." [LIN000424]. This is the extent of her analysis. There is no indication in the record review of what "normal" is. Moreover, Dr. Sood did not have Dr. Reed's February 5, 2020 medical opinion and did not review it. [LIN000426-428]. Dr. Sood did not account for Dr. Reed's changed opinion that Rob was no longer euthyroid, but only "near euthyroid." Id. Dr. Sood was not provided with any of the medical literature submitted in support of Rob's claim and never opined on it even to say that it was not applicable. Id. She never said anything about it because she was never provided it. Id.

The Defendant continues to rely on Dr. Reed's original opinion that Rob was euthyroid. Yet, the Defendant ignores Dr. Reed's changed opinion and Dr. Berger's supporting opinion. [LIN002069-2071]. This is what "wholesale disregard" looks like. See Donovan v. Eaton Corp.,

Long Term Disability Plan, 462 F.3d 321 (2006), White v. Eaton Corp. Short Term Disability Plan, 308 Fed. Appx. 713 (2009).

The Defendant's final decision is solely based on the two record reviewers Drs. Hertza and Sood. [LIN000203-209]. Their analysis, or even their summary of prior treatment, does not "demonstrate the substantive depth and thoroughness of their respective reviews." See Def. Br. in Opp. to Pl. Br. Summ. J., 16, ECF No. 35. Quite the opposite is true. Their reviews start listing treatment dates after March 5, 2019, they limit their analysis to after that time, and they simply answer questions. [LIN000416], [LIN000422]. Our Background section in the February 25, 2020 appeal letter ranged seventeen pages single spaced. [LIN002211-2228]. Dr. Sood's "clinical history" was one page and Dr. Hertza's was three pages. [LIN000416], [LIN000422]. Combined, they only looked at 4 pages of treatment that they found relevant. This is what the Defendant calls "substantive depth and thoroughness." Their opinions are not substantial evidence for the reasons we argue here and in our other briefs previously filed.

**b. The Defendant's denial letter and two appeal decisions lacked careful and coherent reasoning**

The Defendant lauds its perfect process detailed in Richard Tom's declaration. Def. Opp. To Pl. M. Summ. J. 12-16, ECF 35. It discounts Rob's argument that "quoting portions of medical consultants' reports [does not] demonstrate[]" ignoring the claimant's evidence. It argues on brief that, to the contrary, that "the claim professionals selection and inclusion of direct quotes to support their own reasoning shows just the opposite." Def. Opp. To Pl. M. Summ. J. 16, ECF 35.

But where is the Defendant's careful and coherent reasoning? If we omitted the copy and paste job in both appeal decisions, what would we be left with? This point is made with visually with red track changes in our Memorandum in Opposition to the Defendant's Motion for Summary

Judgment, but bears repeating here. If there is nothing left after removing the copy and paste job, how is that careful and coherent reasoning?

The Defendant thinks Rob's position is bizarre. Def. Br. in Opp. to Pl. Br. Summ. J., 15, ECF 35. But, how bizarre is it that Keri Younker fully plagiarized the nurse case manager and Dr. Critchfield to arrive at her conclusion? If she were in a graded class, she would receive a failing grade for plagiarism. And, how bizarre is it that Mr. Jackson simply quoted Drs. Hertza and Sood, but never once mentioned Drs. Reed, Conley, or Berger?

The Defendant argues that Rob profoundly misunderstands the ERISA benefits determination process. Def. Br. In Opp. to Pl. Br. Summ. J., 12, ECF No. 35. Yet, it argues that its job is to "ensure an accurate claim determination for the benefit of all plan participants." Id. at 11. Rob's position is simple, in order to ensure such an accurate claim determination, the Plan is required to "take[] into account all comments, documents, records, and other information submitted by the claimant." 29 C.F.R. § 2560.503-1(h)(2)(iv). However, when the Plan and the record reviewing doctors ignore those substantive issues that support the treating doctor's disability determination, the result is not a principled and reasoned decision-making process. When the Plan does not even provide the record reviewers with all of the medical opinions or evidence submitted by the claimant, that is not a principled and reasoned decision-making process. Rob never asked the Plan to "blindly accept Dr. Berger's" opinion, but it is not unreasonable for him to ask it to address it.

Here, there is no way the Court can say that the Defendant carefully and coherently reasoned to its conclusion. There is no evidence that the Defendant even considered the substantive positions of Drs. Conley, Reed, and Berger because the Defendant never addressed those opinions until judicial review.

Surprisingly, the Fourth Circuit Court of Appeals has dealt with this issue before.

> The problem with Dr. Soriano's opinion is that Dr. Soriano never explained on what basis he doubted the veracity of [the claimant], whom he had never examined. To the extent that he did not believe that [the claimant] physical problems would cause the intense pain of which she complained, he never revealed why he rejected the view of the other doctors that dislodged surgical hardware was irritating surrounding nerve tissue, resulting in debilitating pain for [the claimant]. In fact, he never discussed at all the June 2000 CT scan and flexion and extension films that several doctors reported as depicting the dislodged hardware and resulting nerve root impingement and as supporting [the claimant's] claims regarding the extent of her pain. Without such a discussion, Dr. Soriano's report is simply an unreasoned and unexplained rejection of the objective evidence in the record, [the claimant's] claims regarding her level of pain and functionality, and the opinions of [treating physicians] Drs. Huffmon and Faircloth that she was totally disabled. MetLife was not justified in rejecting the opinions of Drs. Faircloth and Hoffman as well as [the claimant's] statements on the basis of such a flawed report.

Gorski v. ITT Long Term Disability Plan for Salaried Emps., 314 F. App'x 540, 547 (4th Cir. 2008). The same is conclusion is appropriate here.

Dr. Sood's report suffers the same defects as Dr. Soriano's did. Dr. Sood never addressed Dr. Reed's February 5, 2020 opinion letter saying that Rob was not euthyroid and that his ability to work was "difficult to assess." [LIN002070] Dr. Sood never addressed Dr. Berger's opinion that Rob's overdose during the week and underdose during the weekend "played havoc on his depression, anxiety and sleep quality resulting in sustained cognitive impairment." [LIN000401]. Dr. Sood never addressed Dr. Berger's distinction between clinical euthyroid and biochemical euthyroid. Id. Dr. Sood never addressed Dr. Reed's characterization of Dr. Conley's report as objective evidence of cognitive decline. [LIN002070].

It is one thing for the record reviewer to ignore it. But it is another thing for the Plan to ignore it and completely fail to address it.

> In the face of overwhelming evidence concerning Williams'
> continued pain and difficulty in attempting to use her hands and
> wrists, MetLife relied on a scintilla of evidence that did not directly
> address these problems. MetLife appears to have disregarded,
> without justification, Williams' treating physicians' conclusions
> regarding her hand and wrist pain and its effect on her ability to type
> throughout the day. As the Supreme Court has held, ***"[p]lan
> administrators, of course, may not arbitrarily refuse to credit a
> claimant's reliable evidence, including the opinions of a treating
> physician.***" Black & Decker Disability Plan v. Nord, 538 U.S. 822,
> 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). For these reasons,
> we agree with the district court that MetLife's decision to terminate
> Williams' long-term disability benefits for the applicable period was
> an abuse of discretion.

Williams v. Metro. Life Ins. Co., 609 F.3d 622, 634 (4th Cir. 2010) (emphasis added).

> While an administrator has the authority to weigh conflicting pieces
> of evidence, it abuses its discretion when it fails to address
> conflicting evidence. See Williams, 609 F.3d at 633 (finding
> ERISA plan's denial of benefits was unreasonable where
> administrator failed to address evidence conflicting with its
> determination). For these same reasons, it also is clear that AT & T
> failed to engage in a reasoned and principled decision-making
> process, as required by the fifth Booth factor.

Helton v. AT & T Inc., 709 F.3d 343, 359 (4th Cir. 2013). The Defendant cites, on brief,

Piepenhagen v. Old Dominion Freight Line, Inc. 395 F. App'x 950 (4th Cir. 2010). There, the

Fourth Circuit Court of Appeals was analyzing an "any occupation" disability period and a treating

physician who filled out a questionnaire. Id. at 954. The denial letter did not quote the entire

questionnaire but mentioned selected portions thereof. Id. at 955-56.

> This court has clearly held that when an ERISA plan discontinues
> an employee's benefits after totally disregarding some portion of a
> physician's opinion that is favorable to the employee's claim and
> seizing upon that portion which is adverse to the employee's claim,
> such decisionmaking [sic] is unreasonable. See Donovan v. Eaton
> Corp., 462 F.3d 321, 329 (4th Cir. 2006). Nevertheless, we have
> never required a plan to recite every fact found in doctors' reports
> and evaluations.
> . . . .

> The district court concluded that the record demonstrates that the Plan engaged in a "deliberate and principled reasoning process in analyzing [Appellant's] long-term disability claim." J.A. 320. It further concluded that the Plan neither ignored evidence supportive of Appellant's alleged total disability nor distorted statements made by any of the physicians. The court acknowledged that the Plan's first denial letter did not mention all of "Dr. Maiolo's answers on the Cardiac Residual Functional Questionnaire and/or the specific questions that prompted those answer," but that "the selected portions cited by [ the Plan] do not mischaracterize or 'ignore the t[h]rust' of the questionnaire as a whole." J.A. 322.

Piepenhagen v. Old Dominion Freight Line, Inc., 395 F. App'x 950, 955–56 (4th Cir. 2010). The moral of the story is that the Plan's denial letter must substantively address the treating doctors' opinions, particularly if they conflict with the record reviewing doctors. The Plan did that in Piepenhagen. Here, the Defendant did not.

The Defendant's denial letters did not address Drs. Berger, Reed, or Conley's opinions. It just outright rejected them without any legitimate explanation. Rob does not expect the Defendant to note every page he submitted with his appeal. Indeed, we recognize that his submission was voluminous. However, the Defendant is required to address the conflicting evidence. It did not. This is the epitome of careless and incoherent reasoning.

No matter how much the lawyers for the Defendant want to add medical arguments against that conflicting evidence,[8] they cannot change the fact that none of the conflicting evidence was addressed by LFG in the administrative process, particularly in the final adverse decision letter. Richard Tom's declaration does not change these facts either. In fact, it adds more certainty to our position that the Defendant simply abandoned its role as decision maker.

> The financial conflict adds a modicum of skepticism to the standard of review. But the result here would be the same even under a plain review for abuse of discretion. The problem is that the Board denied

---

[8] Here, conflicting evidence means evidence that conflicts with the Defendants record reviewers, i.e. Dr. Berger, Conley, Reed opinions and records, affidavits, medical literature, etc.

benefits based upon an unreasonable bias in favor of Plan-selected physicians. Although the Board noted "potentially conflicting medical evidence contained in the record," it did not resolve the conflicts by examining the evidence or delving into the record before it. It simply adopted the opinions of its retained physicians by default. The Board underscored the reflexive and non-discretionary quality of this action by stating that it "uniformly" accepts and relies upon the reports of its retained doctors. It is true, as the Plan notes, that the Board owed no special deference to the opinions of Dimry's treating physicians. It was also entitled to treat a single medical opinion as sufficient to adjudicate Dimry's claim. But it was not entitled to decide a benefits claim by mere default to a Plan-selected physician. That is the abandonment of discretion, not the exercise of it.

Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan, No. 16-CV-01413-JD, 2018 WL 1258147, at *4 (N.D. Cal. Mar. 12, 2018) (internal citations omitted). Tom's declaration reinforces the fact that the Defendant is supposed to be the decision maker. Instead, all the decision maker did here was copy and paste the record reviewer's opinions with no discussion. Two times, in this administrative process, an appeal specialist disregarded evidence from Rob and copied and pasted their analysis without addressing the real issues. This is not the exercise of discretion, but the abandonment of it.

      **c. Defendant's conflicting positions on treating doctor reports demonstrates the careless and incoherent nature of its arguments, especially on judicial review.**

The Defendant argues that Dr. Conley is not reliable because he didn't defend his position by writing a response to Dr. Hertza's superficial report. Yet, the Defendant argues that Dr. Berger opinions are not reliable because she did respond to Dr. Sood's superficial reports.

The Defendant continues to find ways to put Rob in a vice where he cannot win either way he goes. This illustrates the motives of the Defendant here. The Defendant's financial motivation to save almost One Million dollars is starting to show with this analysis.

This case is not like <u>Nicely v. Unum Life Ins. Co. of Am.</u>, 2009 WL 5201852 (M.D.N.C. Dec. 23, 2009 where no objective testing for cognitive impairment was done at all, no medical record noted cognitive impairment until seven months after the date of disability, the record reviewer reviewed all the medical records, the record reviewer noted inconsistencies in the test results, and the record reviewer opined that the tests performed were "not comprehensive enough from a forensic neuropsychologist perspective."

Here, Rob has dealt with cognitive issues since 2016, he has dealt with mental health issues since 2016, he has dealt with heart palpitations, fatigue exhaustion, heat intolerance, irritability, muscle aches, muscle weakness and mild tremor since 2016. [LIN001884]. His mental status exams have been fairly consistent during the entire course of his disability. His objective testing by Dr. Conley does not have internal or external inconsistencies.

Rather, this case is like <u>DuPerry v. Life Ins. Co. of N. Am.</u>, 632 F.3d 860 (4th Cir. 2011) where the Fourth Circuit Court of Appeals held:

> Considering all of the evidence together, we simply see no reasonable basis in the record for LINA's denial of DuPerry's claim. It is undisputed that DuPerry suffers from chronic diseases that are potentially debilitating. She has presented substantial evidence from her physicians that these diseases do, in fact, prevent her from working. And, she has presented her own declaration and declarations from her family and even her former employer confirming the severity of her symptoms. The only evidence of any consequence that LINA can point to as conflicting with DuPerry's entitlement to benefits are the reports of Dr. Levesque. However, these reports contain no significant basis supporting a conclusion that the symptoms from DuPerry's fibromyalgia, either by themselves or combined with the symptoms from her other conditions, are not sufficiently severe as to prevent her from enduring the rigors of her workweek. Especially in light of the structural conflict present here by virtue of LINA's dual role as insurer and administrator of the plan, we conclude that LINA's denial of DuPerry's claim was unreasonable and an abuse of its discretion. <u>Cf.</u> <u>Stup</u>, 390 F.3d at 308 (explaining in pre-*Glenn* case applying modified-abuse-of-discretion standard that "while an

> administrator does not necessarily abuse its discretion by resolving an evidentiary conflict to its advantage, the conflicting evidence on which the administrator relies in denying coverage must be 'substantial'—especially when, as in this case, the administrator has an economic incentive to deny benefits").

Id. at 873–74.

Considering all of the evidence here, we submit that Drs. Hertza and Sood's reports are just like Dr. Levesques report in DuPerry. These reports do not contain a significant basis supporting a conclusion that the symptoms Rob suffered were not sufficiently severe as to prevent him from enduring the rigors of his work week. This is even more true given the structural conflict as a dual role of insurer and administrator of the plan.

**4. The Court cannot ignore the Defendant's structural conflict of interest even though the Defendant wants it to.**

The Defendant's structure conflict is a factor that this honorable Court must consider. And, like the Fourth Circuit Court of Appeals in DuPerry, when the Defendant behaves like it did here, by ignoring evidence submitted by the defendant, withholding valuable information from record reviewing doctors, copying and pasting record reviewer's opinions and abandoning its discretionary role as decision maker, relying on vague, superficial, and conclusory paper record reviewers, and refusing to address conflicting evidence, the structure conflict comes into play. The Defendant cannot see just how bias it is because of this structural conflict. We would all be fooling ourselves if we did not recognize that claims specialist and appeals specialist are looking for ways to save the company money. The Defendant even admits it on brief. See Def. Br. In Opp. to Pl. Br. Summ. J., 11, ECF 35.

In this case, the Defendant elevated its desire to "preserve assets" over its fiduciary obligation to "discharge its duties . . . solely in the interest of the participants and beneficiaries,"

29 U.S.C.A. § 1104(a)(1)(A), and "with the care, skill, prudence, and diligence under the circumstances," 29 U.S.C.A. § 1104(a)(1)(B).

**CONCLUSION**

The Defendant has grossly mischaracterized the Plaintiff's position and the administrative record. Willful ignorance and copy and paste is not a reasoned and principled decision making process. The Defendant's reliance on Drs. Helding and Critchfield is misplaced as neither had the benefit of the materials submitted by Rob in his second appeal. Neither Drs. Hertza nor Sood could even come close to constituting substantial evidence because they did not review all of the records, their analysis was vague, superficial, and conclusory, and they failed to address substantive medical opinions from Rob's treating physicians.

For these reasons and others outlined above, the Court should deny summary judgment to the Defendant and grant summary judgment to the Plaintiff. Plaintiff is entitled to payment of his back benefits and to be restored to "on claim" status.

Respectfully submitted,

By Counsel: _____/s/_____
ROBERT LEARN

Brandon S. Osterbind, Esq. (VSB No.: 77159)
Kelly A. Osterbind, Esq. (VSB No.: 74984)
OSTERBIND LAW, PLLC
1216 Greenview Drive, Suite A
Lynchburg, VA 24502
Phone: 434-515-2807
Fax: 434-818-0895
bosterbind@osterbindlaw.com
kosterbind@osterbindlaw.com

**CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that on August 20, 2021, I electronically filed this document with the Clerk of the United States District Court for the Western District of Virginia using the CM/ECF system, which will serve an electronic copy on the following:

Alexander Tevis Marshall, Esq. (Tevis.Marshall@ogletreedeakins.com)
Scott Pomeroy, Esq. (scott.pomeroy@ogletree.com)
Byrne Decker, Esq. (b.decker@ogletree.com)
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
Riverfront Plaza, West Tower
901 E. Byrd Street, Suite 1300
Richmond, Virginia 23219

Joshua F.P. Long (jlong@woodsrogers.com)
Woods Rogers PLC
10 S. Jefferson Street, Suite 1400
Roanoke, VA 24011

/s/
Brandon S. Osterbind, Esq.
