CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

3/19/2024
LAURA A. AUSTIN, CLERK
BY:  s/ ARLENE LITTLE
       DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
## LYNCHBURG DIVISION

| | |
|---|---|
| ROBERT LEARN, | CASE NO. 6:20-cv-00060 |
| *Plaintiff*, | |
| v. | MEMORANDUM OPINION |
| THE LINCOLN NATIONAL LIFE INSURANCE COMPANY, | |
| *Defendant*. | JUDGE NORMAN K. MOON |

This case concerns whether the plaintiff was entitled to long-term disability (LTD) benefits under his plan governed by the Employee Retirement Income Security Act of 1974. Plaintiff Robert Learn served as Regional Director of Outpatient Rehabilitation at Centra Health in Lynchburg from 2015 to early 2017. But when Mr. Learn suffered a "thyroid storm"—i.e., an extreme case of hyperthyroidism that can have life-threatening consequences—in 2016, he stopped working. Accordingly, Defendant Lincoln National Life Insurance Company paid LTD benefits to Mr. Learn for 21 months while his physicians tried to normalize his thyroid hormone levels and he was unable to work. In 2018, Mr. Learn's doctor was satisfied that his hormone levels had normalized, and so Lincoln stopped paying LTD benefits.

While his thyroid condition had stabilized, Mr. Learn experienced lingering cognitive problems. He got a new job as a home health therapist but had to quit weeks later as he was unable to recall treatment plans, could not remember how to drive to patients' homes and otherwise felt that he could not safely perform the job. Neuropsychological test results showed that Mr. Learn suffered from impaired short-term memory. Consequently, his neuropsychologist confirmed he was disabled. Mr. Learn's new endocrinologist similarly concluded that as a

consequence of the thyroid storm in 2018 he suffered lasting cognition deficits, and would not be able to return to work in anything like his prior position. His prior endocrinologist who had previously certified he was no longer disabled also acknowledged his "objective" cognitive decline.

Still, Lincoln denied Mr. Learn's benefits appeals. Lincoln's final denial of Mr. Learn's appeal was plagued by myriad shortcomings. For instance, Lincoln never mentioned any of Mr. Learn's doctors. Or their diagnoses. Or, indeed, any evidence Mr. Learn had submitted. Rather, Lincoln just copied and pasted a handful of conclusions from the reports of two outside doctors Lincoln hired to review his claim file, without independent analysis. Further, those outside reviewers' reports were based on incomplete information. Importantly, Lincoln never gave them affidavits submitted by Mr. Learn, his wife, his mother-in-law and friends attesting to instances where his impaired cognition manifested. And that omission was critical. One outside reviewer acknowledged that "impaired sustained attention and amnestic dysfunction" were symptoms of thyroid disorders, but he wrote "these symptoms are not reported to be observed behaviorally" in Mr. Learn's case. That is incorrect. The affidavits—which Lincoln had not provided to the reviewers—described in detail how those symptoms were exhibited in Mr. Learn's behavior. He now cannot follow simple instructions. He struggles with counting. He cannot perform simple addition. He frequently forgets what he is saying in the middle of saying it. The examples go on and on. Nonetheless, Lincoln adopted wholesale the reviewer's conclusion that Mr. Learn had no debilitating limitations, ignoring contrary evidence in the record. And that is just one problem with Lincoln's final denial.

Because Lincoln's denial of LTD benefits was not supported by substantial evidence, it was unreasonable. And because substantial uncontradicted evidence established Mr. Learn's continuing total disability, LTD benefits will be awarded.

**Background**

1. Professional & Educational History

Robert Learn served as the Regional Director of Outpatient Rehabilitation at Centra Health, Inc., in Lynchburg from November 2015 to February 2017, before he left the position and sought long-term disability. Dkt. 20-1, LIN1183, Robert Learn Affidavit. ("RL Aff.") ¶ 14. He is in his early-to-mid 50's. *See id.* ¶ 1.

In 1989, Mr. Learn graduated with a B.S. in health and physical education. In 1994, he received his master's degree in physical therapy from Shenandoah University/Winchester Medical Center. Since then, he has been licensed by the Virginia Board of Physical Therapy. *Id.* ¶¶ 3–5. Mr. Learn has held various positions as a physical therapist in West Virginia and Virginia, getting promoted to senior physical therapist and then a clinical director position in 2003. *Id.* ¶¶ 7–11. Then, from 2005 to 2015, Mr. Learn worked as the Program Director/Regional Director in the Physical Therapist Assistant Program for ECPI University in Newport News. He also served as the curriculum chair for the program from 2012 to 2015. *Id.* ¶¶ 12–13.

In 2015 he took the position of Regional Director of Outpatient Rehabilitation at Centra Health. In that role, Mr. Learn's responsibilities included working to recruit and retain highly skilled staff; overseeing budget preparation; utilizing productivity and quality outcome benchmarks; directing and supervising employee performance; and working with the Managing

Director to develop and implement a strategic plan. Mr. Learn held this position from November 2015 to February 2017. *Id.* ¶ 14.

### 2. Onset of Symptoms

Mr. Learn's symptoms originally appeared in 2016. They included difficulty thinking, significant weight loss (60 pounds), agitation, sweating, frequently tiring for no discernible reason, and frequent and intermittently explosive bowel movements. *Id.* ¶¶ 15, 17. He "tried to work through the episodes," but was put on medical leave in August 2016 "because [he] could not do [his] job," and his "symptoms steadily increased in both frequency and severity." *Id.* ¶ 16. Mr. Learn's primary care physician, Dr. Gibbs, initially intended to prescribe him medication for a tickborne illness. *Id.* ¶ 18.

But in May 2016, while Mr. Learn was in Farmville for his job, he had to leave early; he drove to Lynchburg General Hospital, where he was diagnosed with hyperthyroidism. *Id.* ¶ 19. Afterward, Dr. Gibbs consulted with Dr. Reed, an endocrinologist, for treatment of Mr. Learn's thyroid condition. *Id.* ¶ 20.

### 3. Performance Review

On February 10, 2017, Mr. Learn received a poor performance review from his supervisor. LIN2197–98. The listed "current performance concerns" included: "Doesn't listen and retain information easily, seems to concentrate on what he is going to say next versus active listening;" "Impulsivity with tasks and objectives: needs to address in person what's on your mind;" "Body language, we have had many discussions around a calmer demeanor in meetings;" "Overly enthusiastic during meetings … gets up & down, etc.;" "Lacks composure at times, easily rattled, and doesn't handle stress well;" "Prioritization, planning and completion of tasks takes too long;" and "Becomes visibly frustrated when tasks have ambiguity and require flexible

4

thinking or objectives change." *Id.* Mr. Learn's supervisor also criticized his "[c]ontinued lack of business acumen," "[i]nability to form a cohesive unit with [his] managers," and a "[l]ack of confidence in [his] ability to represent" the Outpatient Rehabilitation division in meetings and other settings. *Id.*

    4.  Dr. Reed Letter

On February 21, 2017, Dr. Reed provided a "medical statement" on behalf of Mr. Learn, which stated, in part, that he had been treating Mr. Learn "as his endocrinologist since May 2016," at which point he was "newly diagnosed with Graves' disease and thyrotoxicosis in May 2016." LIN2072. Dr. Reed stated that, despite treatment with medication, Mr. Learn "continued to have severe symptoms of thyrotoxicosis including palpitations, agitation and shortened attention span and an attention deficit." *Id.*

Dr. Reed further wrote that Mr. Learn "proceeded to have symptoms of hyperthyroidism and this was and continues to be complicated by an anxiety disorder, for which he is seen by a … psychiatrist," Dr. Judd. *Id.* Dr. Reed stated that he and Dr. Judd had several conferences about co-management and use of several medications "to determine if there were drug interactions with [Mr. Learn's] underlying anxiety condition." One such drug, propranolol, "clearly can be associated with mood swings with affective disease and clinical and subclinical hyperthyroidism can be commonly associated with anxiety, depression, agitation, mood swings as well as metabolic consequences of weight loss and palpitations. Mr. Learn suffered at one time or another from all of these symptoms during the period between May [2016] through February 2017." *Id.* Dr. Reed further commented that Mr. Learn's "treatment with [Iodine]-131 was partially effective," and that his "combined anxiety disorder and the inability to normalize

thyroid function with [Iodine]-131 and large doses of methimazole left him in a state of subclinical hyperthyroidism for much of the period between May [2016] and February 2017." *Id.*

Dr. Reed determined that,

> "*I have read the descriptions of Mr. Learn's behavior by his supervisor. The actions of lack of attention, inability to focus and the need to simplify and restate facts are all consistent with a patient who is attempting to manage the hyperactive and hyperadrenergic state of both that are a part of thyrotoxicosis as in May of 201[6]. The clinical hyperthyroidism in June and July of 2016 and period of hyperthyroidism in October and December 2016 would also be associated with these symptoms. His underlying anxiety disorder could well have amplified the symptoms of clinical and subclinical hyperthyroidism and made these much worse.*"

LIN2073 (emphasis added). Dr. Reed further wrote that, "[u]nder the current plan, I believe he will suffer from an unstable thyroid condition with periods of possible subclinical hyperthyroidism for up to 12 weeks from now," and that a "repeat dose of [Iodine]-131 ablative thyroid therapy will be recommended, at which time he will suffer from a changing thyroid state for another 16 weeks at a minimum." *Id.*

Accordingly, Dr. Reed concluded that, "[*i*]*n* [*his*] *opinion this gentleman's performance is very difficult to assess until he has been rendered biochemically euthyroid for a period of 8 weeks or more. Many if not all of his described behaviors could well have been either directly or indirectly accounted for by the coexistent thyrotoxicosis and subclinical hyperthyroidism.*" *Id.* (emphasis added).

5. <u>Mr. Learn Applies for LTD Benefits</u>

In May 2017, Mr. Learn filed a claim for LTD benefits. LIN3043–47. Mr. Learn described his symptoms as: flu-like exhaustion, increased heart rate, fever, lessened appetite, decreased cognitive function, depression, insomnia, weight loss, and headaches. LIN3044. He

wrote that he first noticed these symptoms in March 2016 and first sought treatment by a physician for them in May 2016. *Id.*

In his application, Mr. Learn stated that he was unable to work due to severe exhaustion, anxiety, depression, and a significant decline in cognition and executive-level functioning. *Id.* He also wrote that, before he stopped working, his condition required him to change the way he did his job as he needed significantly more time to perform job responsibilities; as a result, he arrived early and stayed late at work. *Id.* Mr. Learn provided the names of his doctors, including his primary care physician, Dr. Gibbs, his endocrinologist, Dr. Reed, and his psychiatrist, Dr. Judd. LIN3045. Mr. Learn stated that the last day he worked was February 23, 2017, and the first day he was unable to work on account of his disability was February 24, 2017. LIN3044. He also stated that he expected he would be able to return to work by September 2017. *Id.*

Dr. Reed submitted an "attending physician statement" with Mr. Learn's claim for LTD benefits. LIN2970–72. Dr. Reed stated that Mr. Learn's primary diagnosis was "Graves' Disease (Hyperthyroidism)" and also included "Depression / Anxiety."[1] LIN2970. Dr. Reed wrote that Mr. Learn's symptoms first appeared in May 2016, and included "extreme anxiety, inability to focus, short attention, emotional [instability] and tachycardia." *Id.* Concerning treatment, Dr. Reed indicated that Mr. Learn previously had Iodine-131 treatment which "fail[ed] … in 2016," but he noted Mr. Learn was scheduled for an Iodine-131 radiation therapy repeat dose in May 2017 and with a follow-up "to achieve euthyroidism"—i.e., normal thyroid function. *Id.* Dr. Reed provided a restriction for Mr. Learn that he "should not" "attend to personnel interaction and management," on account of his "inability to focus and attend to details" during his Iodine-131 radiation therapy. LIN2972.

---

[1] Dr. Reed also noted that Mr. Learn saw a psychiatrist "in conjunction with [himself] for [Mr. Learn's] anxiety disorder." *Id.*

But overall, Dr. Reed believed that Mr. Learn's "prognosis for recovery" was "very good," and that his "thyroid condition will be eventually completely resolved with either I-131 or surgery …" *Id.* Dr. Reed also wrote that "it is fully expected I-131 … will correct the hyperthyroidism." *Id.* He wrote that "following I-131 he should improve over 60 days gradually and by 120 days should be metabolically euthyroid," i.e., having a normal functioning thyroid gland, "and mentally stable." *Id.* Dr. Reed further expected that, within 120 days, Mr. Learn "should resolve all of the above limitations and be fully functional." *Id.* On May 9, 2017, another dose of Iodine-131 therapy was administered to Mr. Learn. LIN1997.

### 6. Lincoln Approves LTD Benefits

On July 21, 2017, Lincoln approved Mr. Learn's claim for LTD benefits. LIN2923. His monthly benefit was $5,899.32 per month. *Id.*

In its approval letter, Lincoln wrote that "[d]isability benefits will be considered as long as you remain eligible according to the terms of this policy." LIN2924. Lincoln continued: "Your policy provides benefits as long as you are unable to perform the main duties of your Own Occupation, as defined in your policy." *Id.* But, "after this period your claim will be re-evaluated. Benefits will continue if you are disabled from performing any type of work." *Id.* The approval letter also cautioned: "… you are required by this policy to remain under the regular care and attendance of a legally qualified physician who can verify your continuing disability. Occasionally, we will send you supplementary claim forms to provide us with continuing proof of disability, which will include requesting current medical records." *Id.*

### 7. Further Developments in Treatment

On February 12, 2018, Dr. Reed submitted another "Attending Physician's Statement" to Lincoln in relation to Mr. Learn's treatment. LIN2861–63. In it, Dr. Reed noted that the "patient

has improved over the last 12 weeks as he approaches euthyroidism." LIN2861. With respect to Mr. Learn's physical impairments, Dr. Reed noted that his "mood and depression/anxiety with fluctuating thyroid state," placed him at a "level 3," meaning he had a "moderate limitation of [his] functional capacity," but was capable of clerical or administrative sedentary activity. *Id.* However, Dr. Reed assessed that Mr. Learn was "now improving to level 2," by which he meant Mr. Learn could perform medium manual activity. *Id.* Concerning Mr. Learn's mental impairments, Dr. Reed believed that Mr. Learn was currently "able to function in most stress situations and engage in most interpersonal relationships," which was a "slight limitation." *Id.* Dr. Reed explained that Mr. Learn initially was at a level such that he was "able to engage in only limited stress situations and engage in only limited interpersonal relationships," i.e., a moderate limitation. *Id.*

At that time, Dr. Reed assessed that Mr. Learn was not totally disabled from his job. LIN2862. Further, Dr. Reed determined that he expected a fundamental or marked change in Mr. Learn's condition in a month, writing: "I expect by [March 8, 2018] that his TSH [Thyroid Stimulating Hormone levels] will be normal and he can be released to full duty." *Id.* Dr. Reed also wrote that Mr. Learn had "loss of cognitive functioning," stating that, "[i]n the past, his cognitive function was impaired by high thyroid [fluctuations]. He is now improving and expected to fully recover by [March 8, 2018]." *Id.* And when asked when Mr. Learn could return to work, Dr. Reed explained that "we will know from lab work on [March 8, 2018] but expect to be able at that time." *Id.*

Dr. Reed determined that Mr. Learn's "target" TSH levels were 1-3 mU/L. LIN2716. From early 2017 until June 2018, Mr. Learn's TSH levels had previously bounced above and below that target range without actually staying within those limits.

| Test Date | TSH Level |
|---|---|
| March 5, 2017 | 0.04 mU/L |
| March 20, 2017 | 0.07 mU/L |
| March 30, 2017 | 13.13 mU/L |
| May 30, 2017 | 0.01 mU/L |
| June 20, 2017 | 0.08 mU/L |
| June 27, 2017 | 8.31 mU/L |
| August 4, 2017 | 27.81 mU/L |
| September 19, 2017 | 13.4 mU/L |
| November 24, 2017 | 7.36 mU/L |
| January 5, 2018 | 5.60 mU/L |
| March 8, 2018 | 0.4 mU/L |
| April 20, 2018 | 0.18 mU/L |
| June 7, 2018 | 1.16 mU/L |
| September 11, 2018 | 1.03 mU/L |

*See* LIN2228. In fact, from March 2017 until September 2018, only the last two tests—i.e., June and September 2018—showed that Mr. Learn's TSH levels were within Dr. Reed's stated target range.

On April 14, 2018, Mr. Learn conveyed to Dr. Reed that he "continues to feel tired in the morning," and a few days later, relayed that "he continues to have exhaustion, difficulty with crisp thinking, depressive symptoms, and a malaise that is not improving." *Id.* On April 20, Mr. Learn received lab results showing his TSH level again were *low* (0.18 mU/L). *Id.* And again, Dr. Reed adjusted Mr. Learn's medications. *Id.*

10

On April 25, 2018, Mr. Learn visited Dr. Gibbs, his primary care physician, for an annual

exam. LIN2711. Mr. Learn informed Dr. Gibbs that his "[m]emory is crap," though his "[l]ong-

term memory is good," and "multi-tasking [is] better." *Id.* He also conveyed that he "feels well

with minor complaints, has decreased energy level and is sleeping well." *Id.* Dr. Gibbs assessed

in his mental status exam that Mr. Learn was "[o]riented X3 with appropriate mood and affect,

able to articulate well with normal speech/language, rate, volume, and coherence, demonstrates

appropriate judgment and insight and attention span and ability to concentrate are normal." *Id.*

On May 29, 2018, Mr. Learn visited Dr. Judd for a medication management follow-up.

LIN1984. There, Mr. Learn reported that "he has continued to struggle with issues related to his

thyroid," and that "his mood, energy and motivation are still not at baseline. Irritability persists."

*Id.* Mr. Learn identified "no notable improvement in his mood," and reported symptoms of

depression "includ[ing] decreased energy and decreased mood," but not "crying, difficulty

concentrating, fatigue, hopelessness," or other symptoms. *Id.* Dr. Judd determined that Mr.

Learn's "[m]ood is fair," that he was not experiencing hallucinations or suicidal thoughts, and

that his insight and judgment were "good." *Id.* Finally, his laboratory tests from June 7 and

September 11, 2018, showed that his TSH levels were within his target range (1.16 and 1.03

mU/L, respectively). LIN2680, 2702.

On September 12, 2018, Dr. Reed contacted Dr. Gibbs and Dr. Judd, describing his

assessment of updates in Mr. Learn's treatment. LIN2667–68. Dr. Reed wrote that Mr. Learn's

"laboratory studies today again are euthyroid," which "values reflect now approximately 6

months of biochemical euthyroidism and a stable" medication dosage. LIN2667. Dr. Reed

acknowledged that Mr. Learn continued to complain of "malaise, mental alertness, fatigue, and

inability to get out of bed," although Dr. Reed considered that Mr. Learn's "overall alertness on

the phone cognitive ability and verbal affect all appear normal to me in our refill and discussions [sic]." *Id.*

Dr. Reed advised the other doctors that "[d]isability insurer Lincoln will be calling [Mr. Learn] in about a week to review the results of these laboratory data and our recommendations." *Id.* Dr. Reed further wrote that he had relayed to Mr. Learn "that he is now biochemically euthyroid," and that Dr. Reed could "no longer recommend a biochemical basis for any disability." *Id*. Dr. Reed therefore determined that he "will not be able to recommend further disability on the basis of hypothyroidism as [Mr. Learn's] serum TSH is now in the middle of the reference range that we would target for between 1 and 2 mU/L and [h]is free T4 in the reference range. And it has been this way for now approximately 6 months." *Id.* Dr. Reed wanted the other doctors "to have this information because [Mr. Learn] will be looking for other reasons for fatigue." *Id.* Dr. Reed also noted that Mr. Learn "sees [Dr.] Gibbs and was treated recently for a presumed Lyme disease." *Id.*

Mr. Learn saw Dr. Judd on September 20, November 8, and December 12, 2018. LIN1945, 2789, 2797. In the September 20 visit, Mr. Learn reported "ongoing issues with irritability, sweating, and decreased motivation and appetite." LIN2797. Dr. Judd wrote that Mr. Learn was "adequately dressed and groomed," that his judgment was intact, his language "within normal limits," and his fund of knowledge "adequate." *Id.* Dr. Judd noted Mr. Learn's mood was "blah." *Id.* He decided upon a change in Mr. Learn's medication plan: tapering and discontinuing Lexapro, starting Cymbalta (prescribed to treat Major Depressive Disorder), and planning to taper and discontinue Wellbutrin. LIN2798–99. On November 8, Mr. Learn "note[d] ongoing issues with decreased motivation." LIN2789. Dr. Judd again made similar notations about how Mr. Learn presented himself, this time noting his mood as "fair." *Id.* Again, Dr. Judd changed the

dosage of Mr. Learn's medication: increasing his dosage of Cymbalta. LIN2790. And on

December 12, Dr. Judd noted that Mr. Learn "report[ed] an improvement" in his depression, that

he "is slightly more motivated," and that "[h]is concentration is slightly improved." LIN1945.

Dr. Judd, again, made similar notations about Mr. Learn's mental status. *Id.* And yet again, Dr.

Judd increased Mr. Learn's Cymbalta dosage. LIN1946.

### 8.   Lincoln Reviews Mr. Learn's LTD Benefits

On October 25, 2018, Mr. Learn submitted to Lincoln a supplementary statement

concerning his disability status. LIN2837. He continued to claim total disability at that time. *Id.*

Mr. Learn stated that he expected to be able to return to work "[a]s soon as [his] depression,

anxiety, irritability, [and] cognitive function return to normal." *Id.* He specifically described his

then-current symptoms to include "poor short term memory," inability to "multi-task," as well as

fatigue and anxiety. *Id.* He also wrote that he had a limitation in terms of decreased "cognitive

function." *Id.* Mr. Learn explained that he believed that these symptoms were the "results of

Graves' Disease," but that he was taking medication for his "mental health and cognitive issues."

*Id.* At that time, Mr. Learn described his present activities as including "simple housework and

chores, shopping, [and] taking care of [the] dog." *Id.* Mr. Learn signed the statement, attesting

that all of the information he provided was true and complete to the best of his knowledge and

belief, having read and understood certain "attached Fraud Warning Statements." *Id.*

On February 12, 2019, after Lincoln failed to get an attending physician statement from

Dr. Judd, Lincoln sought a third-party psychiatric peer review of Mr. Learn's file. LIN43. Dr.

Phillip Helding, who is board certified in psychiatry, performed the review. LIN2411. Dr.

Helding found that Mr. Learn's "primary diagnosis is noted to be major depressive disorder

(MDD) and anxiety." *Id.* Dr. Helding considered that while Mr. Learn "has a diagnosis of

Depression and Anxiety, review of the office notes provided don't substantiate symptoms are of an impairing proportion," and there was "no indication symptoms are impacting claimant's day to day activities and function." LIN2412. Dr. Helding decided that "[b]ased upon [his] review of the available medical facts, [he] did not find that [Mr. Learn] was functionally impaired from a psychiatric perspective." LIN2414. He also found that "there are no behavioral limitations and restrictions necessary for this claimant." *Id.* Dr. Helding concluded that the "psychiatric information offered … does not describe symptoms of a severity that would typically be expected to cause any functional impairment to the point of not being able to perform work related tasks." *Id.*

        9.   <u>Lincoln Disallows LTD Benefits</u>

On March 4, 2019, Lincoln sent Mr. Learn a letter stating that it had "completed [its] review of [his] Long Term Disability claim and have determined that no additional benefits are payable beyond 03/05/2019." LIN2404. Lincoln stated that, after reviewing "the information currently contained in your claim file, we have determined that you do not meet the definition of Total Disability." *Id.* In support of that conclusion, Lincoln referred to Dr. Reed's September 12, 2018 letter, which "noted that [Mr. Learn] was now biochemically euthyroid and [he] could no longer recommend this as a basis for disability." LIN2405. Lincoln also referenced Dr. Helding's report, in which he determined that the psychiatric information about Mr. Learn "does not describe symptoms of a severity that would typically be expected to cause any functional impairment to the point of not being able to perform work related tasks." LIN2406.

In its letter, Lincoln described that Mr. Learn had originally "stopped working due to a diagnosis of thyrotoxicosis (Graves' Disease)," the treatment for which included "radioactive iodine ablation therapy and monitoring of [his] hormone levels." LIN2407. It also noted that

"[d]ue to this therapy, it was recommended that medication management of [Mr. Learn's] underlying behavioral conditions be suspended pending completion of treatment for [his] thyrotoxicosis." *Id.* Lincoln noted that Dr. Reed indicated on September 12, 2018 that Mr. Learn "was no longer considered disabled due to Graves' Disease." *Id.* However, given Mr. Learn's depression and anxiety, Lincoln stated that it also evaluated medical records to "assess any potential work restrictions and limitations due to these diagnoses." *Id.* Relying on Dr. Helding's report on February 22, 2019, Lincoln concluded that Mr. Learn "no longer meets the definition of Total Disability as indicated in [his] policy and [his] claim file has been closed." *Id.* Ultimately, Lincoln paid Mr. Learn 21 months of LTD payments before discontinuing them. Dkt. 26 at 1; Dkt. 27-1 at 3.

      10. <u>Post-Denial Developments</u>

On March 7, 2019 (three days after Lincoln denied his LTD payments), Mr. Learn met with Dr. Judd. Dr. Judd noted that Mr. Learn's "thyroid condition has normalized." LIN1935. But he also wrote that Mr. Learn "reports no notable improvement in his depressive [symptoms]," and while "anxiety is improved[,] [h]is motivation remains down. His concentration is fair. … He spends his days interacting with his dog." *Id.*

On April 29, 2019, Mr. Learn went to see a new psychiatrist, Dr. Kenneth Fore. In his initial evaluation, Mr. Learn informed Dr. Fore that he had been diagnosed two years prior with Graves' Disease "after noticing weight loss and fatigue," and "weird, bad, skittish behavior." LIN1396. He noted that over the next two years, he sought endocrinology treatment as well as psychiatric treatment from Dr. Judd. During that time, his TSH had improved. *Id.* But Mr. Learn also reported that for six months he had "fatigue, depression, no motivation, [and] poor attentiveness/cognitive issues," and that his depression was "problematic for roughly two years."

*Id.* Mr. Learn further conveyed that he was "not pleased with Dr. Judd," and was "frustrated with care" from him. *Id.* Dr. Fore also noted that Dr. Judd "did not feel [Mr. Learn] was still disabled and [Mr. Learn] was recently denied for disability." *Id*. Mr. Learn explained that he was "dealing with some lingering cognitive issues." *Id.* Yet, he reported that "with his improved mood, he found a job" as a home health therapist. *Id.*

At the conclusion of the evaluation, Dr. Fore diagnosed Mr. Learn with "mood disorder due to known physiological condition with depressive features." LIN1398. He further planned to continue Mr. Learn's medications, but would "consider lowering [them] after 6 months of feeling well." *Id.*

Dr. Fore saw Mr. Learn again less than a month later (May 20, 2019). LIN1392. Dr. Fore noted that Mr. Learn was "struggling with his work as [a] home health worker and quit [his] job after one week" because he "could not do it." *Id.* Mr. Learn explained that his "cognitive function is still problematic and [he is] looking at options currently." *Id.* Mr. Learn also relayed that he was "going to appeal his disability [denial]" because his "cognition is in the toilet," and he was worried that his "Graves' Disease [was] causing long term cognitive issues." *Id.* Dr. Fore noted that he discussed with Mr. Learn that "he will need some neuropsych[iatric] testing for further assessment of his executive functions," and that Mr. Learn "[w]orries about his [long-term] employment options." *Id.* Dr. Fore also noted that Mr. Learn's "mood is improving and more stable[,] but overall his planning, execution skills are suffering to the point of leaving his job." *Id.* Concerning Mr. Learn's "thought process," Dr. Fore noted that "cognitively [the patient] feels he is having difficulty and far from baseline. Seeing difficulty in his work performance." LIN1393. Accordingly, Dr. Fore referred Mr. Learn to Dr. Joseph Conley for neuropsychological testing of further executive skills functions. LIN 1393–94, LIN2394.

16

11. <u>Neuropsychological Evaluation by Dr. Conley</u>

On May 24, 2019, Dr. Conley performed a battery of tests on Mr. Learn to determine "his current neurocognitive status, given his history of Graves' disease (i.e., hyperthyroidism), causing thyrotoxicosis and subsequent over-irradiated thyroid gland." LIN2394.

Dr. Conley made the following behavioral observations concerning Mr. Learn:

> Mr. Learn arrived on time for his scheduled appointment. He was neatly dressed and well groomed. He was alert and oriented in all spheres. Mood was anxious and elevated. Affect was appropriate to mood. Speech was pressed. Thought followed a logical, linear progression. He was inattentive, often asking that questions be repeated. He was friendly and cooperative, appearing to apply himself diligently to all tasks required of him. Therefore, test results are believed to accurately reflect his current level of neurocognitive functioning.

LIN2395.

Mr. Learn's score on one test in particular ("RMW of RMT") indicated "impaired mnestic function, specifically rapid decay of recently encoded verbal memory traces." LIN2395. As a result, Dr. Conley found that the "[r]esults of neuropsychological evaluation are positive for the presence of neurocognitive dysfunction, specifically impaired sustained attention and mnestic dysfunction (i.e., rapid decay of recently encoded verbal memory traces) and a comorbid neuropsychiatric disturbance, characterized by depression, anxiety, irritability, weakness, chronic fatigue, fearfulness, inadequacy, moodiness, social alienation, and inability to cope with everyday stress and responsibility." LIN2396. Dr. Conley determined that "[t]hese combined cognitive and neuropsychiatric problems very likely are a consequence of thyroid disease and associated functional deficits, given that this condition has been found to be associated with anxiety, irritability, memory problems, and poor concentration." *Id.* For this point, Dr. Conley cited a peer-reviewed journal article entitled "A survey of neuropsychiatric complaints in patients with Graves' disease." *Id.* Accordingly, Dr. Conley concluded that "*Mr. Learn's*

*acquired neurocognitive deficits, combined with his reactive neuropsychiatric disorder,*

*specifically Major Depressive Disorder, render him disabled and incapable of maintaining*

*employment at the present time*." *Id.* (emphasis added). He further considered that Mr. Learn's

history of "strong academic and vocational achievement over a period of many years, prior to his

thyroid disease, strongly supports this conclusion." *Id.*

Dr. Conley's recommendations included that Mr. Learn could benefit "from a cautious

trial on stimulant medication." *Id.* Dr. Conley also considered that Mr. Learn's "apparent mood

disorder would appear to be a more pressing concern, requiring treatment as well." *Id.*

12. <u>Mr. Learn's First Appeal of Denial of Benefits</u>

On May 27, 2019, Mr. Learn appealed Lincoln's denial of LTD benefits. LIN2381–82.

Mr. Learn was acting on his own behalf—he was not yet represented by counsel. Mr. Learn

noted that he was under the care of Dr. Fore, and was referred to Dr. Conley for cognitive tests.

LIN2382. He asserted that Graves' Disease "is a serious medical condition that continues to

severely affect the quality of [his] everyday life—including [his] ability to work." *Id.* Mr. Learn

noted that he took a Physical Therapy position to support his family, but had to "terminate [his]

employment after only two weeks because [he] was unable to handle the cognitive requirements

of coordinating, scheduling, documenting, and treating [his] patients." *Id.* Accordingly, Mr.

Learn requested that Lincoln "reconsider [its] previous decision and reinstate [his] disability

benefits." *Id.* Mr. Learn further provided Dr. Conley's neuropsychological test results to Lincoln.

*Id.*; LIN2359–66.

On June 10, 2019, Lincoln sent a letter acknowledging receipt of Mr. Learn's appeal, and

wrote that "[i]t is important that we have all available medical records so that we can have a clear

picture of your current condition." LIN2359. Lincoln asked that Mr. Learn respond about

18

whether he wished to "send in updated medical information," and expressed that Lincoln "want[ed] to provide [him] with every opportunity to submit a complete appeal." *Id.*; *see also* Dkt. 26 at 11 (noting that Lincoln "encouraged [Mr. Learn] to submit any additional materials bearing on his claimed disability").

Dr. Fore returned a "psychiatric supplemental information" form to Lincoln on Mr. Learn's behalf, in which Dr. Fore stated that his diagnosis for Mr. Learn was "mood disorder (depression + anxiety) due to a known physiological condition." LIN2354. Dr. Fore reported that Mr. Learn's symptoms include dysfunction in his executive skills, and that Mr. Learn was "distressed over his lacking ability to stay on topic, organize, perform his work duties." *Id.* With respect to the "expected outcomes and time frame," Dr. Fore wrote that he "expected recovery of [Mr. Learn's] executive skills [in] conservatively 6 months." *Id.* Dr. Fore also noted that Mr. Learn had "immediate" and "recent" "memory problems" (though not "remote"), and that Mr. Learn's concentration and attention were "impaired." LIN2355.

Lincoln contracted with Dr. Critchfield, who is board certified in clinical neuropsychology, to conduct a third-party review of the medical evidence in Mr. Learn's file. LIN2347–52. Reviewing Dr. Conley's evaluation of Mr. Learn, Dr. Critchfield noted that Mr. Learn's results "were reported to reflect neurocognitive dysfunction due to the presence of impaired sustained attention and impaired memory, reflected in a diagnosis of Mild Neurocognitive Disorder due to Thyroid Disease." LIN2348. Dr. Critchfield also explained that "[i]nspection of [Mr. Learn's] scores indicated performance on a memory measure was low average," "measures of attention capacity/working memory were average and divided attention were average." *Id.* And he wrote that Mr. Learn's "[p]erformance on measures of intellectual functioning, problems-solving, inhibition, naming, and processing speed were average." *Id.* Dr.

Critchfield also explained that Mr. Learn's "psychological functioning was reported to be remarkable for depressive symptoms reflected in a diagnosis of Major Depressive Disorder with anxious distress." *Id.* Dr. Critchfield wrote that Dr. Conley's evaluation "did not include any standalone measures of performance validity," though the "[e]mbedded measures of performance validity appear[ed] to be within expectation." *Id.* And Dr. Critchfield noted that Dr. Conley found Mr. Learn "unable to work due to his cognitive and psychological symptoms." *Id.*

Dr. Critchfield concluded that "[f]rom the time period of 5/29/2019 forward, it is this reviewer's opinion that the available medical records do not provide adequate evidence of cognitive or psychiatric symptoms to result in functional impairment." LIN2350. In Dr. Critchfield's view, Dr. Conley's neuropsychological evaluation "did not reflect memory or attention deficits of a nature or severity that would be expected to result in functional impairment. Furthermore, multiple mental status exams have reflected intact memory and attention." *Id.* He also noted that Mr. Learn's "[a]nxiety and depression have been longstanding, and present during time periods when the claimant had demonstrated the capacity to work." *Id.* Dr. Critchfield also wrote that "[t]here is no record that psychological symptoms ever reached a severity necessitating a higher level of treatment, such as intensive outpatient or inpatient psychiatric admission." *Id.*

Mr. Learn then provided additional documentation from Dr. Fore, including his treatment records from appointments from June and July 2019. LIN2323–37. Lincoln acknowledged it had received the information and included it for medical review. LIN2323. In the June 2019 visit, Dr. Fore noted that Mr. Learn stated that he was "miserable" and "noted depression." LIN2325. In the July 2019 visit, Dr. Fore noted that Mr. Learn stated that he is "in a bad way," and discussed "his continued depressed state and worsening he feels." LIN2335. Mr. Learn stated that "his

medications are not helping him and [he is] here today to get his medication changed." *Id.* Dr. Fore also noted that Mr. Learn "is working with several organizations for his disability." *Id.*

Dr. Critchfield reviewed Dr. Fore's new medical records and issued a supplementary report in August 2019. LIN2318–22. In the report, Dr. Critchfield concluded that, "[f]rom a neuropsychological perspective, the additional medical records do not provide support for cognitive or psychological symptoms of a nature or severity to result in functional impairment." LIN2321. In his view, Dr. Critchfield assessed that the "[r]ecords indicate that [Mr. Learn] has had fluctuating report of depression, which have been treated with outpatient psychiatry appointments for medication management. There was no evidence his depressive symptoms were of a severity that required elevation to a higher level of care such as intensive outpatient or inpatient psychiatric treatment." *Id.* Nor was there "evidence of suicidal ideation, psychotic symptoms, or gross neglect." *Id.*

13. Lincoln Denies First Appeal

On August 30, 2019, Lincoln denied Mr. Learn's appeal from the denial of LTD benefits. LIN2311. And Lincoln stated that "[a]ll information in the claim file, including the information provided on appeal, was reviewed by a health care consultant for physical impairments and [Dr. Critchfield] for cognitive or behavioral impairments." *Id.* Lincoln wrote that, "[s]ince benefits were paid to 03/05/2019, the focus of our review is from this date forward." *Id.*

In its appeal denial letter, Lincoln quoted the conclusions of Dr. Critchfield from his reports of June 27 and August 20, 2019. LIN2314. Lincoln "recognize[d] [Mr. Learn] provided the opinion of [his] treating physician(s) regarding [his] condition and recovery;" however, Lincoln "found that the medical evidence provided did not support those decisions for physical, cognitive, or behavioral impairments." *Id.* Lincoln continued: "The medical records did not

support restrictions and limitations that would preclude you from performing in your own or any occupation." *Id.* Lincoln further assessed that "[r]ecords document normal mental status examinations, [and that] there was outpatient behavioral health treatment that did not require any additional intensive treatment." *Id.*

Lincoln acknowledged that Mr. Learn had been "diagnosed with thyrotoxicosis, depression, and anxiety." LIN2315. Nonetheless, Lincoln stated that its "review of the medical documentation … does not support that [Mr. Learn] was unable to perform the main duties of [his] own or any occupation beyond [his] date benefits were last paid"—i.e., March 5, 2019. *Id.* Lincoln further stated that the "medical records on file document [he] [was] euthyroid (normal) and stable in September 2018," and that "[t]here are no additional medical records for physical impairments" from March 5, 2019 onward. *Id.*

In addition, Lincoln found that "[t]he available medical records do not provide adequate evidence of cognitive or psychiatric symptoms to result in functional impairment." *Id.* With respect to Dr. Conley's report, Lincoln stated that it "did not reflect memory or attention deficits of a nature or severity that would be expected to result in functional impairment." *Id.* Lincoln further assessed that "multiple mental status examinations have reflected intact memory and attention." *Id.* As for the "anxiety and depression," Lincoln considered that they "have been longstanding, and present during time periods when [he] had demonstrated the capacity to work," and Lincoln further concluded that "[t]here is no record that psychological symptoms ever reached a severity necessitating a higher level of treatment, such as intensive outpatient or inpatient psychiatric admission." *Id.*

14. <u>Post-Appeal Developments</u>

On September 9, 2019, Mr. Learn had another appointment with Dr. Reed to address his "postprocedural hyperthyroidism." LIN1883. Dr. Reed assessed that Mr. Learn was "biochemically near euthyroid but has ongoing difficulty with depression and anxiety." *Id.* He further wrote that Mr. Learn's TSH level "has been stable over the last year with the exception of June and July[,] where the value had changed between 3.19 milliunits/L to a value of 0.97 milliunits/L while different antidepressant medicines were being utilized." *Id.* Dr. Reed noted that Mr. Learn has "done poorly since approximately April 2019," and that he "now feels more poorly with difficulty with cognition as well as fatigue exhaustion, heart palpitations, heat intolerance, irritability, some muscle aches, some muscle weakness, and occasional tremor by his history." LIN1884. These symptoms were "not unlike ones that he [has] felt in the past." *Id.* Dr. Reed planned to decrease one medication and was going to consider another medication based upon upcoming laboratory studies. LIN1883.

In November 2019, Dr. Reed contacted another endocrinologist, Dr. Berger, to get a second opinion as Dr. Reed "felt that Mr. Learn's residual thyroid condition was perhaps causing his lingering cognitive and mental dysfunction." LIN616. Dr. Reed sought Dr. Berger's opinion regarding a potential diagnosis of Hashimoto's Encephalopathy. *Id.* Thereafter, Dr. Berger saw Mr. Learn as a patient for "hypothyroidism subsequent to radioactive iodine for Graves' disease." *Id.* After her examination of Mr. Learn, Dr. Berger believed that he did not have Hashimoto's Encephalopathy, but "concur[red] that his cognitive function is impaired" and so explored other factors. LIN2080.

Dr. Berger found Mr. Learn's symptoms in 2016 were "so extreme and [*Mr. Learn*] *was still suffering from the ill effects of his Graves' disease*." LIN616 (emphasis added). In reviewing

his records, Dr. Berger considered the most recent 17 of the TSH labs (from 2017 to 2019), and found "only 3 of th[ese] TSH values are in the normal range."[2] *Id.* Indeed, Mr. Learn's TSH values from 2017-2019 were anything but normal: "0.8, 0.07, 0.04, 0.51, 13.5, 0.01, 0.08, 8.31, 27, 13, 7, 5.6, 0.04, 0.18, 0.08, 3.19, 0.97." LIN616–17. She explained that "the higher the TSH value, the more hypothyroid or under treated the patient is," and that "[s]uppressed TSH levels less than 0.34 are indicative of over replacement of thyroid medication." LIN617. Dr. Berger further explained that "[e]ither situation exacerbates depression and when over treated, it exacerbates sleep disturbance, depression, and anxiety and cognitive dysfunction." *Id.* Thus, Dr. Berger determined that Mr. Learn's "levels fluctuated widely" while he was "under treatment, causing significant hypothyroidism resulting in worsening depression and lethargy, cognitive dysfunction to over treatment which worsened his irritability, anxiety, depression and sleep disturbance." LIN616. Dr. Berger expressed that "[*i*]*t is unclear how* [*Mr. Learn's*] *physicians deemed him clinically euthyroid when his thyroid levels were obviously not controlled and not stable at any point*." *Id.* (emphasis added).

Thus, Dr. Berger determined during Mr. Learn's November 2019 examination that he "did not suffer from Hashimoto's encephalopathy but instead from uncontrolled hypothyroidism exacerbating his sleep apnea, depression, anxiety and cognitive dysfunction." LIN617. Further, Dr. Berger explained that during Mr. Learn's February 2020 appointment, he "reported moderate improvement in his clinical symptoms which correlated with laboratory values that he obtained for that visit showing normal thyroid levels as well as normal vitamin levels." LIN618; *see also* LIN2042 (noting that at his February 2020 appointment, Mr. Learn reported that his "[m]emory

---

[2] Dr. Berger explained how, even though "[t]he therapeutic range for thyroid control lies in the TSH range of 0.34–4.8," that was "too wide [a] range" for Mr. Learn; instead, the Endocrine Society "prefers" a TSH level between 0.5–2.5. LIN617.

is getting better," "[s]hort term is a little better but not perfect," and that he was "able to multi

task better"). Dr. Berger continued: "[t]hough [Mr. Learn] said he was not perfect, he could see

improvements with increased motivation and potential improvement of cognitive function since

our first visit from November." *Id.* Dr. Berger explained that while it was "difficult to pinpoint

the exact date when he can return to work," she opined that she (and Mr. Learn) were "hopeful

that with continuation of his current medical regimen with any necessary adjustments, that within

6 months he may be able to perform job related duties." *Id.*

     15. <u>Mr. Learn's Second Appeal of Denial of Benefits</u>

     In February 2020, with the assistance of counsel, Mr. Learn filed a second-level

administrative appeal of the denial of his LTD benefits. LIN2207–41. In his appeal, he

highlighted a "summary of additional evidence submitted" on appeal, which included letters

from Dr. Berger and Dr. Conley, as well as affidavits submitted by him, his wife, his mother-in-

law, and two friends, as well as research articles about the effect of Graves' Disease on the

human mind and body. LIN2229. Among other things, he asserted that he "cannot perform 8 of

the 19" principal duties in his job description because he "cannot use the executive functions of

his brain to concentrate or pay attention." LIN2239. In the appeal, Mr. Learn further contended

that, as was shown in the evidence "from the medical records and from [his] affidavit, he

struggles with all areas of reasoning, problem solving, and planning." *Id.*

     Turning first to Dr. Reed's letter of February 5, 2020, Dr. Reed stated that Mr. Learn's

"combined anxiety disorder and the inability to normalize the thyroid function with [Iodine]-131

and large doses of methimazole left him in a state of subclinical hyperthyroidism for much of the

period between May [20]16 and February 2017." LIN2069. Accordingly, Dr. Reed explained

that "[a]s [they] managed his condition, the circulating TSH was in the ideal therapeutic range in

general only 2 weeks out of the 40-week period or about 5% of the time." *Id.* Dr. Reed further

wrote that "[d]uring this period of fluctuating thyroid function while normalization was

attempted, [Mr. Learn] continued to see his psychiatrist and be treated with antianxiety and

antidepressant medications," and despite the medications, "Mr. Learn continued to have

disabling fatigue and difficult[y] with clear thinking." LIN2070. Dr. Reed continued, that "[o]ver

the next two years his thyroid hormone values remained within the euthyroid range although he

continued to have fatigue," and he explained that in view of Dr. Conley's testing which "showed

some objective cognitive decline," he referred Mr. Learn to Dr. Berger. *Id.* Dr. Reed opined that

he believed that "[m]any if not all of [Mr. Learn's] described behaviors between 2016 and 2018

could well have been either directly or indirectly accounted for by coexistent thyrotoxicosis and

subclinical hyperthyroidism and hypothyroidism." *Id.* Dr. Reed further concluded that "[t]his

altered thyroid state could have emphasized changes from his underlying behavioral diagnosis

and his cognitive decline is objective and its etiology at this time is uncertain." *Id.* Dr. Reed also

described and cited research (including that which he had been an author or coauthor), stating

that it is "well supported that thyroid dysfunction when it is elevated or reduced can have clear

cognitive deficits." LIN2071.

Dr. Berger also submitted a letter with Mr. Learn's appeal describing his diagnosis and

condition in April 2020. LIN265–66. Therein, she "emphasize[d] the severity of Mr. Learn's

thyroid disease and the prolonged course (over years) it took to regulate his thyroid levels," and

stressed that it was "the most extreme case [of hyperthyroidism] known as **Thyroid Storm**."

LIN265 (emphasis added). Dr. Berger noted that his "free T3 level of > 30 (ULN under 4) was

the second highest [she] ha[d] ever seen in [her] 23 years of Endocrine experience." *Id.* Dr.

Berger further described that "the next 2 years of testing never truly revealed a euthyroid

sustainable status for Mr. Learn," and because he "*was [n]ever actually truly euthyroid … this all played havoc on his depression, anxiety and sleep quality resulting in sustained cognitive impairment*." *Id.* (emphasis added). Further, Dr. Berger expressed that following Mr. Learn's "thyroid storm" and its "life threatening consequences," the "resultant cognitive impairment, cognitive decline, memory difficulties and associated depression and anxiety cannot be argued against"—explaining that "[t]his is a well-documented clinical and neuropsychological researched topic with a multitude of articles to support this assertion." LIN266. Dr. Berger concluded that notwithstanding her earlier assessment that Mr. Learn "could potentially return to an employable level of functioning," by April 2020 she "concur[red] [with Mr. Learn] that he is not capable of ever being able to return to the level of work of which he was performing prior to 2016." *Id.*

Mr. Learn's wife submitted an affidavit describing her husband's conditions and symptoms. LIN1194–96. She explained that when her husband "first got sick, he struggled with organizing his thoughts, time frames, and responsibilities;" in short, he "felt that his brain was not working." LIN1195. Mrs. Learn attested that her husband still has "extreme difficulty following simple instructions" and "gets very overwhelmed and anxious." *Id.* For instance, she explained that her husband "struggles with calculating simple math problems involving addition" and "struggles with counting." *Id.* According to Mrs. Learn, her husband tries to assist with daily activities but is impaired in his ability to do so. He "will try to run errands but will forget what he is supposed to get or where he is supposed to go … even if he has a list of what to do or what to get with him." *Id.* And he will "attempt[ ] to help [their] kids with their school papers but struggles to read them," and he told her "he cannot comprehend what is written." LIN1194. Even going out to eat is a struggle. Mr. Learn "struggles [to] order food at a restaurant" and "gets

confused with what he is supposed to order even if he has a menu." *Id.* Mrs. Learn explained that her husband "used to be an avid reader" and "was always learning new things" before he "began experiencing Graves' disease symptoms." *Id.* He has no interest in reading or learning anymore. *Id.* And according to Mrs. Learn, when her husband "tried to return to work in a physical therapy position," he was "unable to handle most aspects of the job." LIN1195. For instance, he was unable "to evaluate and treat patients," "set functional goals and plan activities to help his patient[s] achieve their goals," and he was even "unable to get to patient[s'] homes." *Id.*

Mr. Learn's mother-in-law also submitted an affidavit. LIN1197–98. She described that, "[a]fter being diagnosed with Graves' disease, [Mr. Learn] began struggling with organizational tasks and processes," and that he "also struggled with focusing on his work." LIN1197. She attested that she has "witnessed [Mr. Learn] suffer from poor cognition and difficulty with problem solving." *Id.* Among other things, she explained that Mr. Learn "cannot help his daughter with her homework," and that "[m]aking calculations and drawings based on calculations is overwhelming to him." *Id.* Mr. Learn's mother-in-law attested that he has "lost interest" and "motivation" to do those things he used to be interested in; moreover, he "no longer maintains friendships," and "does not participate in conversations." LIN1197–98. And she further stated that Mr. Learn "is confused by simple tasks such as ordering food at a fast food restaurant or going grocery shopping." LIN1198.

Mr. Learn also submitted an extensive affidavit. LIN1182–93. He described that he was "feeling somewhat better" in February and March 2019, and he thought he could go back to work full time. LIN1189. Then, when Mr. Learn took a job as a home health physical therapist, he explained that his medication "stopped working and [his] cognitive and mental health symptoms started coming back," and as a consequence he "lasted in that job for about 2 weeks."

28

*Id.* For instance, a scheduling task that would "ordinarily take 10 minutes" took him over two hours. *Id.* Mr. Learn further explained that his "short-term memory is terrible," and as a result, he "ha[s] to write down lists to accomplish anything." *Id.* From May to September 2019, he wrote that his symptoms started coming back, including fatigue, exhaustion, impaired memory, and difficulty speaking. LIN1189–90.

In September 2019, Mr. Learn tried again to find a job online where he was "responsible for evaluating and treating patients, reviewing charts, gathering medical histories, completing electronic medical records, and interacting with medical staff." LIN1190. However, Mr. Learn attested that "[b]ecause of his cognitive limitations, [he] felt like [he] could not understand what [he] needed to do." *Id.* He could not, for example, "remember what [he] had done in treatments in order to document them after the fact," and he "could not remember many factors of the initial evaluation and subsequent treatment plans." *Id.* Because he did not "feel safe treating patients with health conditions" and given his "[in]ability to create a treatment plan for the patient" to assist in their recovery, Mr. Learn "felt like [he] had no choice but to resign." *Id.* And while he has "started feeling slightly better, [his] symptoms have continued to the point that [he] ha[s] not been able to return to any meaningful work." *Id.* Mr. Learn attested that at home, he experiences "brain fog," that his "ability to multitask and concentrate suffered," that his thoughts "often seem jumbled, fragmented and unrelated to each other." LIN1191. Mr. Learn wrote that his memory "has continued to suffer": he forgets conversations and grocery lists, and "between 10 and 20 times a day," he will "get up and walk across the room and completely forget what [he] went to do." LIN1191–92. When he is driving, Mr. Learn "sometimes forget[s] where [he] is going or where [he] need[s] to go at that particular moment." LIN1192. And he attested that given his

"thought processing difficulties," he has "great difficulty making even the simplest day-to-day decisions about what to wear for the day or what [he] [is] going to eat for lunch or dinner." *Id.*

Mr. Learn concluded that, "with [his] cognitive issues and fatigue, [he] feel[s] like an old person rather than a 52-year-old man," and that there was "no way that [he] could return to work like this, much as [he] might want to." *Id.*

16. <u>Lincoln Denies Second Appeal</u>

Lincoln secured an endocrinologist "to assist in assessing the severity of [Mr. Learn's] thyroid condition and the impact it would have on his function," as well as a neuropsychologist "to determine whether the evidence available would support the claimant having cognitive or psychiatric restrictions/limitations." LIN415. A neuropsychologist, Dr. Hertza, and an endocrinologist, Dr. Sood, were selected.

Dr. Hertza stated that he conducted his review "from a neuropsychology perspective." LIN421. He noted that Mr. Learn's "reported diagnoses include major depressive disorder, generalized anxiety disorder, and mild neurocognitive disorder due to thyroid disease." *Id.* Dr. Hertza noted that Mr. Learn saw Dr. Conley for a neuropsychological evaluation, but wrote that "no effort tests with regard to cognition were utilized," and as a result, Dr. Hertza wrote that "this test is not interpretable for forensic reasons." *Id.* Neither Dr. Hertza, nor Lincoln, explain what that means. Accordingly, Dr. Hertza concluded that, "[g]iven mental status exams that do not describe functional impairment, formal assessment with no validity measures, and no indication of high-level care, the available medical record is found to not support functional impairment from 03/05/2019 to present." *Id.*

Dr. Sood concluded her review from an internal medicine and endocrinology perspective. She determined that, "[b]ased on the lab results provided for review, TSH values were within

normal range and it is unclear why the dosages kept being adjusted. The change from generic vs.

brand name medication is understood, but when adjusting this, and adding T3 for example, the

dose of T4 was not reduced. It is unclear as to what the providers were addressing by changing

the dosages." LIN422–23. Elsewhere, Dr. Sood wrote that "the claimant's thyroid labs have been

normal." LIN424. Dr. Sood concluded that "there is no functional impairment resulting in

restrictions and limitations supported. As far as the labs that were provided for review, all were

within normal limits. While it is possible that thyroid patients don't feel well on certain

formulations of thyroid medication, this does not impact functionality or result in restrictions or

limitations." LIN425.

In a letter dated May 21, 2020, Lincoln stated that "[b]ased on the information provided,

we have determined that we are unable to approve benefits beyond March 5, 2019." LIN203.

Lincoln wrote that, "[i]n our appeal process, all information previously submitted as well as any

new documentation was used to make a determination." *Id.* After summarizing its claim history

and denials of benefits, Lincoln noted that it consulted with Dr. Hertza and Dr. Sood, in

determining that Mr. Learn's medical documentation "does not support that [he] was unable to

perform the main duties of [his] own occupation beyond [his] date last paid." LIN205. Lincoln

then copied and pasted a portion of Dr. Hertza's statement that there was "no support for

functional impairment," and "[g]iven mental status exams that do not describe functional

impairment, formal assessment with no validity measures, and no indication of high level care,

the available medical record is found to not support functional impairment, from 03/05/2019 to

present." LIN206. Lincoln also quoted Dr. Sood's statement that "thyroid labs have been

normal," that "TSH values were within normal range," and that it was "unclear as to what values

the providers were addressing by changing the dosages." *Id.*

31

**Relevant Plan Provisions**

The Group Policy (the "Plan") includes the following definitions relevant to this case.

TOTAL DISABILITY or TOTALLY DISABLED will be defined as follows:

    1. During the Elimination Period and Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the Main Duties of his or her Own Occupation.

    2. After the Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the Main Duties of any occupation which his or her training, education or experience will reasonably allow.

The loss of a professional license, an occupational license or certification, or a driver's license for any reason does not, by itself, constitute Total Disability.

LIN139.

    MAIN DUTIES or MATERIAL AND SUBSTANTIAL DUTIES means those job tasks that:

    1. are normally required to perform the Insured Employee's Own Occupation; and
    2. could not reasonably be modified or omitted.

LIN136.

    OWN OCCUPATION or REGULAR OCCUPTION means the occupation, trade or profession:

    1. in which the Insured Employee was employed with the Employer prior to Disability; and
    2. which was his or her main source of earned income prior to Disability.

It means a collective description of related jobs, as defined by the U.S. Department of Labor Dictionary of Occupational Titles.

LIN137.

The Group Policy includes the following provisions relevant to submitting a claim for

LTD benefits.

> PROOF OF CLAIM. The Company must be given written proof of claim within
> 90 days after the end of the Elimination Period. When it is not reasonably possible
> to give written proof in the time required, the claim will not be reduced or denied
> solely for this reason, if the proof is filed:
>
>   1.   as soon as reasonably possible; and
>   2.   in no event later than one year after it was required.

LIN142. The proof of claim "must be provided at the Insured Employee's own expense." *Id.* "It

must show the date the Disability began," as well as "its cause and degree." *Id.* Claim

documentation must include, among other things, "completed statements by the Insured

Employee and the Employer," "a completed statement by the attending Physician, which must

describe any restrictions on the Insured Employee's performance of the duties of his or her

Regular Occupation;" and "any other items the Company may reasonably require in support of

the claim." *Id.* Proof of "continued Disability, regular Care of a Physician, and any Other Income

Benefits affecting the claim must be given to the Company" within 45 days of the Company's

request for such information. *Id.* If it is not timely provided, "benefits may be denied or

suspended." *Id.*

The Plan provided the Company "discretionary authority," stating that "[e]xcept for the

functions that this Policy clearly reserves to the Policyholder or Employer, the Company has the

authority to manage this Policy, interpret its provisions, administer claims and resolve questions

arising under it." LIN144. That authority included "determin[ing] eligibility and resolv[ing]

claims questions," "determin[ing] what information the Company reasonably requires to make

such decisions," and "resolv[ing] all matters when an internal claim review is requested." *Id*.

### Standard of Review

Summary judgment is appropriate when "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The party

seeking summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact." *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Once the movant has made this threshold demonstration, the nonmoving party, to survive the motion for summary judgment, must demonstrate specific, material facts that give rise to a genuine issue." *Sedar*, 988 F.3d at 761 (citing *Celotex Corp.*, 477 U.S. at 323). "[A]t the summary judgment stage, the [court's] function is not [ ] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). But summary judgment should be awarded "unless a reasonable jury could return a verdict for the nonmoving party on the evidence presented." *McLean v. Patten Cmtys., Inc.*, 332 F.3d 714, 718–19 (4th Cir. 2003) (citing *Anderson*, 477 U.S. at 247–48).

As a court considers cross-motions for summary judgment, it must review "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citations and internal quotation marks omitted). And as the court considers each individual motion, it must "resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." *Id.* (internal quotation marks omitted).

## Applicable Law

A court is required to "review de novo an ERISA benefits determination unless the plan confers discretionary authority on its administrator." *Woods v. Prudential Ins. Co. of Am.*, 528 F.3d 320, 321 (4th Cir. 2008) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989)). Here, the parties agree that the Plan conferred discretion upon Lincoln in its administration of the Plan. *See id.*; Dkt. 26 at 21; Dkt. 27-1 at 10. In the ERISA context, the

abuse of discretion standard "equates to reasonableness," such that a court "will not disturb an ERISA administrator's discretionary decision if it is reasonable," but it "will reverse or remand if it is not." *Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 322 (4th Cir. 2008). An administrator's decision is reasonable "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence," with "careful attention" being paid to the plan requirements and the rules of ERISA itself. *Id.* (quotations and citations omitted). Relevant here, an administrator's decision is not supported by substantial evidence when its decision reflected a "'wholesale disregard' of evidence supporting the employee's claim." *White v. Eaton Corp. Short Term Disability Plan*, 308 F. App'x 713, 717 (4th Cir. 2009) (quoting *Donovan v. Eaton Corp.*, 462 F.3d 321, 319 (4th Cir. 2006)).

The following are a non-exhaustive list of factors relevant to the Court's inquiry whether the administrator's decision was reasonable:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Solomon v. Bert Bell/Pete Rozelle NFL Player Retirement Plan*, 860 F.3d 259, 264–65 (4th Cir. 2017) (quoting *Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 342–43 (4th Cir. 2000)) (cleaned up). Every "*Booth*" factor" need not be in play in any given case. *Helton v. AT&T Inc.*, 709 F.3d 343, 357 (4th Cir. 2013).

In any event, faced with language that confers discretion upon a plan administrator, the Fourth Circuit has cautioned that a court must follow "its duty of deference and its secondary rather than primary role in determining a claimant's right to benefits." *Evans*, 514 F.3d at 323. In

other words, an administrator's "discretionary decision will not be disturbed if reasonable, even if the court itself would have reached a different conclusion." *Booth*, 201 F.3d at 341.

## Analysis

In this case, Lincoln ignored substantial evidence of Mr. Learn's disability. Because the *Booth* factors on balance weigh against Lincoln's denial of LTD benefits and because Lincoln's final decision denying Mr. Learn LTD benefits was not supported by substantial evidence, it was therefore unreasonable.

1. <u>Adequacy of Materials Considered & Degree to Which They Support It</u>

In this case, the Court will first consider "the adequacy of the materials considered to make the decision and the degree to which they support it." *Booth*, 201 F.3d at 342. Perhaps more than any other *Booth* factor, shortcomings in the materials Lincoln considered demonstrate the arbitrariness of Lincoln's denial of benefits to Mr. Learn.

Mr. Learn was treated by Dr. Conley, Dr. Berger, and Dr. Reed—each of whom treated Mr. Learn and opined that he suffered from real cognitive decline since his "thyroid storm." For instance, Dr. Conley explained that Mr. Learn's neuropsychological evaluation results showed "neurocognitive dysfunction," that his "combined cognitive and neuropsychiatric problems very likely are a consequence of thyroid disease and associated functional deficits;" and that his "acquired neurocognitive deficits, combined with his … Major Depressive Disorder, render him disabled and incapable of maintaining employment at the present time." LIN2395–96. Dr. Berger also found that Mr. Learn suffered from "sustained cognitive impairment" as a consequence of his "most extreme case [of hyperthyroidism] known as Thyroid Storm" and suffering two years of non-euthyroid thyroid levels. LIN265–66. She also found Mr. Learn "not capable of ever being able to return to the level of work he was performing prior to 2016." LIN266. Even Dr.

36

Reed—who had initially cleared Mr. Learn as no longer disabled in 2018 on the basis that he was euthyroid—later changed his assessment in 2019 and 2020. He wrote that Mr. Learn was only "biochemically *near euthyroid*," LIN1883 (emphasis added), and concluded that Mr. Learn's "*cognitive decline is objective*," LIN2070 (emphasis added). Incredibly, Lincoln failed to mention *any* of Mr. Learn's physicians in its final decision denying benefits. Their names do not appear in Lincoln's decision. LIN203–08. Nor did Lincoln describe any of Mr. Learn's doctors' assessments of his diagnoses, impairments, and ability to work. In fact, Lincoln's final decision contains scarcely a glancing reference to *any* evidence submitted by Mr. Learn. *See id.* Rather, Lincoln did little more than block quote the conclusions of Dr. Sood and Dr. Hertza, and add— without elaboration—that its review also did not support Mr. Learn's claim that he was totally disabled, LIN206–07. But ERISA requires that the plan administrator "address evidence favorable to [Mr. Learn] 'thoughtfully and at length,'" and Lincoln's failure to do "suggests that … [it] abused its discretion in denying [him] benefits." *See White*, 308 F. App'x at 719 (quoting *Evans*, 514 F.3d at 326).

Yet Lincoln argues that it did all that was required and more. In Lincoln's view, the final decision shows that its claim reviewers carefully considered the third-party peer-review reports of Dr. Sood and Dr. Hertza, and Lincoln argues that they had no obligation to "specifically discuss every piece of evidence in the record." Dkt. 35 at 15–16. Rather, Lincoln contends that it was "entirely proper" for it to consider the "consulting physicians' reliable opinions, and to quote portions of the peer review reports, in preparing their determination letters." *Id.* at 16. To be sure, there is no requirement that a plan administrator "detail every bit of information in the record." Dkt. 35 at 16; *Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 526 (1st Cir. 2005). But there is a significant flaw in Lincoln's position—namely, that Dr. Sood and Dr. Hertza

themselves did not get important evidence of Mr. Learn's disability in the first instance. And a plan administrator cannot simply "wholesale disregard" evidence of the claimant's disability, *White*, 308 F. App'x at 717, or "arbitrarily refuse to credit a claimant's reliable evidence," *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003); *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 118 (2008) (affirming district court decision that plan administrator acted unreasonably when it "had failed to provide its independent vocational and medical experts with all of the relevant evidence").

Specifically, Lincoln completely ignored affidavits Mr. Learn submitted, including his own, and those of his wife, his mother-in-law, and his two friends and colleagues. In his claim appeal, Mr. Learn's counsel provided these affidavits to Lincoln and argued that they were important—especially with respect to "limitations" as to the "executive functions of [his] brain." LIN2239; *see also id.* (arguing, "[a]s you can see from the medical records and from Mr. Learn's affidavit, he struggles with all areas of reasoning, problem solving, and planning"); LIN2229 (describing the affidavits in "summary of additional evidence submitted"). Yet Lincoln failed to provide these affidavits to Dr. Hertza and Dr. Sood. LIN216–18, 426–28.

Significantly, the information in these affidavits directly undermine Dr. Hertza's conclusions. After describing Dr. Conley's and Dr. Berger's findings, Dr. Hertza acknowledged that "[t]*he provider accurately describes symptoms which are often seen with thyroid disorders including, but not limited to, impaired sustained attention and amnestic dysfunction* and comorbid neuropsychiatric disturbances characterized by depression, anxiety, irritability, weakness, fatigue, fear, inadequacy, moodiness, social alienation, and inability to cope with stress." LIN212. But Dr. Hertza then wrote that "*in this case, these symptoms are not reported to be observed behaviorally*." *Id.* (emphasis added). Further, Dr. Hertza acknowledged that "formal

38

evaluation is not necessary to determine functional impairment," but suggested that "when mental status exams are nondescriptive a formal evaluation helps to evidence level of deficit." *Id.* Had Lincoln provided any of the affidavits to Dr. Hertza, he would have seen evidence that these behaviors *were*, in fact, "reported to be observed behaviorally." *Id.* For instance, in his affidavit, Mr. Learn testified how "[his] short-term memory is terrible." RL Aff. ¶ 54. For example, Mr. Learn "get[s] up and walk[s] across the room and completely forget[s] what [he] went to do"—a circumstance that happens "between 10 and 20 times a day." *Id.* ¶ 74. Moreover, he forgets conversations entirely. *Id.* ¶ 73. Mr. Learn "frequently forget[s] what [he] was doing or saying in the middle of doing or saying it." *Id.* ¶ 75. His wife testified to other examples. Mr. Learn—a former healthcare executive—now struggles to count (WF Aff. ¶ 15), perform arithmetic (*id.* ¶ 11), and has "extreme difficulty following simple instructions" (*id.* ¶ 10). There are myriad other examples. Dr. Hertza (and Dr. Sood), did not and could not consider any of that evidence, because Lincoln did not provide them those affidavits.

Lincoln, for its part, argues that the requisite "objective evidence" is lacking in Mr. Learn's claim documentation. Dkt. 26 at 25–26 (arguing that courts "regularly hold that the concept of proof connotes an 'objective' component to such evidence"). In Lincoln's view, without such an "objective component," plan administrators would "have to accept all subjective claims of the participant without question." *Id.* at 26 (citing *Williams v. UNUM Life Ins. Co. of Am.*, 250 F. Supp. 2d 641, 648 (E.D. Va. 2003)). Similarly, Lincoln argues that Mr. Learn cannot rely "on the testimony of friends and family members," nor his own affidavit, because they are statements "contain[ing] no objective medical evidence of impairment," and that "[c]ourts routinely discount such lay testimonials." *Id.* at 27 & n.6. Lincoln advances numerous other

variants of this position that Mr. Learn failed to submit sufficiently "objective" evidence of disability. *See, e.g.*, Dkt. 35 at 6, 15; Dkt. 36 at 3–6.

These after-the-fact arguments run headlong into Lincoln's statement (to Mr. Learn) that "[*o*]*bjective evidence is not a requirement* to satisfy this provision." LIN2280 (emphasis added). Indeed, Lincoln continued to advise that "medical evidence supporting the claim being made is needed," which "can include office and treatment records, testing results, therapy records, *or any other type of documentation that would support the inability to perform the min and substantial duties of one's occupation*." *Id.* (emphasis added). Mr. Learn provided just the type of documentation that Lincoln had requested. Lincoln cannot be heard to complain now that Mr. Learn's evidence is not "objective" enough. Moreover, the Fourth Circuit has clearly held that plan administrators should consider similar evidence as part of their "full and fair review requirements" under ERISA, including in a case similarly involving the denial of disability benefits during the claimant's treatment for thyroid disease. *See Harrison v. Wells Fargo Bank, N.A.*, 773 F.3d 15, 23–24 (4th Cir. 2014) (faulting plan administrator for not considering evidence in the record of the claimant's "mental and physical distress," including "her sister's statement [that] detailed [her] debilitating panic attacks," and that explained how "the claimant was unable to care for herself").

In any event, even if objective evidence were required—and it was not—Mr. Learn provided ample objective evidence of disability. That evidence includes his neurocognitive test results—test results that Dr. Conley found demonstrated "impaired sustained attention and mnestic dysfunction (i.e., rapid decay of recently encoded verbal memory traces)," and that Mr. Learn's "acquired neurocognitive deficits, combined with his … Major Depressive Disorder, render him disabled and incapable of maintaining employment at the present time." LIN2396.

Lincoln raises several arguments for why it was allegedly reasonable for Lincoln to discount Mr. Learn's test results by Dr. Conley showing limited mnestic function. Dkt. 35 at 8. None are persuasive, or supported by the record. Lincoln makes much of the fact that Mr. Learn's *other* results for *other* aspects of his cognitive function, were normal and did not show impairment. *See, e.g.*, Dkt. 35 at 8 (conceding that Mr. Learn "did obtain a below average score on one test of his mnestic function," but argued that "that score was an outlier when viewed in comparison to the balance of the testing administered by Dr. Conley"); Dkt. 26 at 23. But that is neither here nor there. The fact that Mr. Learn did not exhibit impaired "long term" memory, or that he demonstrated "normal word-reading and color-naming fluency," LIN2395, or the like, does not undermine separate test results "indicating impaired mnestic function, specifically rapid decay of recently encoded verbal memory traces"—i.e., a decline in his short-term memory. LIN2395–96. And, significantly, neither Dr. Critchfield nor Dr. Hertza held that position. LIN417, 419–20, 2348–50.[3]

Instead, Lincoln's main argument against Dr. Conley's test results is that the "consulting physicians Drs. Critchfield and Hertza, both of whom are board-certified neuropsychologists," opined that "Dr. Conley's testing lacked the essential validity measures necessary to confirm that the test subject was putting forth his best effort," Dkt. 35 at 8; *see also* Dkt. 26 at 23 (arguing that absent the "safeguards" of "stand-alone validity measures," Dr. Critchfield and Dr. Hertza explained that "such testing is simply not reliable for forensic purposes").

But Lincoln's argument is misleading; it does not reflect Dr. Conley's test results or indeed, the opinion of Dr. Critchfield. Dr. Critchfield never said that Dr. Conley's testing lacked

---

[3] Dr. Critchfield did opine that Dr. Conley's evaluation "did not reflect memory or attention deficits of a nature or severity that would be expected to result in functional impairment." LIN2350.

"essential validity measures," nor that such testing was "not reliable for forensic purposes" without particular validity measures. *See* Dkt. 35 at 8; Dkt. 26 at 23. Rather, Dr. Critchfield merely noted that Dr. Conley's evaluation "did not include any *standalone* measures of performance validity"—a fact that is uncontested, LIN2348 (emphasis added). But Dr. Critchfield further acknowledged that Dr. Conley's testing *had* included "*embedded* measures of performance validity," and Dr. Critchfield explained that those embedded measures "*appear*[*ed*] *to be within expectation*." *Id.* (emphases added). Dr. Hertza (and by extension, Lincoln) completely ignored the embedded validity measures; much less explained why freestanding validity measures were necessary for the testing to be forensically interpretable—contrary to Dr. Conley's and Dr. Critchfield's opinions. Further still, Dr. Hertza never explained what he meant when he said Dr. Conley's test results "were not interpretable for forensic reasons." In other words, Dr. Hertza and Lincoln discounted contrary evidence without explanation. *See White*, 308 F. App'x at 717.

Nonetheless, Lincoln maintains that Dr. Conley's tests should be discounted because they lacked freestanding validity measures (though they contained embedded validity tests). Dkt. 26 at 23–24. Lincoln cites *Johnson v. Prudential Insurance Company of America*, 916 F.3d 712 (8th Cir. 2019), to argue that Dr. Conley's testing was "not reliable for forensic purposes" because it lacked "stand-alone validity measures." Dkt. 26 at 28. But *Johnson* does not support Lincoln's argument. Just the opposite. In fact, the Eighth Circuit explained in *Johnson* that "there are *multiple established ways* to test validity of a neuropsychological examination," in a case in which multiple "embedded" and "free-standing" tests had both been employed. 916 F.3d at 716 (emphasis added). The claimant in that case had *failed* multiple validity tests to an extraordinary degree—providing significant evidence he was malingering. In one doctor's testing that included

both types of validity tests, the claimant "failed almost all of the validity tests," including two free-standing ones that indicated he "was actively attempting to perform poorly." *Id.* at 714. When another doctor conducted testing of the claimant's cognitive state, the claimant "*failed all nine validity measures* on the tests she administered," which the doctor found to be "compelling evidence of suboptimal effort." *Id.* (emphasis added). Thus, far from supporting Lincoln's argument that freestanding validity measures were required, *Johnson* recognized that embedded validity measures were an "established way[ ] to test validity of a neuropsychological examination," just like free-standing validity measures. 916 F.3d at 716.

Other authority cited by Lincoln stands for the wholly unremarkable proposition that where the record contains evidence of symptom *exaggeration* or that the claimant was making poor effort, that undermines the claimant's evidence of disability. In one cited case, the claimant "failed eighty-six percent of the validity criteria … used to determine whether a patient is honestly using his or her best efforts to perform the required physical tests," and "[v]ideo footage further support[ed] the conclusion that [the claimant] was not cooperative," as by "flexing his right knee in the waiting room prior to his [assessment]," an act "he later refused to perform during the [assessment] itself." *Ortega-Candelaria v. Johnson & Johnson*, 755 F.3d 13, 22 (1st Cir. 2014). Again, unsurprisingly, the court "conclude[d] that the record contains evidence reasonably sufficient to support a determination that [the claimant] was uncooperative during his evaluation." *Id.*

To be clear, in this case there is *no* evidence of symptom exaggeration or suboptimal effort by Mr. Learn. To the contrary, as Dr. Critchfield recognized, embedded validity measures "appear[ed] to be within expectation." LIN2348. And Dr. Conley himself personally observed Mr. Learn to be "friendly and cooperative, appearing to apply himself diligently to all tasks

required of him" during the neuropsychological testing. LIN2395. Put simply, the record does

not support Lincoln's attempt to discredit Dr. Conley's test results on the basis of the validity

measures employed or Mr. Learn's results on such validity measures.[4] And to the extent there

was any conflict between Dr. Conley and Dr. Critchfield on the one hand, and Dr. Hertza on the

other, Lincoln impermissibly ignored without explanation the evidence that supported Mr.

Learn's claim.

Next, Lincoln tries another tack, arguing that Dr. Conley's "neurocognitive testing is

further drawn into doubt by the results of mental status examinations administered by multiple

treating practitioners both before and after his examination." Dkt. 26 at 24; Dkt. 35 at 6–8

(arguing "Dr. Conley's opinion of disability was inconsistent with the many contemporaneous

medical observations in the record from Plaintiff's other treating physicians"). To be sure, in Dr.

Hertza's initial report, he opined—albeit in a conclusory manner—that Mr. Learn's "[m]ental

status exams do not describe functional impairment." LIN420. But significantly, Dr. Hertza did

not describe the mental status exams to which he was referring. Moreover, some of the exam

notes would have been *supportive* of Mr. Learn's claim to disability, rather than *undermine* it.[5]

---

[4] Nor is there any basis in the record by which Lincoln could conclude that Dr. Conley should have employed other forms of validity testing, such as freestanding validity tests, rather than embedded tests. *Compare Gorbacheva v. Abbott Lab. Extended Disability Plan*, 309 F. Supp. 3d 756, 773 (N.D. Cal. 2018) (holding that plan administrator could reasonably rely on doctor's conclusion that the claimant's functional capacity evaluation lacked any validity testing, where the doctor further "testified that there are standardized techniques … that include validity and reliability measures," and providing examples of the same). Here, in contrast to *Gorbacheva*, validity tests were employed and the record further lacked any explanation or evidence that those measure employed were in any way deficient.

[5] *See, e.g.*, LIN416 (citing Dr. Judd's treatment notes that "[t]he claimant continued to have concentration issues"); *id.* ("[m]ental status noted a constricted affect"); LIN417 (citing Dr. Fore's notes that "[t]he claimant reported cognitive dysfunction," and "[m]ental status noted an anxious effect"); *id.* ("[m]ental status noted a depressed mood"); *but see* LIN397 (citing Dr. Fore's mental status exam that Mr. Learn "left session cognitively intact and not in acute distress").

Neither Dr. Hertza nor Lincoln explained why it considered some mental status exams more significant than others, let alone why they believed those mental status exams undermined Dr. Conley's test results. LIN420. Indeed, there is no basis in the record for the Court to conclude that Dr. Hertza (and Lincoln) did anything other than simply "pick[ ] and choos[e] certain evidence in the record while ignoring other relevant evidence." *See Mills v. Union Sec. Ins. Co.*, 832 F. Supp. 2d 587, 598 (E.D.N.C. 2011) (citing *Myers v. Hercules, Inc.*, 253 F.3d 761, 768 (4th Cir. 2001)).

Further still, Lincoln's final decision entirely ignored Dr. Berger's conclusions. *See* LIN203–08. Lincoln ignored Dr. Berger's conclusions that Mr. Learn was "still suffering from the ill effects of his Graves' disease," LIN616; that Mr. Learn was "[n]ever truly euthyroid;" and that "this all played havoc on his depression, anxiety and sleep quality resulting in sustained cognitive impairment," LIN265; and that Mr. Learn was "not capable of ever being able to return to the level of work which he was performing prior to 2016," LIN266. For their part, Dr. Hertza and Dr. Sood noted Dr. Berger's opinions and assessments, but they, too, failed to meaningfully engage with such opinions and conclusions, much less explain any critique of such opinions. LIN210–15, 418–21, 422–25.

In its filings in court, Lincoln now argues that the Court should discount Dr. Berger's opinions on the basis that, among other things: "her analysis is entirely retrospective and concerns impairments that manifested during [Mr. Learn's] … 'thyroid storm' from 2016 to 2018," she did not "cite any evidence of cognitive impairments that [Mr. Learn] alleges," she "d[id] not rely on Dr. Conley's [report]," and that her letter was more akin to patient "advocacy" than unbiased medical opinion. Dkt. 26 at 24–25; *see also id.* at 19 (describing her letters as "advocacy letters"); Dkt. 35 at 10–11 (similar); Dkt. 36 at 4, 7 (similar). However, because the

45

Court is limited to considering only those rationales provided by Lincoln in its denial of benefits, and because Lincoln did not rely on any of these grounds as a basis for terminating benefits, they provide no grounds to affirm Lincoln's decision on judicial review. *See, e.g.*, *Hall v. Metro. Life Ins. Co.*, 259 F. App'x 589, 592–93 (4th Cir. 2007); *Thompson v. Life Ins. Co. of N. Am.*, 30 F. App'x 160, 164 (4th Cir. 2002) ("A court may not consider a new reason for claim denial offered for the first time on judicial review.").[6]

Even if these arguments could be considered, they are belied by the record and caselaw. Lincoln argues that Dr. Berger's "contemporaneous notes plainly refute the conclusory assertions of ongoing disability she makes in her *post-hoc* advocacy letters." Dkt. 35 at 11. Not so. Lincoln cherry-picks parts of Dr. Berger's treatment notes it finds favorable (e.g., when asked if Mr. Learn had "[t]rouble concentrating on things, such as reading the newspaper or watching television," he replied, "[n]ot at all"), *id.* at 10, while ignoring that Dr. Berger wrote in those same notes, "[c]ognitive decline is still there and depression and anxiety have ensured," and that Dr. Berger later determined, "I concur that his cognitive function is impaired …." LIN2047–48. Dr. Berger's contemporaneous treatment notes support, rather than refute, her later assessments. Lincoln fails to explain why the parts of the treatment notes it cites are more probative of Mr. Learn's disability than the ones it ignores. In any event, this record bears little resemblance to the

---

[6] Lincoln also ignored other relevant evidence without comment. In its denial letter, Lincoln quoted part of Dr. Hertza's initial report stating that there was "no indication of high level care," as supporting termination of benefits. LIN206. But in response to that report, Mr. Learn's counsel submitted evidence that Mr. Learn was undergoing a six-week 'intensive treatment" regimen of "transcranial magnetic stimulation," or "TMS," as treatment for his major depressive disorder. LIN222–23. Indeed, Dr. Hertza acknowledged Mr. Learn's TMS six-week TMS treatment, and did not expressly reiterate his opinion that Mr. Learn had not received any "high level care," LIN210–11, which would have been inaccurate. Neither Lincoln nor Dr. Hertza discussed or elaborated upon this treatment, nor explained why it did not support a finding of disability. LIN210–12. Again, Lincoln simply ignored contrary evidence without explanation. *See White*, 308 F. App'x at 717.

cases Lincoln cites, where a treating physician's later opinion on patient disability was completely unmoored from earlier treatment notes without explanation.[7] Other new arguments Lincoln raises in its briefing, including deriding Dr. Berger's, Dr. Conley's, and Dr. Fore's medical opinions on the basis that Mr. Learn went "shopping for new doctors" to support his disability claim, Dkt. 26 at 23, similarly fails because such arguments were not a basis upon which Lincoln had terminated benefits. *See Thompson*, 30 F. App'x at 164.

This *Booth* factor therefore weighs heavily in favor of Mr. Learn. Lincoln's final decision, on its face, failed to acknowledge, let alone address, substantial evidence of Mr. Learn's disability. *See Booth*, 201 F.3d at 342 (noting consideration of "the adequacy of the materials considered to make the decision and the degree to which they support it"). Neither Lincoln (nor Dr. Hertza nor Dr. Sood) ever addressed the ample evidence of disability in Mr. Learn's, his wife's and the other affidavits. Additionally, Dr. Conley's neuropsychological testing constituted objective evidence of Mr. Learn's cognitive decline, and the myriad after-the-fact reasons Lincoln now offers to discredit those test results do not undermine Dr. Conley's testing or conclusions. Lincoln similarly failed to address (let alone explain any criticism of) Dr. Berger's opinions and Dr. Reed's updated opinion that Mr. Learn suffered from real objective cognitive decline.

## 2. Whether the Decisionmaking Process Was Reasoned And Principled

The Court also must consider "whether the decisionmaking process was reasoned and principled." *Booth*, 201 F.3d at 342. In other words, the plan administrator's decision must

---

[7] *Compare, e.g.*, *White v. Standard Ins. Co.*, 895 F. Supp. 817, 840 (E.D. Mich. 2012) (plan administrator did not act arbitrarily in discounting physician's conclusion that patient's pain medication "makes her totally disabled" and impaired her "cognitive ability and functional ability to do her job," when contemporaneous examination records recorded that the patient's "only reported side-effect from the medication was constipation").

"result from a fair and searching process." *Harrison v. Wells Fargo Bank, N.A.*, 773 F.3d 15, 21 (4th Cir. 2014). In some respects, this is a similar inquiry to the prior one: asking whether the plan administrator considered adequate materials and whether they supported the administrator's decision. *Stull v. Life Ins. Co. of N. Am.*, No. 3:20-cv-291, 2021 WL 4993485, at *10 (W.D.N.C. Oct. 27, 2021); *Aisenberg v. Reliance Standard Life Ins. Co.*, No. 1:22-cv-125, 2024 WL 711608, at *14 (E.D. Va. Feb. 21, 2024) (describing this *Booth* factor as "a composite of the *Booth* factors when considered holistically"). Lincoln's decisionmaking process was not "reasoned and principled" or "fair and searching."

First, "[a] complete record is necessary to make a reasoned decision." *See Harrison*, 773 F.3d at 21; *Glenn*, 554 U.S. at 118 (noting that the plan administrator's "fail[ure] to provide its independent vocational and medical experts with all of the relevant evidence" supported setting aside plan administrator's decision). As previously described, Lincoln failed to provide Mr. Learn's affidavits to Dr. Hertza and Dr. Sood, and Lincoln's failure to provide that material evidence directly undermined their conclusions. *See supra* at 37–39.

Second, Lincoln's consideration of Mr. Learn's appeal was arbitrarily walled off from his diagnosis, medical condition, and treatment before March 5, 2019—i.e., the period when Lincoln had found Mr. Learn disabled. In Lincoln's view, because his disability must be supported after March 5, 2019, that period was "the [sole] focus of [Lincoln's] determination." LIN205; *see also* LIN2313 ("Since benefits were paid to 03/05/2019, the focus of our review is from this date forward."). Accordingly, Dr. Sood, Dr. Hertza, and Dr. Critchfield all constrained their review to the period beyond March 5, 2019.[8] Even in its filings before this Court, Lincoln suggests that it

---

[8] *See* LIN416 ("The period in the review is from 03/05/2019 to the present."); LIN422 ("The period currently under review is from 03/05/2019 and forward."); LIN210 (similar); LIN214 (similar).

would be improper to consider Mr. Learn's "impairments" pre-March 5, 2019, arguing, for example, that Dr. Berger's "analysis [was] entirely retrospective and concerns impairments that manifested during [Mr. Learn's] so-called 'thyroid storm' from 2016 to 2018." Dkt. 26 at 24; *see also* Dkt. 35 at 5 (criticizing Mr. Learn's reliance on evidence between 2016 and 2018). But as Mr. Learn's doctors—Dr. Conley, Dr. Learn, and even Dr. Reed—all explain, Mr. Learn's wild thyroid fluctuations from 2016 to March 5, 2019 all contributed to lasting and sustained objective cognitive decline *after* March 5, 2019. *See, e.g.*, LIN2965–96 (Dr. Conley); LIN265–66 (Dr. Berger); LIN2070 (Dr. Reed). The fact that Lincoln had found Mr. Learn disabled *during* that earlier period and awarded LTD benefits did not render evidence of his disability irrelevant to his claim that he later remained disabled. However, Lincoln never grappled with that clear and consistent explanation for Mr. Learn's disability, and its (and Dr. Hertza and Dr. Sood's by extension) failure to consider pre-March 5, 2019 evidence arbitrarily gave short shrift to the basis for disability supported by the evidence here.

Third, there is little in Lincoln's final appeal decision to show that it was the result of a "fair and searching process." *See Harrison*, 773 F.3d at 21. A paradigmatic example of Lincoln's perfunctory analysis of Mr. Learn's evidence is its treatment of his abnormal thyroid hormone (TSH) levels. Dr. Reed had determined that Mr. Learn's "target" TSH levels were between 1–3 mU/L. LIN2716. For a year and a half (from early 2017 to June 2018), Mr. Learn's TSH levels regularly ricocheted above and below that range, without actually staying within those limits, with a handful of exceptions. LIN2228; LIN617. Dr. Berger explained what those varying TSH levels meant, stating that "the higher the TSH value, the more hypothyroid or under treated the patient is," while "[s]uppressed TSH levels less than 0.34 are indicative of over replacement of thyroid medication." LIN2108. And Dr. Berger explained the significance of those varying levels

to Mr. Learn, as "[e]ither situation exacerbates depression and when over treated, it exacerbates sleep disturbance, depression and anxiety and cognitive dysfunction." *Id.* Accordingly, she had concluded that "Mr. Learn's TSH values from 2017-2019" demonstrated that he suffered from "uncontrolled hypothyroidism exacerbating his sleep apnea, depression, anxiety and cognitive dysfunction." LIN617; *accord* LIN2396 (Dr. Conley, reporting that Mr. Learn's "combined cognitive and neuropsychiatric problems are very likely a consequence of thyroid disease and associated functional deficits").

But Lincoln did not engage with Mr. Learn's evidence and medical opinions that his wildly fluctuating thyroid levels over years caused permanent cognitive decline. Rather, Lincoln simply adopted Dr. Sood's statement that "[t]he claimant's thyroid levels have been normal," and that, "[b]ased on the lab results provided, TSH levels were within normal range and it is unclear why the dosages kept being adjusted." LIN206. Indeed, the evidence was just the opposite—that Mr. Learn's thyroid levels predominantly had *not* been "within normal range" according to Dr. Reed's target or Dr. Berger's "preferred" TSH level between 0.5–2.5. *See* LIN617, 2716. Dr. Sood and Lincoln seemingly employed a different definition of "normal" TSH ranges, but never defined it, much less explained why it was more appropriate than those ranges used by Dr. Reed and Dr. Berger. To the extent that Dr. Sood only considered Mr. Learn's recent TSH levels without considering the effect that his previous highly irregular TSH levels and "uncontrolled hypothyroidism" had on his "sleep apnea, depression, anxiety and cognitive dysfunction," LIN617, Lincoln's reliance on such an opinion ignored Mr. Learn's clearly articulated basis for disability and lacked the requisite reasoned, principled decisionmaking.

Dr. Sood's cursory consideration of Mr. Learn's changing medication and dosages, and Lincoln's subsequent cut-and-paste adoption of Dr. Sood's conclusion, further demonstrate that Lincoln did not employ a fair and searching process in this case. Dr. Sood summarily opined that it was "unclear why the dosages kept being adjusted" for Mr. Learn's medications, except that the switch to "generic vs. brand name medication … [wa]s understood." LIN423. But Dr. Berger had explained the changes she had made to Mr. Learn's medications and dosages. LIN2108. For example, she noted that Mr. Learn had been on a medication regimen "for the past 2 years, which essentially g[ave] him an overdose of Levothyroxine medication throughout the week and an under dose of Levothyroxine once a week." *Id.* The result was that, "[c]linically, this create[d] a roller coaster effect for patients and exacerbate[d] any underlying mental disorders especially depression and anxiety related to an imbalance of his dose." *Id.* Dr. Berger adjusted the timing and dosages "to truly make [Mr. Learn] clinically euthyroid," but still he already suffered from "uncontrolled hypothyroidism exacerbating his sleep apnea, depression, anxiety and cognitive dysfunction." *Id.* Dr. Sood was aware of Dr. Berger's opinion in this respect. LIN423. But she did not address it. Neither did Lincoln. Rather, Dr. Sood (and Lincoln) simply wrote it was "unclear why the dosages kept being adjusted." LIN206, 423. That cursory treatment, which again ignored substantial evidence in Mr. Learn's favor and the main reason for his disability, falls short of the requisite fair and searching process.

That is not to say that Lincoln's decisionmaking lacked *any* indicia that it employed a reasoned and methodical process. Lincoln afforded Mr. Learn two levels of appeal, and he was permitted several opportunities to provide additional information to Lincoln. Moreover, Lincoln employed neuropsychologists (Dr. Critchfield and Dr. Hertza), a psychiatrist (Dr. Helding) and an endocrinologist (Dr. Sood) to conduct independent reviews of Mr. Learn's claim.

Undoubtedly, there was "extensive back-and-forth between [Lincoln] and [Mr. Learn] at every step of [Lincoln's] review of [his] claim," and there was a "'dialogue between [Lincoln] and [Mr. Learn].'" *See Pifer v. Lincoln Assurance Co. of Boston*, No. 1:22-cv-186, 2023 WL 5208111, at *19–20 (M.D.N.C. Aug. 14, 2023) (quoting *Harrison*, 773 F.3d at 22). And yet "the opportunity for dialogue alone is not sufficient to outweigh the deficiencies in the decisionmaking process previously identified" because Lincoln "shut [its] eyes" to considerable evidence Mr. Learn submitted in support of his claim for LTD benefits—meaning Lincoln's decisionmaking process was "neither reasoned nor principled." *See Pifer*, 2023 WL 5208111, at *20.

Because Lincoln's decisionmaking process lacked numerous hallmarks of a principled and reasoned decisionmaking process, this *Booth* factor also weighs significantly in Mr. Learn's favor.

### 3.  Other *Booth* Factors

#### a.  *The Language of the Plan*

The Court next considers whether Lincoln adhered to the "language of the plan" in rendering its benefits decision. *Booth*, 201 F.3d at 342.

As previously described, the Plan provided Lincoln with "discretionary authority" to "manage this Policy, interpret its provisions, administer claims and resolve questions arising under it," including "determin[ing] eligibility and resolv[ing] claims questions." LIN144. And there is no dispute that Lincoln has discretionary authority to administer the Plan, and as a result, the Court's review is for abuse of discretion and whether Lincoln's decision was unreasonable. *See* Dkt. 26 at 21; Dkt. 27-1 at 10. Moreover, there does not appear to be any dispute that, under the Plan, Mr. Learn had the burden to demonstrate that he was disabled after March 5, 2019.

Dkt. 26 at 3; LIN142; Dkt. 37 at 10 (disclaiming argument that the "burden of proof shifted to the Defendant"). In these respects, the language of the Plan sets forth the appropriate abuse of discretion standard of review but otherwise does not weigh in favor of or against Mr. Learn's claim of disability. *See Pifer*, 2023 WL 5208111, at *8 (similar).

Mr. Learn, for his part, argues that Lincoln went beyond the Plan's language in terminating his benefits. Dkt. 27-1 at 12–13. Specifically, Mr. Learn contends that Dr. Critchfield and Dr. Hertza improperly considered whether his depressive symptoms were of such a "severity" that they "required elevation to a higher level of care such as intensive outpatient or inpatient psychiatric treatment." *Id.*; *see also* LIN2314; LIN421. Mr. Learn posits that the Plan includes no language requiring this type of treatment to determine whether he is considered disabled, and therefore whether he has had intensive outpatient or inpatient treatment "has no relevance to whether [he] is disabled." Dkt. 27-1 at 13. In any event, Mr. Learn writes that "he actually did receive intensive outpatient care to try to combat his symptoms," namely Transcranial Magnetic Stimulation (TMS) "in an attempt to ease symptoms from his major depressive disorder." *Id.* Mr. Learn faults Lincoln's "oversight" of this "intensive treatment option," which he argues further shows that Lincoln failed to perform "a principled review of [his] file." *Id.*

Lincoln counters that the fact that its "claim professionals, in preparing their determination letters, chose to quote portions of the medical consultants' reports does not mean that Lincoln imposed some extra-contractual 'intensive care' requirement." Dkt. 35 at 14. Rather, Lincoln argues that its determination letters "make[ ] clear that Lincoln at all times applied the Group's 'Own Occupation' standard" in conformity with the Plan's language. *Id.* at 15. For instance, Lincoln notes in its determination that: "In summary, the medical documentation

contained in your claim file does not support Total Disability as defined by the policy." *Id.* (quoting LIN2407).

Lincoln did not clearly "exceed[ ] the language of the Plan" when its reviewers wrote that his depressive symptoms were not "of a severity that he required elevation to a higher level of care such as intensive outpatient or inpatient psychiatric treatment." *See* Dkt. 27-1 at 12. The statements appear merely descriptive concerning the type of treatment he sought or required, and Dr. Critchfield's use of the "such as" qualifier further suggested that he did not see "intensive outpatient or inpatient psychiatric treatment" as a necessary prerequisite for a disability finding. In this respect at least, Lincoln did not plainly eschew the Plan language as to whether Mr. Learn was "totally disabled." *See* LIN139, 136–37. Accordingly, this *Booth* factor neither weighs for or against Mr. Learn.[9]

### b.   *Purposes & Goals of the Plan*

Next, the Court must consider the "purposes and goals of the plan." *Booth*, 201 F.3d at 342. Mr. Learn notes that "ERISA was enacted to promote the interests of employees and their beneficiaries in employee benefit plans, and to protect contractually defined benefits." Dkt. 27-1 at 14 (quoting *Bruch*, 489 U.S. at 113). Mr. Learn's argument with respect to this factor largely incorporates his argument as to the other factors—that Lincoln's process and decisionmaking demonstrated Lincoln's "arbitrariness and conflict of interest," and that it was "act[ing] in its own interest, and not in the best interest of the beneficiary, [Mr. Learn]." Dkt. 27-1 at 15–16. Lincoln, on the other hand, emphasizes its "duty to preserve fund assets for the benefit of all

---

[9] Still, as previously described, Lincoln's failure to address Mr. Learn's intensive TMS treatment to treat his depression—though they opined that he had not undertaken any "intensive outpatient or inpatient psychiatric treatment"—is indicative of why other *Booth* factors weighed against Lincoln. *See Booth*, 201 F.3d at 342 (citing "the adequacy of the materials considered" and whether the decisionmaking was "reasoned and principled").

future claimants." Dkt. 26 at 25; Dkt. 25 at 11–12. Because the arguments with respect to this factor largely overlap with the parties' arguments on the other factors, the Court assigns no unique weight to this factor.

   c. *Consistency of the Fiduciary's Interpretation of the Plan*

   The Fourth Circuit has also directed courts to consider "whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan." *Booth*, 201 F.3d at 342. Here, the Court finds that this factor is of only marginal significance to the overall analysis of Lincoln's decision. The Court notes that Lincoln had previously concluded that Mr. Learn was disabled under the terms of the Plan and paid him LTD benefits for 21 months. The basis for that decision was largely Mr. Learn's wildly fluctuating TSH levels and Dr. Reed's conclusions that certain time was required for treatment before Mr. Learn would become euthyroid, while he underwent Iodine-131 therapy. And when Dr. Reed wrote Lincoln that Mr. Learn had become euthyroid, even Mr. Learn concedes it was not unreasonable for Lincoln to rely upon that assertion in March 2019 when it denied him benefits. *See* Dkt. 27-1 at 17 (writing that "it is understandable that early on in March 2019, [Lincoln] considered [Mr. Learn] clinically euthyroid. After all [his] treating physician at the time, Dr. Reed, claimed [Mr. Learn] was euthyroid."); *see also* Dkt. 26 at 22 (Lincoln arguing that by March 2019, Mr. Learn's "treating physicians [he] initially relied upon to establish his disability claim" found "he was no longer disabled").

   However, *after March 5, 2019*, conditions changed: the basis for Mr. Learn's continuing disability was that he was never truly euthyroid, and that he had suffered lasting cognitive deficits as a result of years of uncontrolled hypothyroidism. While Lincoln denied Mr. Learn's appeals on that basis post-March 5, 2019, on this record and given Mr. Learn's assertions of

disability, it was not an *inconsistent* interpretation of the Plan for Lincoln to deny LTD payments in March 2019, though they had earlier been allowed.[10] As described above, however, Lincoln's failure to full consider and analyze Mr. Learn's further evidence of disability was a significant failure in the Court's consideration of the other *Booth* factors—particularly regarding the adequacy of materials considered and whether there was a reasoned decisionmaking process.

Mr. Learn also contends that Lincoln "used a standard inconsistent with the policy's definition of 'Totally Disabled' when it claimed [he] is not disabled because he did not receive "intensive" care. Dkt. 27-1 at 22. The Court has already addressed Mr. Learn's argument that Lincoln improperly required "intensive care" above. While Lincoln did not appear to impose a standard higher than that established by the Plan—and so did not impose an interpretation of the Plan inconsistent with its earlier decision to award LTD benefits—nonetheless Lincoln's description that Mr. Learn had never received "intensive outpatient" care is belied by the record and reflects a cursory, unreasoned opinion. Again, that is more significant to the other *Booth* factors. This *Booth* factor concerning the consistency of the plan interpretation is of only marginal significance, and neither weighs in favor of, nor against, Mr. Learn.

d.   *Consistency with Procedural and Substantive Requirements of ERISA*

The Court next considers whether Lincoln's decision was "consistent with the procedural and substantive requirements of ERISA." *Booth*, 201 F.3d at 342. Mr. Learn argues that Lincoln

---

[10] Mr. Learn also argues that Lincoln interpreted the Plan inconsistently on the basis of its different treatment of the significance of his mental status examinations—before March 5, 2019 and after that date. The Court considers any discrepancy in Lincoln's treatment of Mr. Learn's mental status examinations to be of minimal significance to this specific *Booth* factor, especially in view of the different articulated bases for Mr. Learn's disability before March 2019, versus after March 2019. As previously discussed however, Lincoln's cursory reliance on those examinations, and the unexplained reliance on those portions of the exams to deny LTD benefits and ignoring the portions that would have been supportive of Mr. Learn's disability claim, shows a failure to fully consider the record and engage in a thorough, searching analysis of his claim—which is highly relevant to other *Booth* factors.

violated ERISA's regulations by failing to provide "[a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary." Dkt. 27-1 at 27 (citing 29 C.F.R. § 2560.503-1(g)(1)(iii)). Specifically, Mr. Learn contends that Lincoln in its August 30, 2019 denial letter, and in its November 9, 2019 letter, did not sufficiently explain what information Mr. Learn "needed to produce to perfect his appeal." Dkt. 27-1 at 27. In this respect, Mr. Learn has not identified any material shortcoming in Lincoln's compliance with ERISA's procedural or substantive requirements—especially since Lincoln only was required to have "substantially complied with Section 2560.503-1's requirement that such letters outline the steps that a claimant must take *to obtain review*" of the benefits denial. *Donnell v. Metro. Life Ins. Co.*, 165 F. App'x 288, 296 (4th Cir. 2006) (unpublished) (emphasis added). It does not "direct ERISA plan administrators to provide claimants with a formula for obtaining benefits." *Id.*

Mr. Learn raises a more substantial issue when he argues that Lincoln's final appeal decision letter failed to explain its basis for disagreeing with his evidence. Dkt. 27-1 at 27. The relevant ERISA regulations provide that a plan administrator must "includ[e] an explanation of the basis for disagreeing with or not … [t]he views presented by the claimant to the plan of health care professionals treating the claimant ...." 29 C.F.R. § 2560.503-1(g)(1)(vii)(A)(i). The Court has already taken into account the substantive deficiencies in the analysis of Lincoln's final decision letter above, in the Court's weighing of the "adequacy of the materials considered" and whether  Lincoln's decisionmaking process was "reasoned and principled." *See supra* 36–52. In view of the parties' arguments on the issue, the Court finds that this *Booth* factor adds little to the analysis.

e.   *Conflict of Interest*

When an entity that administers a plan "both determines whether an employee is eligible for benefits and pays benefits out of its own pocket," that "dual role creates a conflict of interest." *Glenn*, 554 U.S. at 108. The court should consider that conflict as a factor in determining whether the plan administrator abused its discretion in denying benefits—though the significance of the factor will depend upon the particulars of any given case. *See id.* That factor would be of "more importance (perhaps of great importance) where circumstances suggest a higher likelihood that it affected a benefits decision," including in cases "where an insurance company administrator has a history of biased claims administration." *Id.* at 117. But it would be "less important (perhaps to a vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy." *Id.* Examples of such "active steps" include "walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits." *Id.*

There is no dispute that Lincoln operated under a "structural conflict," as it both determined whether an employee was eligible for benefits and paid benefits out of its own pocket. Dkt. 27-1 at 28–29; Dkt. 35 at 24. Lincoln argues, however, that there was no evidence "that structural conflict actually influenced Lincoln's decision-making process." Dkt. 35 at 24. Thus, in Lincoln's view, this is a case "where the conflict factor is unimportant." *Id.* Mr. Learn counters that the conflict-of-interest factor weighs in his favor. He points to the dollar-value of the claim—nearly one million dollars—as substantiating its significance. Dkt. 27-1 at 29. He also argues that Lincoln failed "to even try to explain why it continued to ignore objective evidence of cognitive impairment." *Id.* In particular, he critiques Lincoln's assertion that his

symptoms were not "of a nature or severity that would be expected to result in functional impairment," when that "contradicts exam results, [and] numerous treating physicians['] opinions." *Id.* In Mr. Learn's view, these shortcomings are evidence that the structural conflict actually influenced Lincoln's decisionmaking.

The Court finds that this factor carries little significance in this case. There is no argument, much less evidence, that Lincoln "has a history of biased claims administration." *See Glenn*, 554 U.S. at 108. And, at the same time, it appears Lincoln has taken "active steps to reduce potential bias and to promote accuracy." *Id.* at 117. Those included hiring a third-party vendor to select a qualified independent physician to review the claim file. Dkt. 26 at 9; LIN43, LIN2411. Moreover, the Fourth Circuit has stated that "this factor is only significant if the plaintiff points to 'evidence of how the conflict of interest affected the interpretation made by the administrator.'" *Shaw v. United Mut. of Omaha Life Ins. Co. of Am.*, No. 21-1818, 2022 WL 3369525, at *2 (4th Cir. Aug. 16, 2022) (unpublished) (per curiam) (quoting *Fortier v. Principal Life Ins. Co.*, 666 F.3d 231, 236 n.1 (4th Cir. 2012)). Mr. Learn's criticisms of Lincoln's characterizations of his symptoms—while certainly relevant to other factors—are not, without more, evidence that Lincoln's conflict of interested influenced its interpretation of the Plan, nor is the substantial dollar value of his claim.

To be sure, this factor does weigh somewhat in Mr. Learn's favor. *See, e.g.*, *White*, 308 F. App'x at 720 n.5. But, given the lack of substantiation as to the how the structural conflict of interest impacted Lincoln's interpretation of the Plan, or other evidence showing circumstances suggesting it impacted its benefits decision, *see Shaw*, 2022 WL 3369525, at *2; *Glenn*, 554 U.S.

59

at 117, the Court finds any weight in Mr. Learn's favor is not material to the Court's resolution of this case.[11]

    4.  <u>Summary of *Booth* Factors</u>

At bottom, the Court finds that the *Booth* factors pertaining to "the adequacy of the materials considered to make the decision and the degree to which they support it," and "whether the decisionmaking process was reasoned and principled," weigh most significantly in favor of Mr. Learn and a conclusion that Lincoln's decision denying LTD benefits was not reasonable. Also weighing somewhat in favor of Mr. Learn are the fourth *Booth* factor (whether the fiduciary's interpretation "was consistent with … earlier interpretations of the plan"), and the eighth *Booth* factor (the "fiduciary's motives and any conflict of interest it may have"). The other factors do not weigh in favor of or against the reasonableness of Lincoln's decision. On balance, the Court finds that the *Booth* factors decidedly establish that Lincoln's decision denying Mr. Learn LTD benefits was unreasonable. So too does the Court find that Lincoln's denial of benefits was not supported by substantial evidence, as it was not "the result of a deliberate, principled reasoning process," and it was characterized by the "wholesale disregard" of substantial, uncontradicted evidence supporting Mr. Learn's claim. *See Evans*, 514 F.3d at 322; *White*, 308 F. App'x at 717 (quoting *Donovan*, 462 F.3d at 319).

### Conclusion

The Court therefore concludes, accounting for and weighing the applicable *Booth* factors and the Plan language and record, that Lincoln acted unreasonably in denying Mr. Learn's claim for long-term disability benefits. In an accompanying Order, the Court will grant Plaintiff's

---

[11] The seventh *Booth* factor, concerning "any external standard relevant to the exercise of discretion," is not relevant—much less material to—the outcome in this case. *See Booth*, 201 F.3d at 342.

motion for summary judgment, Dkt. 27, and deny Lincoln's motion for judgment on the administrative record, Dkt. 25. In view of Lincoln's abuse of discretion in conducting its review of Mr. Learn's LTD benefits appeal described above, the Court will order Lincoln to provide Mr. Learn with payment of back LTD benefits from March 5, 2019—the date that Lincoln first denied benefits under the Plan. *See Champion v. Black & Decker (U.S.) Inc.*, 550 F.3d 353, 362 (4th Cir. 2008) (explaining that district court has discretion whether to remand or award benefits, and that "remand should be used sparingly"); *see also Helton*, 709 F.3d at 360 (explaining that "remand is not required, particularly in cases in which an ERISA plan administrator abused its discretion"). The Court will also permit counsel for Mr. Learn to file an application for "costs and reasonable attorney's fees." *See* 29 U.S.C. § 1132(g)(1).

The Clerk of Court is directed to send this Memorandum Opinion to counsel of record.

Entered this __**19th**__ day of March, 2024.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE